# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **OHIO STATE CONFERENCE OF THE** | : | |
| **NATIONAL ASSOCIATION FOR THE** | : | |
| **ADVANCEMENT OF COLORED PEOPLE, et al.,** | : | Case No. 2:14-CV-404 |
| | : | |
| Plaintiffs, | : | Judge Peter C. Economus |
| | : | |
| v. | : | Magistrate Judge |
| | : | Norah McCann King |
| **JON HUSTED, et al.,** | : | |
| | : | |
| Defendants. | : | |

---

## SECRETARY OF STATE JON HUSTED'S OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

Respectfully submitted,

MICHAEL DEWINE
Ohio Attorney General

*/s/ Steven T. Voigt*

STEVEN T. VOIGT (*pro hac vice*)*
 **Lead and Trial Counsel*
BRIDGET E. COONTZ (0072919)
KRISTOPHER J. ARMSTRONG (0077799)
HALLI BROWNFIELD WATSON (0082466)
Assistant Attorneys General
Constitutional Offices Section
30 E. Broad Street, 16th Floor
Columbus, Ohio 43215
Tel:  614-466-2872; Fax: 614-728-7592
steven.voigt@ohioattorneygeneral.gov
bridget.coontz@ohioattorneygeneral.gov
kristopher.armstrong@ohioattorneygeneral.gov
halli.watson@ohioattorneygeneral.gov

*Counsel for Defendant*
*Ohio Secretary of State Jon Husted*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... ii

I.     INTRODUCTION ................................................................................................1

II.    STATEMENT OF FACTS ...................................................................................3

       A.     The History Of Early Voting In Ohio. .....................................................3

       B.     Ohio's Expansive Early Voting System ...................................................8

III.   LEGAL ARGUMENT..........................................................................................13

       A.     Plaintiffs Are Not Entitled To A Preliminary Injunction.......................13

Plaintiffs bear the burden of establishing their claim to a preliminary injunction, which is "much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Plaintiffs simply have not met their burden to obtain a preliminary injunction on any of their claims.

       B.     Plaintiffs Have Not Demonstrated Likely Success On Their Voting
              Rights Act Claim..................................................................................15

Courts have recognized two types of claims arising under Section 2 of the VRA: "vote dilution" claims and "vote denial" claims. *Holder v. Hall*, 512 U.S. 874, 880 (1994); *Hayden v. Pataki*, 449 F.3d 305, 314, 328 (2d Cir. 2006). Plaintiffs assert vote denial, claiming that Directive 2014-17 creates "unjustified burdens" for African Americans, compared with prior EIP voting times, such that some people will not be able to vote. Plaintiffs fail to establish such a claim.

              1.     Plaintiffs have not demonstrated likely success on their
                     vote denial claim. ....................................................................16

Plaintiffs will not succeed on their VRA claim. First, Plaintiffs' comparison of the new EIP voting times against the prior ones (a "retrogression" analysis) is improper under a Section 2 vote denial context. *Brown v. Detzner,* 895 F.Supp.2d 1236 (M.D. Fl. 2012); *Florida v. U.S.*, 885 F.Supp.2d 299, 311 (D. D.C. 2012). Second, Plaintiffs' argument, that there is a purported "disproportionate burden" on African Americans, is not sufficient legal justification for a Section 2 violation. *Jacksonville Coalition for Voter Protection v. Hood,* 351 F.Supp.2d 1326, 1335-36 (M.D. Fla. 2004). Third, Plaintiffs are unable to prove a causal connection between Directive 2014-17 EIP voting days/hours and a denial of a

right to vote because Plaintiffs' expert finding is unreliable and based on inaccurate data. *Ortiz v. City of Philadelphia Office of the City Comm'rs Voter Registration Div.,* 28 F.3d 306, 310 (3rd Cir. 1994). Simply put, Plaintiffs have presented nothing to support their vote denial claim.

C. Plaintiffs Are Not Entitled To A Preliminary Injunction Based On Any Vote Dilution Argument ...............................................................................23

Plaintiffs dedicate much of their brief to an inapposite discussion of the "Senate Factors." Consideration of the Senate Factors is proper only in a vote dilution context, which is not present here. Assuming Plaintiffs do present a claim of vote dilution, on the merits, Plaintiffs will not succeed because Plaintiffs must establish the *Gingles* pre-conditions. Plaintiffs have not done so.

1. Plaintiffs fail to establish the *Gingles* pre-conditions. ...............................23

A plaintiff arguing "vote dilution" would be asserting that "an election practice results in the dilution of minority voting strength and, thus, impairs a minority's ability to elect the representative of its choice." *Burton v. City of Belle Glade,* 178 F.3d 1175 (11th Cir. 1999). Plaintiffs have not proved – or even argued – the "necessary" preconditions for a vote dilution claim.

2. Plaintiffs fail to establish any benchmark. ...................................................24

Plaintiffs are unable to identify an alternative benchmark for voting days and hours (other than any purported retrogression), which is required in a vote dilution lawsuit. *Hall*, 512 U.S. at 880. Using a "hypothetical" as a benchmark, as Plaintiffs do here, is also insufficient. *Id.* at 881.

3. Plaintiffs would not succeed under the Senate Factors. ..............................25

Despite their extensive attention to the Senate Factors, Plaintiffs will not succeed. Plaintiffs rely on Professor Roscigno to support their position related to these factors, but Professor Roscigno has conceded that his conclusions did not take into consideration all of the voting opportunities available to Ohioans, concluding that Ohio is a State where access to voting is virtually unlimited in terms of days and hours.

D. Plaintiffs' Section 2 Claim Fails Because All Ohioans Have Meaningful Access To The Political Process. ........................................................28

All Ohioans – regardless of race – have a meaningful access to the political process, and Ohioans have many more opportunities to vote than do citizens of most other states. Ohio also leads the states with large African-American population shares in offering early voting. Further, for most Ohio counties, Directive 2014-17 actually expands the number of EIP voting hours. In the face of these expansive opportunities, Plaintiffs' VRA claims fail.

E.      Plaintiffs Have Not Demonstrated Likely Success On Their Equal
        Protection Claim. ....................................................................................................29

        1.      Ohio's early absentee voting system satisfies rational basis. ....................29

In Ohio, "early" voting occurs by absentee ballot and there is no constitutional right to an absentee ballot, *McDonald v. Board of Election Commissioners,* 394 U.S. 802, 807-08 (1969), much less one that is provided before election day. *See also O'Brien v. Skinner,* 414 U.S. 524 (1974). In order to carry their burden under rational basis review, Plaintiffs must negate "every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will." *Johnson v. Bredesen,* 624 F.3d 742, 747 (6th Cir. 2010). Plaintiffs have failed to do so.

        2.      Even if the Anderson/Burdick test applies, plaintiffs have
                not proven that Ohio's early voting laws substantially
                burden voters' rights. ...............................................................................31

Even if the *Anderson/Burdick* standard were appropriate in this case, Plaintiffs' claim for preliminary injunctive relief must fail. The United States Supreme Court has recognized that "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358 (1997). If a regulation "imposes only reasonable, nondiscriminatory restrictions" on voting "the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick,* 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788, n.9).

        3.      Directive 2014-17 imposes reasonable, nondiscriminatory
                restrictions on voting that serve the State's important
                regulatory interest in establishing uniform early voting
                hours.........................................................................................................33

Plaintiffs have not presented any evidence that Directive 2014-17 provides any voter with more or different opportunities to vote early in-person than another. Indeed, they could not because

Directive 2014-17 treats all voters the same. This is the exact uniformity and equal treatment of <u>all</u> voters that the Sixth Circuit demanded in *Obama for America*, 697 F.3d at 433-434.

4.    Directive 2014-17 does not severely burden the fundamental right to vote. ......................................................................34

Plaintiffs cannot demonstrate that they are completely unable to vote by any of the multitude of options available to them. Instead, they argue that they may be unable to vote using the method that they <u>prefer</u>, early in-person voting, on the day and at the time they <u>prefer</u>. Importantly – and fatal to any claimed burden – they make this claim without even considering the EIP voting opportunities that will be available the Saturday, Sunday and Monday before election day.

5.    The State's interest in administering uniform elections justifies the days and hours for in-person absentee voting established by 2014-17. ......................................................................36

Plaintiffs cannot genuinely claim that the State does not have an interest in uniformity when their own counsel asked for it. Absent such uniformity, a BOE in one county could <u>roll back</u> the amount of early voting offered and provide <u>fewer</u> days for early voting than is offered to voters in another county. Plaintiffs have not proven that uniform EIP voting hours severely burdens their right to vote, and their Equal Protection claim must therefore fail.

F.    Plaintiffs Fail To Establish The Additional Three Preliminary Injunction Factors. ......................................................................37

The latter three factors needed for a preliminary injunction do not support Plaintiffs' motion. Plaintiffs will not suffer an irreparable injury absent an injunction because they have not identified a single person who is or will be unable to vote. Plaintiffs also have not shown that preliminary injunction would not cause substantial harm to others because BOEs have already expended time and resources to plan for the upcoming election. Lastly, "the public interest" would not be served by a preliminary injunction because Plaintiffs ask for more than the status quo, requesting what has never before existed in Ohio – statewide, judicially mandated EIP voting hours and days. *See generally Summit County Democratic Central and Exec. Committee v. Blackwell,* 388 F.3d 547, 551 (6th Cir. 2004).

G.    Plaintiffs' Preliminary Injunction Motion Is Barred By Laches. ...........................38

Plaintiffs delay in pursuing their claims is fatal to their request for extraordinary relief. *McClafferty v. Portage Cty. Bd. of Elections,* 661 F.Supp.2d 826, 839 (N.D. Ohio Sept. 30, 2009). Plaintiffs waited two months to file their motion seeking the injunction. Plaintiffs' delay in filing the present motion greatly prejudices Defendants, requiring unnecessarily expedited discovery. The only "emergency" in this case was created by the Plaintiffs' delay. Plaintiffs' motion for a preliminary injunction is barred by laches and should therefore be denied.

IV.    CONCLUSION ............................................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Am. Civil Liberties Union of New Mexico v. Santillanes*,
   546 F.3d 1313 (10th Cir. 2008) ........................................................................32, 36

*Brown v. Detzner*,
   895 F.Supp.2d 1236 (M.D. Fl. 2012)...............................................15, 16, 17, 18

*Buckley v. American Constitutional Law Foundation*,
   525 U.S. 182 (1999).........................................................................................14

*Burdick v. Takushi*,
   504 U.S. 428 (1992)..............................................................................31, 32, 33

*Burton v. City of Belle Glade*,
   178 F.3d 1175 (11th Cir. 1999) ............................................................15, 23, 24

*Clingman v. Beaver*,
   544 U.S. 581 (2005).........................................................................................32

*Coleman v. Bd. of Educ. v. City of Mt. Vernon*,
   990 F.Supp. 221 (S.D.N.Y. 1997)....................................................................19

*State ex rel. Comm. for the Referendum of Ordinance No. 3543-00 v. White*,
   90 Ohio St.3d 212, 736 N.E.2d 873 (2000) ...............................................38, 40

*Common Cause/Georgia v. Billups*,
   554 F.3d 1340 (10th Cir. 2009) .......................................................................35

*Crawford v. Marion County Election Bd.*,
   553 U.S. 181 (2008).........................................................................................35

*Damon's Rests., Inc. v. Eileen K Inc.*,
   461 F. Supp.2d 607 (S.D. Ohio Nov. 13, 2006) ..............................................14

*Florida v. U.S.*,
   885 F.Supp.2d 299 (D. D.C. 2012) ..................................................................16

*Frank v. Walker*,
   11-CV-01128, 2014 WL 1775432 (E.D. Wis. Apr. 29, 2014) ....................17, 37

*Gonzalez v. Arizona*,
   677 F.3d 383 (9th Cir. 2012) ...........................................................................19

**Cases** *(continued)* Page(s)

*Goosby v. Osser,*
409 U.S. 512 (1973)....................................................................................29

*Hayden v. Pataki,*
449 F.3d 305 (2d Cir. 2006)....................................................................15

*Holder v. Hall,*
512 U.S. 874 (1994)...................................................................15, 24, 25

*Horner v. Ky. High School Athletic Ass'n,*
43 F.3d 265 (6th Cir. 1994) ...............................................................35, 36

*Irby v. Virginia State Bd. of Elections,*
889 F.2d 1352 (4th Cir. 1990) .................................................................19

*Jacksonville Coalition for Voter Protection v. Hood,*
351 F.Supp.2d 1326 (M.D. Fla. 2004)................................................18, 19

*Johnson v. Bredesen,*
624 F.3d 742 (6th Cir. 2010) ...................................................................30

*Johnson v. Gov. of Fla.,*
405 F.3d 1214 (11th Cir. 2005) ...............................................................23

*Krummen v. City of N. Coll. Hill, Ohio,*
1:13CV193, 2013 WL 3270372 (S.D. Ohio June 26, 2013)....................37

*Leary v. Daeschner,*
228 F.3d 729, 736 (6th Cir. 2000) ......................................................13, 14

*Libertarian Party of Ohio v. Blackwell,*
462 F.3d 579 (6th Cir. 2006) ...................................................................37

*Mark Wandering Medicine v. McCulloch,*
906 F.Supp.2d (D. Mont. 2012), *vacated as moot by* 544 Fed. Appx. 699
(2013).....................................................................................................19, 24

*McClafferty v. Portage Cty. Bd. of Elections,*
661 F.Supp.2d 826 (N.D. Ohio Sept. 30, 2009).........................38, 39, 40

*McDonald v. Board of Election Commissioners,*
394 U.S. 802 (1969)...........................................................29, 30, 31, 32

*National Federation of Independent Businesses v. Sebelius,*
___ U.S. ___, 132 S.Ct. 2566, 2594 (2012)............................................14

**Cases** *(continued)*            **Page(s)**

*O'Brien v. Skinner*,
   414 U.S. 524 (1974) ...........................................................................................29

*Obama for America v. Husted*,
   697 F.3d 423 (6th Cir. 2012) .........................................................................33, 34

*Obama for America v. Husted*,
   888 F.Supp.2d 897 (S.D. Ohio 2012) ...............................................................8, 31

*Obama for America v. Husted*,
   S.D. Ohio Case No. 2:12-cv-0636 ........................................................................39

*Obama for America v. Husted*,
   Case No. 2:12-cv-636, 2014 WL 2611316 (S.D. Ohio June 11, 2014) ....................................8

*Ortiz v. City of Philadelphia Office of the City Comm'rs Voter Registration Div.*,
   28 F.3d 306 (3rd Cir. 1994) ................................................................................19

*Overstreet v. Lexington-Fayette Urban County Gov't*,
   305 F.3d 566 (6th Cir. 2002) ..............................................................................14

*PBV v. Rossotti*,
   1999 WL 220123 (6th Cir. 1999) ........................................................................38

*Prigmore v. Renfro*,
   356 F.Supp. 427 (N.D.Ala.1972), *summ. aff'd*, 410 U.S. 919 (1973) .....................................29

*Reno v. Bossier Parish Sch. Bd.*,
   528 U.S. 320 (2000) .......................................................................................16, 24

*Service Employees Int'l Union Local 1 v. Husted*,
   698 F.3d 341 (6th Cir. 2012) ..............................................................................40

*Shelby Cnty., Ala. v. Holder*,
   133 S. Ct. 2612 (2013) ......................................................................................16

*Stewart v. Blackwell*,
   444 F.3d 843 (6th Cir. 2006) *superseded*, 473 F.3d 692 (6th Cir. 2007) ................................17

*Summit County Democratic Central and Exec. Committee v. Blackwell*,
   388 F.3d 547 (6th Cir. 2004) ..............................................................................38

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ................................................................................. *passim*

*Timmons v. Twin Cities Area New Party*,
   520 U.S. 351 (1997) .......................................................................................14, 32

**Cases** (*continued*)......................................................................................................**Page(s)**

*TOA Techs, Inc. v. Guzzeti*,
   1:12CV667, 2012 WL 1096114 (N.D. Ohio Mar. 29, 2012).................................................13

*U.S. v. City of Euclid*,
   580 F.Supp.2d 584 (N.D. Ohio 2008)...................................................................................37

*Wesley v. Collins*,
   791 F.2d 1255 (6th Cir. 1986) ................................................................................17, 18, 25

**Statutes**                                                  **Page(s)**

Ohio Rev. Code § 3501.32.........................................................................................................13

Ohio Rev. Code § 3509.01.........................................................................................................29

Ohio Rev. Code § 3509.02(A)(1)-(8) ..........................................................................................3

Ohio Rev. Code § 3509.03.........................................................................................................12

Ohio Rev. Code § 3509.04.........................................................................................................12

Ohio Rev. Code § 3509.05.........................................................................................................13

Ohio Rev. Code § 3599.06.........................................................................................................11

Voting Rights Act of 1965, 42 U.S. 1973............................................................................ *passim*

**Other Authorities**                                         **Page(s)**

2005 Ohio Laws ..........................................................................................................................4

Ohio Constitution Article II, §26 ..............................................................................................38

U.S. Const., First Amendment ........................................................................................... *passim*

U.S. Const., Fourteenth Amendment .................................................................................. *passim*

U.S. Const. Art I, §4, cl. 1............................................................................................................1

The Secretary of State of Ohio submits this Opposition to the Motion for Preliminary Injunction submitted by Plaintiffs.  Plaintiffs seek to enjoin Secretary of State Directive 2014-17 ("Directive 2014-17") and Senate Bill 238 ("SB 238").  This brief opposes Plaintiffs' motion with regard to Directive 2014-17.  The General Assembly seeks to intervene to defend SB 238.

## I.    INTRODUCTION

The United States Constitution expressly reserves to the States the power to decide "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives."  Art I, §4, cl. 1.[1]  As the chief election official responsible for implementing the time, place, and manner of Ohio's elections, Secretary of State Jon Husted has set uniform, expansive early voting hours to ensure that all Ohioans have ample opportunities to vote.   Leading up to this November's election, over the course of four weeks there will be 22 days on which Ohioans can vote early in-person ("EIP"), including two Saturdays and one Sunday.  With no-excuse mail-in balloting – something 23 states[2] do not allow – Ohioans can vote early 24 hours a day by dropping their ballot in any mailbox.  Compare Ohio's countless opportunities to vote with those provided by New York, Pennsylvania, Michigan, New Jersey, Missouri, and Virginia where there is no EIP voting at all.  In those states, the only opportunity to vote is on a single Tuesday – Election Day.

Importantly, Secretary of State Husted did not set the EIP voting hours on his own, or without consideration of the needs of the voters and the Boards of Elections ("BOE") who are

---

[1]  Defendants' three experts are Nolan McCarty, Ph.D., Susan Dod Brown Professor of Politics and Public Affairs Chair, Department of Politics, Princeton University, Tom Brunell, Ph.D. and Professor of Political Science at the University of Texas at Dallas, and Sean Trende, attorney, author, political analyst, and recognized expert on voting trends and voting opportunities.  Sean Trende's Report is attached as Exhibit A ("Trende Report") to the Voigt Declaration.  Dr. McCarty's Report is Exhibit B ("McCarty Report").  Dr. Brunell's Report is Exhibit C ("Brunell Report").

[2]  *See* National Conference of State Legislatures, "Absentee and Early Voting," July 1, 2014 (http://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx).

charged with implementing early voting. Instead, the early-voting hours adopted in Directive 2014-06, and further expanded by 2014-17, were taken directly from a bi-partisan plan created by the Ohio Association of Election Officials (the "OAEO"), a group which represents the needs and views of <u>all</u> of Ohio's 88 county BOEs. The OAEO plan reflects the "boots on the ground" approach to running elections and was designed to provide ample and uniform voting opportunities while also balancing the disparate needs of Ohio's small, medium, and large counties.

Plaintiffs have not presented sufficient legal authority or evidence to demonstrate that Ohio's well-reasoned, ample, and uniform voting opportunities should be set aside. First, Plaintiffs conflate the proper standard of review for their claim asserted under § 2 of the Voting Rights Act ("VRA") with a retrogression analysis that applies only to a claim asserted under § 5 of the VRA. Equally inapplicable are the "vote dilution" standards that Plaintiffs attempt to apply to this, a "vote denial" claim. Applying the proper standard to Plaintiffs' § 2 "vote denial" claim, Plaintiffs have not presented sufficient evidence that Ohio's 22 days of EIP voting over the course of four weeks denies them their right to vote based on race.

Second, turning to Plaintiffs' Equal Protection Claim, Plaintiffs have not carried their burden of demonstrating that Ohio's early voting days and hours are not rationally related to the legitimate government interest in uniformity. Further, even if Plaintiffs' Equal Protection claim is analyzed under anything other than rational basis, Ohio's early voting hours are reasonable and nondiscriminatory and provide the same voting opportunities to all Ohioans. Plaintiffs cannot prove otherwise here where the evidence they proffer is suspect and fails to account for all of the EIP voting days that exist under Directive 2014-17. Plaintiffs cannot overcome the fact that Ohio offers broader opportunities for pre-election voting than nearly all other states, and

therefore cannot demonstrate a likelihood of success on the merits of their Equal Protection claim.

Secretary of State Husted wants the same thing that Plaintiffs do – and that is to ensure that all Ohioans vote and have ample opportunities in which to do so. Twenty-two days of EIP voting over the course of four weeks, including the three days prior to Election Day, provide that. Neither the Constitution nor the VRA requires Ohio to have the expansive voting laws that it has, much less adopt the as-yet unspecified early voting hours and days that Plaintiffs seek. Plaintiffs cannot demonstrate a substantial likelihood of success on the merits (or any of the other factors needed for a preliminary injunction).

While the Secretary of State recognizes and respects the sincerity of Plaintiffs' Declarations and opinions, the time and manner of holding elections must have some reasonable boundaries. Directive 2014-06 was based on a bi-partisan recommendation of the local election officials who have the first-hand knowledge to balance the needs of the voters with the needs of the 88 county BOEs. And through Directive 2014-17, the Secretary of State took that recommendation even further and offered even more voting opportunities than the OAEO recommended. Plaintiffs have failed to demonstrate that the Constitution or the VRA requires more, and their request for a preliminary injunction should be denied.

## II. STATEMENT OF FACTS

### A. The History Of Early Voting In Ohio.

Prior to 2005, an Ohioan could vote on a day other than Election Day only if he or she had a statutorily-approved "valid excuse," for example, being over age 62, having a physical disability or infirmity, or being out of his or her home county on Election Day.[3] Ohio law

---

[3] *See* R.C. 3509.02(A)(1)-(8) (2004) (Ex. D).

changed in 2005 to permit no-excuse early voting, when current Secretary of State Jon Husted was the Speaker of the Ohio House of Representatives.[4]   Belying Plaintiffs' insinuations that the current dispute is entirely partisan-based, Republicans in the General Assembly in 2005 (including then-Speaker Husted) overwhelmingly voted for early voting, while Democrats largely voted against it.[5]

Following the implementation of no-excuse early voting, a few Ohio counties began mailing unsolicited absentee-ballot applications to all voters in the county.  Secretary of State Husted (who was at that point still Speaker of the House) supported these efforts, but recognized an inequality, *i.e.*, that some Ohioans were sent absentee ballot applications, while some were not.[6]  Thus, in the summer of 2008, then-Speaker Husted supported proposed legislation that would allow the State to provide funds to the Secretary of State to mail absentee-ballot applications to all of Ohio's registered voters.[7]

In the 2008 and 2010 elections, each of Ohio's 88 counties was permitted to set its own early voting hours.[8]  Although State law in 2008 allowed a voter to vote absentee in-person during any of the 35 days preceding the Election Day, State law did not require a BOE, or the BOE's alternative locations to be open during any particular days or hours, and in most counties, this meant that EIP voting was only available during the BOE's normal business hours.[9]  Each county's BOE sets its own "normal" business hours, and in the vast majority of counties there

---

[4]  2005 Ohio Laws File 40 (Sub. H.B. 234) (Ex. E) (only cited pages attached).

[5]  *See* Ohio House Journal, Oct. 19, 2005 (Ex. F).

[6]  Declaration of Matthew Damschroder ("Damschroder Declaration") ¶ 43 (Ex. G).

[7]   *See* 2008 Am. Sub. H.B. 562 (signed by the Governor on June 24, 2008) (Ex. H) (only cited pages attached).

[8]  Damschroder Declaration ¶ 35 (Ex. G).

[9]  *Id.* ¶¶ 35-37 (Ex. G).

were no evening or weekend hours, save one Saturday during which most BOEs that were open

had only four hours of voting.[10]  In 2008, only 7 of Ohio's 88 county BOEs were open for in-

person absentee voting on the Sunday before the election.  In 2010, only 5 BOEs were open on

the Sunday before the election.[11]  <u>In most counties, there are more early voting hours available</u>

<u>under the Directive Plaintiffs challenge in this case than were available in 2010.</u>[12]  Therefore,

most counties for the 2014 gubernatorial general election will have more EIP voting hours than

they did for the 2010 gubernatorial general election.

 As with the implementation of early voting, the number of EIP voting days has never

been a strictly "Democrat" or "Republican" issue.  In 2009, a bill sponsored by the Democrats in

the Ohio General Assembly, H.B. 260, sought to reduce the number of early voting days from 35

to 21.[13]  The bill, supported by Democrats, passed the Democrat-controlled Ohio House but did

not make it out of the Senate.[14]

 By 2012, Jon Husted was the Ohio Secretary of State.  Favoring uniformity, as he

consistently has, Secretary of State Husted initially announced in the summer of 2012 that if any

county BOE had a tie vote regarding establishing early-voting hours, he would break the tie in

favor of that particular Board's normal business hours.[15]  Ultimately, given the possibility that

there would still be a wide variety of early-voting schedules among Ohio's 88 counties,

Secretary of State Husted issued a Directive setting uniform early-voting hours for the entire

---

[10]  *Id.* (Ex. G).

[11]  *Id.* (Ex. G).

[12]  *Id.* ¶ 38 (Ex. G).

[13]  2009 Ohio H.B. 260 (passed by the House on Nov. 18, 2009) (Ex. I).

[14]  Ohio House Journal, Nov. 18, 2009 (Ex. J).

[15]  *See* Directive 2012-35 (Ex. K).

State for the 2012 general election.[16]  Further, in his continued effort to make absentee voting applications available to all Ohioans, Secretary of State Husted mailed unsolicited absentee ballot applications to all registered Ohio voters before the 2012 general election.[17]  Secretary of State Husted was the first Ohio Secretary of State to mail unsolicited absentee ballot applications to voters statewide.

In 2014, with no law in place setting uniform EIP voting opportunities for all Ohioans, Secretary of State Husted sought an early-voting schedule with bi-partisan approval that would be workable for voters in counties of all sizes.[18]  (Ohio's largest counties, Cuyahoga and Franklin, each have over 1.1 million residents.  But Ohio also has many small counties; the smallest, including Morgan, Noble, Monroe, and Vinton counties, each have less than 16,000 residents.[19])  Each county BOE is responsible for covering the staffing, security, and facility costs for early-voting; the more early voting hours there are, the more money it costs the county BOE.[20]  A well-designed, uniform plan would take into account county resources vis-à-vis usage of early voting to achieve an efficient use of resources.

The OAEO offered just such a plan.  The OAEO is a bi-partisan organization comprised of the members of Ohio's 88 county BOEs, as well as BOE directors, deputy directors, and

---

[16]  *Id*. (Ex. K).  This desire for uniformity was shared by the American Civil Liberties Union – Plaintiffs' counsel in this case.  On August 13, 2012, the ACLU wrote to Secretary Husted urging that "all voters, whether they live in Lucas or Lawrence County, should have consistent times to vote."  Ltr. to Husted from ACLU, Aug. 13, 2012 ("ACLU Letter 8/13/12") (Ex. L).  The ACLU reiterated this desire for uniformity again in November of 2012.  Ltr. to Husted from ACLU, Nov. 15, 2012 (requesting "uniform" hours) ("ACLU Letter 11/15/12") (Ex. M).

[17]  Damschroder Declaration ¶ 22 (Ex. G).

[18]  *See* Directive 2014-06 (Ex. N).

[19]  Ohio Dep't of Development "Ohio 2010 Census Population for Counties", http://development.ohio.gov/files/research/P1003.pdf (last accessed July 21, 2014) (Ex. O).

[20]  Declaration of Dana Walch ("Walch Declaration") ¶ 8 (Ex. P).

staff.[21]  The OAEO's trustees consist of 20 members – 10 Democrats and 10 Republicans – from a diverse cross-section of Ohio's large, medium, and small counties.[22]

The OAEO believes that any changes to the absentee voting system must consider the impact those changes would have on all 88 counties.[23]  In testimony before the General Assembly regarding S.B. 238, its Executive Director stated that the OAEO's absentee voting reform plan (which included a recommendation for early voting days and hours) was based on the fact that "we are effectively now running three elections in Ohio.  The first is Election Day.  The second is 35 days of early in-person voting.  The third is a mail-in election."[24]  The Executive Director testified that this state of affairs resulted in costly elections, despite the fact that since opening up early voting, voter turnout had decreased.[25]  As careful stewards of "other peoples' money," the OAEO's trustees felt that the organization's recommended plan presented the most efficient and effective use of resources to achieve the most positive results in terms of convenience for early voters and reduced lines for those voting early on Election Day.[26]

The significance of the OAEO plan cannot be understated, as it is the plan put forth by the "boots on the ground" election officials who represent all 88 county BOEs.  The plan was crafted and approved by a task force and a committee that included bi-partisan representation from small, medium, and large counties.[27]  It balanced the needs of the large counties and small

---

[21]  OAEO Report and Recommendations for Absentee Voting Reform at p. 1 ("OAEO Report")(Ex. Q); Testimony of OAEO Executive Director Aaron Ockerman regarding SB 238, p. 1 ("Ockerman Testimony") (Ex. R); Declaration of OAEO President Kathy Jones ("Jones Declaration") ¶ 7 (Ex. S).

[22]  Ockerman Testimony p. 1 (Ex. R); Jones Declaration ¶ 16 (Ex. S).

[23]  OAEO Report p. 1 (Ex. Q); Ockerman Testimony p. 1 (Ex. R).

[24]  Ockerman Testimony p. 2 (Ex. Q).

[25]  *Id.* (Ex. R).

[26]  *Id.* pp. 2-3 (Ex. R).

[27]  Jones Declaration ¶¶ 18-31 (Ex. S).

counties – taking into account their size, geographic location, and fiscal condition – and presented an appropriate and bi-partisan middle ground from the actual BOE workers who are ultimately charged with implementing elections.[28]  Importantly, these are the people who staff early voting and who have first-hand knowledge of when the polls should be open so that all Ohioans have ample opportunities to vote.  It is this first-hand knowledge that led these officials to wisely put forth a plan that distinguished between presidential, gubernatorial, and special elections[29] – among which voter turn-out, and thus the need to provide early-voting times, varies greatly.

Secretary of State Husted adopted the OAEO plan for early in-person voting hours in Directive 2014-06.[30]  Then, in compliance with this Court's ruling in *Obama for America*, Case No. 2:12-cv-636, 2014 WL 2611316 (S.D. Ohio June 11, 2014), Secretary of State Husted further expanded the uniform EIP voting permitted under Directive 2014-06 and issued Directive 2014-17.[31]  Directive 2014-17, issued on June 17, 2014, superseded Directive 2014-06 and permits uniform in-person early voting in Ohio during the hours proposed by the OAEO plan – plus hours on the Sunday and Monday immediately preceding Election Day.

### B.   Ohio's Expansive Early Voting System

Placed in the context of the other 49 states and the District of Columbia, Ohio's opportunity for early voting is expansive.  Figures 1 and 2 below compare the days during which Ohioans may cast in-person absentee ballots to the days available to citizens of six similarly-

---

[28] *Id*. ¶ 28 (Ex. S); OAEO Report p. 1 (Ex. Q).

[29]  *Id.* p. 2 (Ex. Q).

[30]  Directive 2014-06 (Ex. N).

[31]  Directive 2014-17 (Ex. T).

sized states in which African Americans make up a similar or greater percentage of the population: New York, Michigan, New Jersey, Missouri, Pennsylvania, and Virginia:

**Fig. 1 - In-Person Voting Opportunities for the 2014 General Election - Ohio**[32]



**Fig. 2 - In-Person Voting Opportunities for the 2014 General Election - New York, Michigan, New Jersey, Missouri, Pennsylvania, and Virginia**[33]



To elaborate on Figure 1 above, Ohio offers the following in-person opportunities to vote in the 2014 general election:

| Day/Date | Time |
| --- | --- |
| Tuesday, October 7 | 8:00 am to 5:00 pm |
| Wednesday, October 8 | 8:00 am to 5:00 pm |
| Thursday, October 9 | 8:00 am to 5:00 pm |
| Friday, October 10 | 8:00 am to 5:00 pm |
| Tuesday, October 14 | 8:00 am to 5:00 pm |
| Wednesday, October 15 | 8:00 am to 5:00 pm |

---

[32] *Id.* (Ex. T).

[33] Trende Report, ¶ 41, pp. 11-12, Fig. 2 (Ex. A).

| Day/Date | Time |
| --- | --- |
| Thursday, October 16 | 8:00 am to 5:00 pm |
| Friday, October 17 | 8:00 am to 5:00 pm |
| Monday, October 20 | 8:00 am to 5:00 pm |
| Tuesday, October 21 | 8:00 am to 5:00 pm |
| Wednesday, October 22 | 8:00 am to 5:00 pm |
| Thursday, October 23 | 8:00 am to 5:00 pm |
| Friday, October 24 | 8:00 am to 5:00 pm |
| Saturday, October 25* | 8:00 am to 4:00 pm |
| Monday, October 27 | 8:00 am to 5:00 pm |
| Tuesday, October 28 | 8:00 am to 5:00 pm |
| Wednesday, October 29 | 8:00 am to 5:00 pm |
| Thursday, October 30 | 8:00 am to 5:00 pm |
| Friday, October 31 | 8:00 am to 5:00 pm |
| Saturday, November 1* | 8:00 am to 4:00 pm |
| Sunday, November 2* | 1:00 pm to 5:00 pm |
| Monday, November 3* | 8:00 am to 2:00 pm |
| Tuesday, November 4 (Election Day) | 6:30 am to 7:30 pm |

**\* Plaintiffs' proffered evidence assumes these four EIP voting days do not exist.**[34]

In New York, Michigan, New Jersey, Missouri, Pennsylvania, and Virginia – and in 11 other states – in-person voting is available on only one day: Election Day, Tuesday, November 4.[35] The percentages of the population that is African American in New York, Michigan, New Jersey, and Virginia are higher than in Ohio.[36] In fact, as shown in Figure 3 of Sean Trende's

---

[34] Plaintiffs proffer two purported experts, Daniel A. Smith, Ph.D. (doc. 18-1), and Professor Vincent Roscigno (doc. 18-2). Page 8 of Dr. Smith's Report shows that Dr. Smith's calculations were based on the incorrect assumption that the Sunday and Monday before Election Day are not available as EIP absentee voting days. Doc. 18-1, Smith Report, PAGE ID # 169. Similarly, Dr. Roscigno did not consider the two Saturdays and one Sunday of currently-existing EIP absentee voting in his Report. Transcript of Vincent Roscigno Deposition ("Roscigno Depo.") pp. 54:2-56:15 (stating that he did not acknowledge Sunday voting and did not "mention Saturday specifically") (Ex. U).

[35] Trende Report, ¶ 41, pp. 11-12, Fig. 2 (Ex. A).

[36] *Id.*. ¶ 55, p. 16, Fig. 3 (Ex. A).

Report, no state with an African-American population share equal to or larger than Ohio's offers more early voting days than Ohio.[37]  Said another way, every state with a percentage of African-American population equal to or greater than Ohio's offers <u>less</u> opportunity for early voting.[38]  Of states with large African-American population shares, Ohio therefore leads the nation in early-voting opportunities.

Among all states,[39] Ohio has far broader opportunities to vote.  Seventeen states allow no early voting at all.[40]  Among all states, the median number of early voting days is 11.[41]  Ohio, by contrast, offers 22 EIP voting days for the 2014 general election – twice the median.[42]  Twenty-eight states offer no early voting on the weekends, and 39 definitively offer no voting on a Sunday.[43]  Other than Ohio, only eight states definitively offer any Sunday voting.[44]  Of all states, Ohio currently ranks 9th in terms of the number of early-voting days offered.[45]  Said another way, Ohio offers more EIP absentee voting opportunities than 42 other states.

## C. The Many Ways To Vote In Ohio

In Ohio, a voter can cast a ballot either through traditional, in-person voting on Election Day,[46] or via in-person or mail-in "absentee ballot" prior to Election Day.[47]

---

[37] *Id.* ¶ 55, p. 16, Fig. 3 & ¶ 56,  p. 16 (Ex. A).

[38] *Id*. (Ex. A).

[39] For purposes of this discussion, "states" includes the District of Columbia as well.

[40] Trende Report, ¶ 41, pp. 11-12, Fig. 2 (Ex. A).

[41] *Id.* ¶ 49, p. 14 (Ex. A).

[42] *Id.* ¶ 41, pp. 11-12, Fig. 2 and ¶ 51, p. 14 (Ex. A).

[43] *Id.* ¶¶ 52-53, p. 15 (Ex. A).

[44] *Id.* ¶ 54, p. 15 (Ex. A).

[45] *Id.* ¶ 41, pp. 11-12, Fig. 2 and ¶ 51, p. 14 (Ex. A).

[46]  Polls are open until 7:30 p.m. on Election Day.  Also, R.C. 3599.06 provides job protection for Ohioans who take a reasonable amount of time off to vote on Election Day.

[47] Damschroder Declaration ¶ 5 (Ex. G).

***An application to receive a ballot may be submitted by:***

- Mailing in an application to the BOE[48];

- Taking the application to the county BOE in person; or

- Having another person deliver the application to the BOE for the individual.[49]

For example, a group or organization seeking to coordinate absentee ballot applications for all of its members could have its members (individually or while together) execute the applications and then deliver them in one batch to the Board on behalf of its members.

***A voter may receive an absentee ballot by:***

- If applying in-person, receiving the ballot in-person (to be cast at the BOE or taken home to mark and return later); or

- If applying by mail or if another person delivered the application to the BOE, by mail.[50]

***A voter may return/cast an absentee ballot by:***

- If applying in-person, marking the ballot at the BOE and returning it immediately;

- Mailing the ballot to the BOE (regardless of whether it was received in-person or by mail);

- Returning the ballot to the BOE in-person (regardless of whether it was received in-person or by mail);

- Having a family member (e.g., a parent, step-parent, parent-in-law, grandparent, sibling, child, step-child, uncle, or aunt, among others) return the ballot to the BOE.[51]

---

[48] In fact, because Secretary of State Husted is mailing an absentee ballot application to Ohio's registered voters for the 2014 general election, a voter could vote entirely through the mail by mailing the application and voted ballot to the appropriate BOE. *Id.* ¶ 22 (Ex. G).

[49] *Id.* ¶¶ 6-7 (Ex. G); R.C. 3509.03.

[50] Damschroder Declaration ¶¶ 9-13 (Ex. G); R.C. 3509.04.

Many BOEs have ballot boxes located outside of their offices to allow electors returning their voted ballot in person to do so outside of normal business hours and/or without having to enter the building.[52]  In addition, absentee ballots may be placed in the mail at any time of the day or night.[53]  An absentee ballot will be counted so long as it is delivered in-person to the BOE by 7:30 pm on Election Day.[54]  Further, a valid absentee ballot returned by mail will be counted if it is postmarked the day before Election Day and received by the Board by the tenth day after the election.[55]  While the above ways to vote in Ohio focus on early voting, which takes place over the course of four weeks, Ohioans also have thirteen hours (6:30 a.m. to 7:30 p.m.) to vote on Election Day.[56]

## III.   LEGAL ARGUMENT

### A.    Plaintiffs Are Not Entitled To A Preliminary Injunction.

"Injunctive relief is an extraordinary remedy and is issued cautiously and sparingly." *TOA Techs., Inc. v. Guzzetti*, No. 1:12CV667, 2012 WL 1096114, at *2 (N.D. Ohio Mar. 29, 2012) (citation omitted).  To evaluate a claim for injunctive relief, Courts consider whether: (1) the movant has a strong likelihood of success on the merits; (2) the movant would suffer irreparable injury absent the injunction; (3) issuance of a preliminary injunction would cause substantial harm to others; and (4) the public interest would be served by issuance of a preliminary injunction.  *See Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

---

[51]  Damschroder Declaration ¶¶ 14-16 (Ex. G); R.C. 3509.05.

[52]  Damschroder Declaration ¶ 16 (Ex. G).

[53]  *Cf. id.*; *see also* R.C. 3509.05.

[54]  Damschroder Declaration ¶ 17 (Ex. G); R.C. 3509.05.

[55]  Damschroder Declaration ¶ 17 (Ex. G); R.C. 3509.05.

[56]  *See* R.C. 3501.32.

The movants bear the burden of establishing their claim to a preliminary injunction, which "should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). The proof required to obtain an injunction is "much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739. The party seeking a preliminary injunction must establish its case by clear and convincing evidence. *Damon's Rests., Inc. v. Eileen K Inc.*, 461 F. Supp.2d 607, 621 (S.D. Ohio Nov. 13, 2006). To meet its burden, the movant's evidence "must more than outweigh the [opposing] evidence," but must also "persuade the court that its claims are highly probable." *Id.* Additionally, courts must apply a presumption in favor of a statute's constitutionality. *See National Federation of Independent Businesses v. Sebelius*, ___ U.S. ___, 132 S.Ct. 2566, 2594 (2012) (stating "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality").

Here, the request for emergency injunction must be considered in the elections context, where courts understand that "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Thus, "States … have considerable leeway to protect the integrity and reliability of … election processes generally." *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 191 (1999).

With regard to all of their claims, Plaintiffs have not met their burden to obtain a preliminary injunction.

**B.** **Plaintiffs Have Not Demonstrated Likely Success On Their Voting Rights Act Claim.**

Courts have recognized two types of claims arising under Section 2 of the Voting Rights Act of 1965 ("VRA"), "vote dilution" claims and "vote denial" claims. *Holder v. Hall*, 512 U.S. 874, 880 (1994); *Hayden v. Pataki*, 449 F.3d 305, 314, 328 (2d Cir. 2006). "[V]ote dilution occurs when an election practice results in the dilution of minority voting strength and, thus, impairs a minority's ability to elect the representative of its choice." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1198 (11th Cir. 1999). "Vote denial occurs when a state. . . employs a 'standard, practice, or procedure' that results in the denial of the right to vote on account of race." *Id.* at 1197-98. Plaintiffs assert vote denial.[57]

In a vote denial claim, a plaintiff must establish either:

(1) discriminatory intent on the part of legislators or other officials responsible for creating or maintaining the challenged system; *or* (2) objective factors that, under the totality of the circumstances, show the exclusion of the minority group from meaningful access to the political process due to the interaction of racial bias in the community with the challenged voting scheme.

*Brown v. Detzner*, 895 F.Supp.2d 1236, 1244 (M.D. Fl. 2012). Plaintiffs do not claim Directive 2014-17 was passed with "discriminatory intent."[58] Rather, they claim Directive 2014-17 creates "unjustified burdens" for African Americans, compared with the days and hours of EIP voting that existed previously, such that some people will not be able to vote.

---

[57] *See, e.g.*, Doc. 17, Plaintiffs' Brief, PAGE ID # 101 (claiming voters will be "denied" the right to vote); Complaint ¶1 (same).

[58] While Plaintiffs' Complaint includes various allegations about purportedly "unusual" legislative procedures and purports to quote a single email from one member of one county's BOE, Plaintiffs' motion for preliminary injunction is not based on these allegations or on any purported discriminatory intent. Even if it was, the allegations are unpersuasive. The *Brown* Court considered similar contentions about legislative procedures and statements by officials and determined plaintiffs had failed to establish by a substantial likelihood that they would be able to prove discriminatory intent. *Brown*, 895 F.Supp.2d at 1245-49.

### 1. Plaintiffs have not demonstrated likely success on their vote denial claim.

The entirety of Plaintiffs' vote denial argument is that when compared with the previous days and hours for EIP voting, Directive 2014-17 purportedly makes "voting [so] disproportionately more burdensome" for African Americans that some individuals will be unable to vote. For a number of reasons, Plaintiffs will not succeed with their claim.

First, Plaintiffs' comparison of the new days and hours for EIP absentee voting against the prior days/hours is improper under a Section 2 analysis. While such a comparison (which involves consideration of any retrogressive effect on minority voting strength) may be proper under Section 5 of the VRA, *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612, 2619-20 (2013), Ohio is not a "covered" state under the VRA and Section 5 does not apply here. So in essence Plaintiffs are trying to fit a Section 5 analysis into a Section 2 claim.[59] This is improper.

In a vote denial context, a court is not asked to "conduct[] a 'retrogression' analysis, meaning th[e] Court is not comparing the new statute against the old to determine whether these voting changes will worsen the position of minority voters in comparison to the preexisting voting standard, practice, or procedure." *Brown*, 895 F.Supp.2d at 1251 (internal quotation omitted). *See also Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 324-25 (2000).

*Florida v. U.S.*, 885 F.Supp.2d 299, 311 (D. D.C. 2012), details such a Section 5 retrogression analysis related to pre-election voting days and hours, and *Florida* shows that the pre-clearance questions – proper under Section 5 but not Section 2 – are the very same questions Plaintiffs improperly present to this Court. The *Florida* Court compared the existing pre-election days and hours with the proposed new days and hours to determine whether "the change imposes

---

[59] Doc. 1, Complaint ¶ 68, PAGE ID # 24 ("These changes result in substantial reduction in opportunities . . ."); Doc. 17, Plaintiffs' Brief, PAGE ID # 139 ("SB 238 and the 2014 Directives . . . cut into an early voting period . . . .").

a burden material enough that it will likely cause some reasonable minority voters not to exercise the franchise" and whether the "voting change" will "worsen[] the position of minority voters in comparison to the pre-existing voting standard, practice, or procedure." *Id.* at 311-12 (internal quotation omitted). That's exactly the analysis that Plaintiffs want here. Plaintiffs incorrectly rely on *Florida* (an inapposite Section 5 case) to compare the old days and hours against the new ones, and Plaintiffs' attempt to graft a Section 5 analysis into a Section 2 claim should be rejected.[60]

Second, Plaintiffs' argument, that there is a purported "disproportionate burden" on African Americans as a result of Ohio's broad laws, is not sufficient legal justification for a Section 2 violation. "[A] mere showing of disproportionate impact is not sufficient to demonstrate a Section 2 violation." *Brown*, 895 F.Supp.2d at 1250 n. 14; *Wesley v. Collins,* 791 F.2d 1255, 1260-61 (6th Cir. 1986). Instead, the inquiry under Section 2 is whether:

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [the protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. 1973(b). Whether "political processes are equally open depends on a searching practical evaluation of the past and present reality, and on a functional view of the political process." *Thornburg v. Gingles,* 478 U.S. 30, 45 (1986) (internal quotation and citation omitted); *see also* 1982 Report of the Senate Judiciary Committee, p. 68 (Ex. V) (only cited pages attached).[61]

---

[60] Doc. 1, Complaint ¶ 4, PAGE ID # 4; Doc. 17, Plaintiffs' Brief, PAGE ID # 134.

[61] Plaintiffs' own cases demonstrate that disproportionality is insufficient to prove a Section 2 claim. *See, e.g., Frank v. Walker*, 11-CV-01128, 2014 WL 1775432, at *31 (E.D. Wis. Apr. 29, 2014) (citing *Smith v. Salt River Project,* 109 F.3d 586, 595 (9th Cir.1997)). *See also Stewart v. Blackwell,* 444 F.3d 843, 879 (6th Cir. 2006) *superseded*, 473 F.3d 692 (6th Cir. 2007) (punch card case where the Court determined that "the question then for the district court, under Section 2(b), is whether under the totality

Only two years ago, the Middle District of Florida denied a preliminary injunction where plaintiffs made almost identical arguments about "disproportionate burdens" caused by a reduction in days for EIP voting. *Brown,* 895 F.Supp.2d at 1239, 1256. There, the Court rejected plaintiffs' attempt to stop a change in EIP voting "from no fewer than 12 to 8" days. The *Brown* Court compared Florida's EIP opportunities with the voting opportunities in other states. Despite finding that "Florida's eight days of early voting is <u>below</u> the 19-day average across all 32 states" allowing early voting, the Court concluded that Florida's rules would not "result in a denial or abridgement of the right to vote on account of race." *Id.* at 1254-55 (emphasis added). In contrast with Florida's eight days of EIP voting, which was upheld in *Brown*, Ohio has <u>22</u>.[62] Indeed, in contrast with Florida's <u>single day</u> of EIP weekend voting, Ohio has <u>three – one Sunday and two Saturdays</u>.[63] If Florida's much more restrictive EIP voting does not violate the VRA, certainly Ohio's more liberal opportunities do not. Moreover, the *Brown* Court's concern over the "far-reaching implications" of "acceptance of Plaintiffs' argument that eight days of early voting . . . violates Section 2" is even more pronounced here. *Id.* at 1254. If Ohio's expansive voting opportunities are not allowed under the VRA, then it follows that the election days and hours of most states (which have more restrictive laws) cannot be valid. Such a premise cannot be.

In another relevant "vote denial" case, *Jacksonville Coalition for Voter Protection v. Hood,* 351 F.Supp.2d 1326, 1335-36 (M.D. Fla. 2004), the Court denied a motion for preliminary injunction related to early voting. There, plaintiffs argued that the placement of early voting

---

of circumstances, the evidence demonstrates a discriminatory result" ); *Wesley,* 791 F.2d at 1260-61 ("[A] showing of disproportionate racial impact alone does not establish a per se violation of the [VRA].").

[62] Trende Report ¶ 7, p. 2, ¶ 51, p. 14, ¶ 72, p. 20 (Ex. A).

[63] *Brown*, 895 F.Supp.2d at 1252-53.

locations and the existence of long voting lines disproportionately affected African Americans and therefore violated the VRA. *Id.* at 1334-36. The Court differentiated discrimination from inconvenience, and held that "inconvenience does not result in a denial of 'meaningful access to the political process.'" *Id.* at 1335. The Court acknowledged that "feasibility" and "practicable" considerations can be relevant to a state's early voting system and it expressed reluctance to micro-manage the legislature's and executive's power to decide election procedures. *Id.* at 1336-38.[64]

Third, Plaintiffs are unable to prove a causal connection between Directive 2014-17 EIP voting days/hours and a denial of a right to vote. Plaintiffs' proffered causation expert is Dr. Smith, but Dr. Smith's finding are unreliable and based on inaccurate data. Thus, Plaintiffs have presented no evidence of a "causal connection between the challenged electoral practice and the alleged discrimination that results in a denial or abridgement of the right to vote." *Ortiz v. City of Philadelphia Office of the City Comm'rs Voter Registration Div.,* 28 F.3d 306, 310 (3rd Cir. 1994). "Said otherwise, a § 2 challenge 'based purely on a showing of some relevant statistical disparity between minorities and whites,' without any evidence that the challenged voting qualification causes that disparity, will be rejected." *Mark Wandering Medicine v. McCulloch,* 906 F.Supp.2d, 1083,1088 (D. Mont. 2012), *vacated as moot by* 544 Fed. Appx. 699 (2013). *See also Gonzalez v. Arizona,* 677 F.3d 383, 407 (9th Cir. 2012) (affirming judgment against plaintiffs on their VRA §2 claim based on a failure to prove causation); *Irby v. Virginia State Bd. of Elections,* 889 F.2d 1352, 1359 (4th Cir. 1990) (holding no VRA §2 violation because of no "causal link between the appointive system and black underrepresentation").

---

[64] "[T]he Court notes that long lines, delays and confusion – in and of themselves – do not constitute any 'practice or procedure' of the School Board. Indeed, they may reflect nothing more than the ineffectiveness or inefficiency of individual election workers." *Coleman v. Bd. of Educ. v. City of Mt. Vernon,* 990 F.Supp. 221, 232 (S.D.N.Y. 1997).

A fundamental assumption underlying Plaintiffs' case is that people always vote on the same day and at the same time every year. Common sense – and facts that Plaintiffs never considered – prove this to be untrue. For instance, Matt Damschroder, a former employee of the Franklin County (Ohio) Board of Elections, stated that in Franklin County:

> A voter's selection of one method of voting (e.g., in person) during a particular time during the absentee voting period (e.g., the last weekend of voting) is not indicative of the method by which, or time when, that same elector will participate as a voter in future elections. Based on data analyzed from the Franklin County Board of Elections, it is clear that of the 8,534 in person absentee voters during "golden week" in 2008, only 259 (or 3.35%) voted in person during "golden week" in 2012.[65]

Tom Brunell, Ph.D. concludes that this assumption in Dr. Smith's Report is "a major logical problem."[66] Plaintiffs' other proffered expert, Professor Vincent Roscigno, conceded he "does not believe there is any way of assessing" whether a person will vote in the same manner from one election to the next.[67]

The assumptions and data that Dr. Smith used in his report are flawed in other ways. Dr. Smith assumes that the Sunday and Monday before Election Day will not be available as EIP voting days and his calculations are based on this assumption. That these days were re-instated under Directive 2014-17 moots all or most of his report.[68] In addition, Ohio's BOEs do not all

---

[65] Damschroder Declaration ¶ 39 (Ex. G).

[66] Brunell Report p. 4 (Ex. C) ("there is a major logical problem with [Dr. Smith's] analyses - he looks at the distribution of votes cast in Ohio on specific dates in recent elections. He tries to estimate the proportion of these early votes cast by whites and blacks. Smith then looks at the dates that were early voting-eligible in the past several elections, but will not be in future elections. The reader is supposed to draw the conclusion that since the estimates have a higher proportion of black voters casting ballots on these days than whites, that this will be detrimental to black voters").

[67] Roscigno Depo. p. 79:2-23 (Ex. U).

[68] Doc. 18-1, Smith Report, PAGE ID # 169.

record voting data uniformly and in at least some and likely in many instances the date Dr. Smith assumes was the date a vote was cast is likely incorrect.[69]

In the relatively short period of time Defendants' experts have had to review Dr. Smith's Report, Defendants' experts have identified numerous additional flaws with Dr. Smith's conclusions, all of which establish that the Smith Report cannot be used to prove any causation:

- "[T]he popular idea that early voting boosts turnout finds very little support in the academic literature."[70]

- "[T]he academic literature casts doubt on the idea that reducing the window of EIP voting would have a large impact on the size or composition of the electorate."[71]

- Dr. Smith did not provide any statistics or analysis related to past voting in the evening hours, nor did he consider Ohio's opportunity to vote without excuse by mail-in absentee ballot.[72]

- "To draw firm conclusions about African American voting patterns in Ohio, one must at least attempt to take into account the vast sums of money poured into the state, the historic nature of the Obama candidacy, and the changing strategies of the parties . . . A failure to take account of these factors hopelessly complicates any attempt to draw the conclusion that the increase in minority turnout is a function of Ohio's early voting laws, or that the increased useage of early voting among African-Americans represents a revealed preference that will continue to manifest in future elections."[73]

- "[T]o date, the racially disparate use of early voting has not appeared in Ohio, except in the 2008 and 2012 elections, when an historic presidential campaign was directing massive amounts of resources toward the state in an attempt to convince voters to vote early."[74]

---

[69] Damschroder Declaration ¶¶ 18-19 (Ex. G) ("The 88 county boards of elections each use one of five different county-level election management software systems that have different ways of tracking relevant election data and the 88 county boards of elections adopt differing local policies and procedures for using their system to track this data. As a result, election data relative to the date on which a ballot may have been requested, issued, cast, and/or returned to a board of elections may result in bad matches (both false positives and false negatives).").

[70] McCarty Report p. 11 (Ex. B).

[71] *Id.* p. 12 (Ex. B).

[72] Brunell Report pp. 8-9 (Ex. C).

[73] Trende Report ¶¶ 73-74, pp. 20-21 (Ex. A).

[74] *Id.* ¶ 118, pp. 30-31 (Ex. A).

- "[T]he preferred method for examining the effects of early voting laws has been to look at how they affect turnout in all states, and to do so in multiple years."[75]  Dr. Smith did not use this method.

- The relationship "is not very strong" between percentages of African Americans and EIP in Dr. Smith's regression analysis, "imply[ing] that many factors beyond the racial composition of the districts drives participation in early voting."[76]

- When "aggregat[ing] [data] up from the census block to a higher level of aggregation," the trends in Smith's Report are reversed.  "Counties with higher black VAP tend to utilize EIP voting at lower rates on average."[77]

- Dr. McCarty has "strong suspicions that the method of bounds was employed incorrectly in Dr. Smith's Report."[78]

- "Smith . . . tries to generalize his findings from very limited data" including "just one presidential and midterm election" and "not for the entire state of Ohio, but limited, in some cases, to just a handful of counties."[79]

- The Census Bureau's Current Population Study, relied on by Dr. Smith, "does not ask when during the early period voters cast their ballots" and therefore it is "difficult to infer" a relationship with the new days/hours of Directive 2014-17.[80]

- Dr. Smith extrapolates data from "homogeneous blocks to conclude that the black EIP voting rate exceeds the white rate statewide" but this is "inappropriate" because "there are very large numbers of heterogeneous blocks."[81]

- "[I]t is difficult to make inferences about the black and white EIP voting rates from the estimated relationship between the overall EIP rate and the black VAP" because, "[f]or example, whites who live in racially mixed neighborhoods may be more likely to utilize EIP voting than whites who live in homogeneous white neighborhoods" and "the relationship between the EIP rate and the black VAP may be driven by changes in participation by election-day voters."[82]

---

[75] *Id.* ¶ 119, p. 31 (Ex. A).

[76] McCarty Report pp. 3-4 (Ex. B).

[77] *Id.* p. 5 (Ex. B).

[78] *Id.* p. 8 (Ex. B).

[79] Brunell Report pp. 1, 5 (Ex. C).

[80] McCarty Report p. 9 (Ex. B).

[81] *Id.* p. 7 (Ex. B).

[82] *Id.* p. 4 (Ex. B).

Not surprisingly, given Ohio's expansive opportunities to vote compared with other states,[83] Plaintiffs have offered nothing comparing the availability of voting in Ohio with other states. Simply put, Plaintiffs have presented nothing to support their claim that Ohio's broad pre-election absentee voting options will disproportionately burden African-Americans such that individuals will be precluded from voting.[84]

## C. Plaintiffs Are Not Entitled To A Preliminary Injunction Based On Any Vote Dilution Argument

Plaintiffs dedicate much of their brief to an inapposite discussion of the "Senate Factors." The "Senate Factors" consist of nine factors, discussed below, that the Senate Judiciary Committee published in connection with the 1982 amendments to the VRA. Consideration of the Senate Factors is proper only in a vote dilution context, which is not present here. Assuming *arguendo* that Plaintiffs do present a claim of vote dilution, on the merits, Plaintiffs will not succeed. Before the Senate Factors can even be considered, Plaintiffs must establish the *Gingles* pre-conditions and provide a measurable benchmark against which to examine the changes in the laws. Plaintiffs have done neither (nor even attempted to).

### 1. Plaintiffs fail to establish the *Gingles* pre-conditions.

A plaintiff arguing "vote dilution" under the VRA would be asserting that "an election practice results in the dilution of minority voting strength and, thus, impairs a minority's ability to elect the representative of its choice." *Burton*, 178 F.3d at 1198. Plaintiffs are not asserting a "dilution" claim. *Johnson v. Gov. of Fla.,* 405 F.3d 1214, 1227 n. 26 (11th Cir. 2005). But even if they were, this claim cannot succeed because Plaintiffs have not proved – or even argued – the "necessary" preconditions for a vote dilution claim. *Burton*, 178 F.3d at 1198-99.

---

[83] Trende Report ¶¶ 49-56, pp. 14-16 (Ex. A).

[84] Doc. 1, Complaint, PAGE ID # 1.

These preconditions are: (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . ." (2) "the minority group must be able to show that it is politically cohesive. . ." and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles,* 478 U.S. at 50-51. Plaintiffs have not provided any argument or evidence to support any of these pre-conditions. *Burton,* 178 F.3d at 1202 (holding that summary judgment was proper where plaintiffs did not present sufficient evidence to satisfy the *Gingles* pre-conditions); *McCulloch*, 906 F.Supp.2d at 1091 (denying motion for preliminary injunction because, *inter alia*, there was "no showing that Plaintiffs are unable to elect representatives of their choice").

### 2. Plaintiffs fail to establish any benchmark.

Plaintiffs are unable to identify an alternative benchmark for voting days and hours, which is also a requirement in a vote dilution lawsuit. "In a §2 vote dilution suit, along with determining whether the *Gingles* preconditions are met . . . a court must find a reasonable alternative practice as a benchmark against which to measure the existing voting practice." *Hall*, 512 U.S. at 880. Plaintiffs argue that they want "multiple Sundays and weekday evening hours"[85] but they fail to compare this against a benchmark.

To the extent Plaintiffs want to compare the current hours and days for pre-election voting with what existed before Directive 2014-17, "[r]etrogression is not the inquiry in §2 dilution cases." *Id.* at 884.[86] Instead, in a Section 2 vote dilution claim, a plaintiff needs to specify some benchmark other than any purported retrogression. *Id.* ("Plaintiffs could not

---

[85] Doc. 17, Plaintiffs' Brief, PAGE ID # 152.

[86] "Retrogression, by definition, requires a comparison of a jurisdiction's new voting plan with its existing plan." *Reno*, 528 U.S. at 478.

establish a Section 2 violation merely by showing . . . a retrogressive effect on the political strength of a minority group.") (quoting the 1982 Report of the Senate Judiciary Committee p. 68, n. 224)(Ex. V) (only cited pages attached).

*Hall* rejected the idea of using a "hypothetical" as a benchmark in a dilution case. *Id.* at 881. Such use of a moving target as a benchmark – *e.g.*, "multiple Sundays and weekday evening hours" – is "inherently standardless". *Id.* at 885. This means that in some cases there can be "no appropriate benchmark to determine if an existing voting practice is dilutive" and in those instances, the legislation is not subject to a dilution challenge. *Id.* at 884. This is true here. Plaintiffs have articulated no benchmark in their pleadings.[87] And Plaintiffs have no cognizable Section 2 dilution claim on this basis.

### 3. Plaintiffs would not succeed under the Senate Factors.

A basic question in a dilution claim is whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Gingles*, 478 U.S. at 44 (quoting the Senate Judiciary Committee Report). In *Wesley,* the Sixth Circuit recognized that despite historical racial discrimination with effects that continue to the present day, "such evidence of past discrimination 'cannot, in the manner of original sin, condemn action that is not in itself unlawful.'" 791 F.2d at 1261 (quoting *City of Mobile v. Bolden,* 446 U.S. 55, 74 (1980)).

The Senate Judiciary Committee Report accompanying the 1982 amendments to the VRA listed factors – sometimes known as the "Senate Factors" – that may be helpful to determine "if, based on the totality of circumstances . . . political processes leading to the

---

[87] It is not clear what Plaintiffs are asking for in this litigation. After being offered a second bite at the apple in written discovery to add specificity to their claim for relief, Plaintiffs again reiterated their generic argument for more days and hours of voting, without particulars. *See* Plaintiff NAACP's Response to Interrogatory No. 22 (Ex. W).

nomination or election . . . are not equally open to participation by members of a class of citizens protected by subsection (a)." *Gingles,* 478 U.S. at 36.

These factors include (1) the extent of any history of official discrimination; (2) the extent to which voting in elections is racially polarized; (3) the extent the State has used large election districts, majority vote requirements, single-shot provisions or other voting practices that enhance the opportunity for discrimination against a minority group; (4) candidate slating; (5) the extent minorities bear the effect of discrimination in education, employment and health, which hinder their ability to participate in the political process; (6) whether campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to office; (8) whether elected officials have a significant lack of responsiveness to the particularized needs of the minority group; and (9) whether policy underlying the state's or the political subdivision's use of the contested practice or structure is tenuous. *Id.* at 37.

Plaintiffs rely on Professor Roscigno to support their position related to these factors.[88] Professor Roscigno, a sociologist with no meaningful experience in election law,[89] made sweeping conclusions throughout his Report that Ohio's election laws impair African Americans' ability to participate in the political process.[90] Professor Roscigno repeatedly conceded throughout his deposition, however, that he did not understand Ohio's election laws

---

[88] Professor Roscigno testified that he was not opining whether the Senate Factors actually apply in this litigation. Roscigno Depo., pp. 19:13-20:15 (Ex. U).

[89] Aside from his Report in this case, Professor Roscigno has never published any other analysis of the factors identified in the Senate Judiciary Report. Roscigno Depo. 22:16-19 (Ex. U). He has never testified as an expert in a case involving election laws or the Voting Rights Act. *Id.* at 22:20-25 (Ex. U). Six or seven years ago was the last time he taught a course that even partly touched on election laws. *Id.* at 23:12-24:2 (Ex. U). He has never published even a single paper related to election laws. *Id.* at 24:23-25:1 (Ex. U). His (incorrect) understanding of Ohio's election laws came from reading the newspaper. *Id.* at 45:2-49:9 (Ex. U).

[90] Doc. 18-2, Roscigno Report, PAGE ID # 279-280, 290.

and that his conclusions did not take into consideration all of the voting opportunities available to Ohioans.

By way of example, Professor Roscigno wrongly assumed that there are no evening hours on Election Day.[91]  He admitted that he did not take into consideration the additional days added to EIP absentee voting by Directive 2014-17.[92]  And he admitted that Directive 2014-17's two Saturdays and one Sunday of voting – which he did not consider in his Report – "expanded" access to voting, that "there is more opportunity now to vote" because of them, and these additional days could weaken his conclusions.[93]  He admitted that the availability of no-excuse voting by mail (which he never considered in his Report) "increase[s]" access to the political process for African Americans.[94]  Professor Roscigno testified that he attributed the increase in African American voter turnout in recent years in Ohio to expanded days and hours of EIP, but he admitted he did nothing to exclude other possibilities such as national trends and campaign spending, to name a few.[95]  He admitted that he relied on opinion editorials and a partisan political survey without disclosing the survey's partisanship or researching the potential partisanship of the editorials.[96]  He admitted that he did not consider all of the Senate Factors despite drawing overall conclusions.[97]  He did not know whether the Secretary of State would

---

[91]    Roscigno Depo., pp. 44:19-45:1 (Ex. U); *Cf.* Damschroder Declaration ¶ 17("For all voters, an absentee ballot will be counted so long as it is delivered in person to the board of elections by 7:30 pm on Election Day.") (Ex. G).

[92]    Roscigno Depo., pp. 45:2-46:2 (Ex. U).  Roscigno's Report is dated June 20, 2014.  Directive 2014-17 was issued prior to his report on June 17, 2014.

[93]    Roscigno Depo., pp. 54:9-59:5 (Ex. U).

[94]    *Id.* pp. 61:18-63:2 (Ex. U).

[95]    *Id.* pp. 74:9-77:24 (Ex. U).

[96]    *Id.* pp. 105:1-112:5 (Ex. U).

[97]    *Id.* pp. 32:1-3, 80:7-16 (Ex. U).

mail absentee ballot applications to registered voters in the fall of 2014.[98]  He admitted, however, that the mailing would "expand" voting opportunities.[99]  He agreed that "It's certainly possible" some people could view his description of changes in voting laws as something other than objective.[100]  He also agreed that a state can have a legitimate interest in setting uniform pre-election voting hours.[101]

Professor Roscigno even concluded that Ohio – with its very broad absentee voting options – is a State where access to voting is <u>virtually unlimited in terms of days and hours</u>:

> Q. <u>Given that a voter can drop off a mail-in absentee ballot in a postal box at any time of the day in Ohio, isn't access to voting in Ohio really unlimited in terms of days and hours?</u>
>
> A. <u>Yes.</u>[102]

**D. Plaintiffs' Section 2 Claim Fails Because All Ohioans Have Meaningful Access To The Political Process.**

All Ohioans – regardless of race – have a meaningful access to the political process. Ohioans have many more opportunities to vote than do citizens of most other states.[103]  Only a handful of states have longer EIP voting periods than Ohio.[104]  Across all states, Ohio has twice the median days of actual voting.[105]  "[A]ll of the states with a larger African-American population share than Ohio offer fewer days of early voting" than does Ohio.[106]  In contrast with Ohio's two Saturdays and one Sunday of EIP voting, 28 states do not have any EIP voting on the

---

[98]  *Id.* p. 48:5-13 (Ex. U).

[99]  *Id.* (Ex. U).

[100]  *Id.* p. 52:4-25 (Ex. U).

[101]  *Id.* p. 82:5-13 (Ex. U).

[102]  *Id.* p. 78:20-25 (objection omitted) (Ex. U).

[103]  *See supra* II. Statement of Facts, B. Ohio's Expansive Voting System, pp. 8-11.

[104]  Trende Report at ¶¶ 50-51, p. 14, ¶ 41, pp. 11-12, Figure 2 (Ex. A).

[105]  *Id.* ¶ 51, p. 14 (Ex. A).

[106]  *Id.* ¶ 56, p. 16 (Ex. A).

weekends.[107]  Only nine States (including Ohio) have EIP voting on a Sunday.[108]  Many states do

not allow for pre-election voting at all and many states do not permit no-excuse mail-in absentee

voting.[109]  For most counties, Directive 2014-17 actually expands the number of EIP voting

hours.[110]

### E. Plaintiffs Have Not Demonstrated Likely Success On Their Equal Protection Claim.

#### 1. Ohio's early absentee voting system satisfies rational basis.

In Ohio, "early" voting occurs by absentee ballot.  *See generally* Ohio Rev. Code §

3509.01.  There is no constitutional right to an absentee ballot,  *McDonald v. Board of Election*

*Commissioners,* 394 U.S. 802, 807-08 (1969), much less one that is provided before election day.

*See also Prigmore v. Renfro,* 356 F.Supp. 427, 432 (N.D.Ala.1972), *summ. aff'd,* 410 U.S. 919

(1973); *O'Brien v. Skinner,* 414 U.S. 524 (1974); *Goosby v. Osser,* 409 U.S. 512 (1973).   An

absentee ballot is required only where there is no other available means to vote, such as the

opportunity to vote on Election Day as is provided in Ohio.  *Compare Skinner,* 414 U.S. at 529–

31 *and Goosby,* 409 U.S. at 519–23 *with McDonald,* 394 U.S. at 807–09 *and Prigmore,* 356

F.Supp. 427.

In *McDonald*, the plaintiffs claimed that Illinois law violated the Equal Protection Clause

because it provided absentee ballots to "physically incapacitated" individuals, but it did not

provide them to purportedly similarly situated incarcerated pre-trial detainees who could not get

to the polls on election day.  Because the plaintiffs failed to prove that there was no other method

by which they could vote, the Court applied rational basis scrutiny to the plaintiffs' claimed

---

[107]  *Id.* ¶¶ 52, p. 15 (Ex. A).

[108]  *Id.* ¶ 54, p. 15 (Ex. A).

[109]  *Id.* ¶ 52, p. 15, ¶ 41, p. 12, Fig. 2. (Ex. A);  *See supra* fn. 2.

[110]  Damschroder Declaration ¶ 35 (Ex. G).

"right" to an absentee ballot.  *Id.* at 808.   Plaintiffs' case here suffers the same failure of proof. That is, where there is no evidence that an absentee ballot is the <u>only</u> method by which a voter can vote, absentee ballot systems must only satisfy a rational basis review.  *Id.* at 809.

To satisfy rational basis, the challenged "statute need only be 'rationally related to legitimate government interests.'"  *Johnson v. Bredesen,* 624 F.3d 742, 746 (6th Cir. 2010) (*quoting Doe v. Mich. Dept. of State Police,* 490 F.3d 491, 501 (6th Cir. 2007)).   Where rational basis applies, courts "will not strike down a statute on equal protection grounds 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the legislature's actions were irrational.'"  *Id.* (*quoting Vance v. Bradley,* 440 U.S. 93, 97 (1979)).   In order to carry their burden under rational basis review, Plaintiffs must negate "every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will."  *Id.* at 747 (*quoting Club Italia Soccer & Sports Org. v. Charger Twp. Of Shelby, Mich.,* 470 F.3d 286, 298 (6th Cir. 2006) (alteration in original)).   Plaintiffs have failed to do so.

As an initial matter, Plaintiffs do not allege that Directive 2014-17 classifies Plaintiffs or treats them differently than any other voter.  Not only that, but the same irony exists here as was present in *McDonald*.  There the Court stated:

> Ironically, it is Illinois' willingness to go further than many States in extending the absentee voting privileges so as to include even those attending to election duties that has provided appellants with a basis for arguing that the provisions seem to operate in an invidiously discriminatory fashion to deny them a more convenient method of exercising the franchise.

*Id.* at 810-811. The Court continued that rather than uncover a discriminatory scheme, Plaintiffs' claims disclosed "a consistent and laudable state policy of adding, over a 50-year period, groups to the absentee coverage as their existence [came] to the attention of the legislature." *Id.*

Ohio too has gone farther than 42 other states[111] when it comes to absentee voting. And Plaintiffs cannot deny the legitimate government interest in uniform voting hours when their own legal counsel previously asked for it – twice.[112] Further, Plaintiffs do not even attempt to negate the legitimacy of the OAEO's hours, and they cannot. Those hours are the considered recommendations of election officials who actually implement early voting in Ohio and who have the experience to balance voters' needs with those of the 88 county Boards, representing Ohio's small, medium, and large-sized counties.[113] Directive 2014-17 is clearly related to that legitimate interest, and it provides the uniformity that Plaintiffs requested.

Thus, the Plaintiffs' claims are even more "ironic" than the *McDonald* plaintiffs. Ohio is not required to provide early in-person absentee voting <u>at all</u>. And when the Secretary of State went a step farther to provide it uniformly as Plaintiffs' counsel requested, Plaintiffs sued him anyway. Plaintiffs have failed to carry their burden of demonstrating that Directive 2014-17 is not rationally related to the legitimate governmental interest in uniformity and their request for preliminary injunctive relief should be denied.

> ### 2. Even if the Anderson/Burdick test applies, plaintiffs have not proven that Ohio's early voting laws substantially burden voters' rights.

In *Obama for America*, this Court applied the *Anderson/Burdick* framework to the plaintiffs' claims, and that made sense. *Obama for America v. Husted,* 888 F.Supp.2d 897, 906

---

[111] Trende Report at ¶ 51 (Ex. A).

[112] ACLU Letter 8/13/12 (Ex. L); ACLU Letter 11/15/12 (Ex. M).

[113] *See* OAEO Report (Ex. Q); Ockerman Testimony p. 1 (Ex. R); Jones Declaration ¶ 28 (Ex. S).

(S.D. Ohio 2012). Unlike Plaintiffs in this case, the *OFA* plaintiffs (non-UOCAVA voters) claimed to be treated differently than voters to whom they were similarly situated (UOCAVA voters). The *Anderson/Burdick* framework applies to such Equal Protection claims. But here, Plaintiffs do not claim that Directive 2014-17 treats anyone differently. Thus, *Anderson/Burdick* is inapplicable, and as discussed above under *McDonald,* rational basis applies.

However, even if the *Anderson/Burdick* standard were appropriate in this case, Plaintiffs' claim for preliminary injunctive relief must fail. The United States Supreme Court has recognized that "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons,* 520 U.S. at 358. In fact, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Id.* (internal citations omitted). And though "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections…[e]lection laws will invariably impose some burden upon individual voters." *Burdick v. Takushi,* 504 U.S. 428, 433 (1992). *See also Clingman v. Beaver*, 544 U.S. 581, 593 (2005) (states must enact reasonable regulations for elections); *cf. also The Am. Civil Liberties Union of New Mexico v. Santillanes*, 546 F.3d 1313, 1322 (10th Cir. 2008) ("Restrictions that are generally applicable, even-handed, politically neutral, and which protect the reliability and integrity of the election process are generally not considered severe restrictions and are upheld.") (internal quotations omitted).

But "subject[ing] every voting regulation to strict scrutiny…would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. Thus, the Supreme Court created a two-tier "sliding scale" analysis to evaluate equal protection

challenges to a state's regulations. *Id.* When considering a challenge to a state election law the court must "weigh 'the character and magnitude of the asserted injury to the rights protected by the First and the Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs' rights." *Obama for America v. Husted,* 697 F.3d 423, 429 (6th Cir. 2012) (*citing Burdick,* 504 U.S. at 434). A "severe" restriction must be "narrowly drawn to advance a state interest of compelling importance." *Burdick,* 504 U.S. at 434. However, if a regulation "imposes only reasonable, nondiscriminatory restrictions" on voting "the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick,* 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788, n.9).

> **3.** **Directive 2014-17 imposes reasonable, nondiscriminatory restrictions on voting that serve the State's important regulatory interest in establishing uniform early voting hours.**

Plaintiffs have not presented any evidence that Directive 2014-17 provides anyone with more or different opportunities to vote early in-person than it provides to them. And it does not. Directive 2014-17 treats all voters the same. Every Ohio voter, regardless of where they live, will have the same opportunities to vote early in-person, by mail, and on Election Day. This is the exact uniformity and equal treatment of <u>all</u> voters that the Sixth Circuit demanded in *Obama for America*, 697 F.3d at 423 ("*OFA*"). In *OFA,* the Sixth Circuit rejected Ohio's "weighty" interests proffered to justify treating military and non-military voters differently in the context of in-person early (absentee) voting not because the State was <u>required</u> to provide in-person absentee voting, but because it treated voters differently when it did. *Id.* at 433. Rather, the Court stated: "If the State had enacted <u>a generally applicable, nondiscriminatory voting</u>

regulation that limited in-person voting for all Ohio voters, its 'important regulatory interests' would likely be sufficient to justify the restriction." *Id.* at 433-434 (*citing Burdick*, 504 U.S. at 434) (emphasis added).

Directive 2014-17 is a generally applicable nondiscriminatory voting regulation that sets uniform hours for in person voting for all Ohio voters. It serves the State's important regulatory interest in establishing uniformity – uniformity that the Plaintiffs' counsel requested[114] – while treating all voters the same, as the Sixth Circuit demanded in *OFA*. Plaintiffs have failed to provide any evidence to the contrary.

> ### 4. Directive 2014-17 does not severely burden the fundamental right to vote.

Neither Plaintiffs nor the voters they represent can demonstrate that they are completely unable to vote by any of the multitude of options available to them, including voting by mail or having a family member drop off their application and their ballot to the BOE.[115] Instead, they argue that they may be unable to vote using the method that they <u>prefer</u>, early in-person voting, on the day and at the time they <u>prefer</u>. Importantly – and fatal to any claimed burden – they make this claim without even considering the EIP voting opportunities that will be available the Saturday, Sunday and Monday before election day. Days that, by Plaintiffs' own evidence, it

---

[114] ACLU Letter 8/13/12 (Ex. L); ACLU Letter 11/15/12 (Ex. M).

[115] Some of the Declarations submitted by Plaintiffs appear to assume there is no EIP voting on <u>any</u> Sunday. Other Declarations express a <u>preference</u> for "weekend" voting. Others discuss coordinating busing to the polls <u>on Election Day itself</u>. *See, e.g.,* Doc. 18-14, J. Simpson Dec. ¶ 20 ("If Sundays are eliminated . . ."); Doc. 18-15, R. Jones Dec. ¶ 21 ("Without Sunday voting . . ."); Doc. 18-16, D. Freeman Dec. ¶ 19 ("On Election Day, some African-American churches offered their vans to transport individuals to the polls."); Doc. 18-17, D. Morgan Dec. ¶ 15 (stating that he goes door-to-door "so that individuals can sign up for a ride on a date and at a time that is convenient for them."); Doc. 18-23, J. Spring Dec. ¶ 23 (expressing the homeless' preference for voting on "weekends"); Doc. 18-19, G. Cooper Dec. ¶ 9 ("If we have multiple Sundays, we will not have to conduct all of our Souls to the Polls efforts on a single day.").

would be more convenient for them to vote.[116]  The magnitude of the burden alleged here simply cannot be quantified when Plaintiffs have not considered <u>three additional days</u> of voting that they admit is crucial.  *See Crawford v. Marion County Election Bd.* 553 U.S. 181, 200 (2008) ("[O]n the basis of the evidence in the record it is not possible to quantify…the magnitude of the burden".) *Cf. Common Cause/Georgia v. Billups,* 554 F.3d 1340 (10th Cir. 2009) (challenge to Georgia voter ID law rejected where the data relied upon was incomplete and unreliable and failed to account for other forms of identification that were acceptable under the statute).

Equally insufficient proof of a severe burden is Plaintiffs' allegation that they will be disproportionately impacted by Directive 2014-17.  The Fourteenth Amendment "does not regard neutral laws as invidious ones, <u>even when their burdens purportedly fall disproportionately on a protected class.</u>"  *Crawford,* 553 U.S. at 207 (2008) (Scalia, J. concurring) (emphasis in original).  A generally applicable law, such as Directive 2014-17, even if it would have any disparate impact, does not violate the Equal Protection Clause without proof of discriminatory intent.  *Id.* (*citing Washington v. Davis,* 426 U.S. 229, 248 (1976).  This is so because "[t]he Equal Protection Clause forbids only intentional discrimination."  *Horner v. Ky. High School Athletic Ass'n,* 43 F.3d 265, 276 (6th Cir. 1994) (*citing Davis,* 426 U.S. 229 (1976)).  Therefore "[w]hen a facially neutral rule [such as Directive 2014-17] is challenged on equal protection grounds, the plaintiff must show that the rule was promulgated or reaffirmed *because of,* not merely in spite of, its adverse impact on persons in the plaintiff's class."  *Id.,* 43 F.3d at 276 (emphasis in original).  Though disproportionate impact is not irrelevant, it "'is not the sole touchstone of…discrimination'."  *Id.* (*quoting Davis,* 426 U.S. at 242).  Rather "the type of impact sufficient in itself to prove intentional discrimination is that which is significant, stark,

---

*See supra* fn. 115.

and unexplainable on other grounds." *Id.* (*citing Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264-68 (1977)). Plaintiffs have failed to offer such proof.

It is well-settled that "states have wide latitude in determining how to manage election procedures." *Santillanes,* 546 F.3d at 1321 (10th Cir. 2008) (*citing Buckley v. Am. Constitutional Law Found., Inc.,* 525 U.S. 182, 191 (1999)). And in determining how to manage elections in Ohio, the Secretary of State cannot possibly be charged with the impossible task of setting early voting hours that makes everyone completely happy and is the most convenient set of days/hours for each individual's particular circumstances (employment, family, school, extra-curricular activities, etc.). But he has tried. The Secretary of State adopted – and further expanded – a neutral plan recommended by bi-partisan local election officials who best understand the needs of Ohio voters. Plaintiffs cannot prove that the plan is "unexplainable on other grounds," *see Horner,* 43 F.3d at 276, when the Secretary of State has offered a reasoned explanation for it.

In their motion, Plaintiffs offer no evidence regarding the intent of Directives 2014-06 or 2014-17. Instead, their entire evidence focuses on the <u>impact</u> of Directive 2014-06, a Directive that has been superseded. Without providing any evidentiary support, they simply argue that Directive 2014-17 will have a similar disproportional impact. This is wholly insufficient to carry their burden of establishing entitlement to preliminary injunctive relief.

### 5. The State's interest in administering uniform elections justifies the days and hours for in-person absentee voting established by 2014-17.

Plaintiffs cannot genuinely claim that the State does not have an interest in uniformity when their own counsel asked for it.[117] The Secretary of State adopted Directive 2014-17, a directive that sets uniform hours and gives Ohioans more opportunities for early voting than

---

[117] ACLU Letter 8/13/12 (Ex. L); ACLU Letter 11/15/12 (Ex. M).

exists in 42 other states.[118]   Absent such uniformity, a BOE in one county could <u>roll back</u> the amount of early voting offered and provide <u>fewer</u> days for early voting than is offered to voters in another county.   The Secretary of State has ensured that will not happen by promulgating Directive 2014-17.   It is a reasonable, nondiscriminatory plan for early voting that applies equally across the State and ensures that all Ohioans will have the same opportunity to vote.[119] Plaintiffs have not proven that it severely burdens their right to vote, and their Equal Protection claim must therefore fail.[120]

### F.   Plaintiffs Fail To Establish The Additional Three Preliminary Injunction Factors.

Plaintiffs do not attempt to establish the latter three factors needed for a preliminary injunction.   Regardless, the factors do not support Plaintiffs' motion.   Plaintiffs will not suffer an irreparable injury absent an injunction.   They have not identified a single person who is unable to vote, despite Ohio's broad voting opportunities.

Plaintiffs also have not shown that "the issuance of a preliminary injunction would not cause substantial harm to others."   Just the opposite is true.   County BOEs have already expended time and resources to plan for the upcoming election.[121]   BOEs have budgets to

---

[118]  Trende Report, ¶ 51, p. 14 (Ex. A).

[119]  Plaintiffs' Equal Protection cases are inapposite and unpersuasive.  *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 588 (6th Cir. 2006) is minority party ballot access case involving First Amendment issues.  In *Krummen v. City of N. Coll. Hill, Ohio*, 1:13CV193, 2013 WL 3270372 (S.D. Ohio June 26, 2013), the issue was whether retroactive term limits violated the Ohio Constitution's prohibition on the retroactive application of laws.  *Frank v. Walker*, 2014 WL 1775432 (E.D. Wis. Apr. 29, 2014) is a voter ID case where the Court considered whether Wisconsin's voter ID law would prevent individuals who don't not have an ID from voting.  *U.S. v. City of Euclid*, 580 F.Supp.2d 584 (N.D. Ohio 2008) is a VRA vote dilution case discussing the *Gingles* pre-conditions.  *Euclid* doesn't even discuss Equal Protection.

[120]  Plaintiffs' Equal Protection claim also fails for all of the reasons set forth earlier in this brief in opposition to Plaintiffs' VRA claim, including but not limited to Plaintiffs' failure to establish causation.

[121]  *See* Declaration of Dana Walch ¶¶ 6-7 ("The budget for the upcoming general election has already been approved" and the budget "accounts for absentee voting procedures, that is, mail-in absentee voting

maintain and changing the days/hours at this late stage would cause financial burdens and other burdens on BOEs. Also, the Secretary of State has an interest in having election-related directives implemented.

Lastly, "the public interest" would not be served by issuance of a preliminary injunction. The traditional purpose of a preliminary injunction is to preserve the status quo. *PBV v. Rossotti,* 1999 WL 220123, *1 (6th Cir. 1999). Plaintiffs do not wish to maintain the status quo, but instead ask for what has never before existed in Ohio and likely in no other state that is not subject to VRA §5 – statewide, judicially mandated EIP voting hours and days. *See generally Summit County Democratic Central and Exec. Committee v. Blackwell,* 388 F.3d 547, 551 (6th Cir. 2004) ("[T]he State's interest in not having its voting processes interfered with, assuming that such processes are legal and constitutional, is great."). Finally, Ohio's Constitution affirms the legitimate public interest in uniformity and states, "All laws, of a general nature, shall have a uniform operation throughout the state." Ohio Constitution Article II, §26.

### G. Plaintiffs' Preliminary Injunction Motion Is Barred By Laches.

In addition to all of the foregoing reasons, Plaintiffs' decision to file its motion for preliminary injunctive relief only 98 days before early voting is to begin, 125 days after Directive 2014-06 was issued, and 60 days after Plaintiffs filed their Complaint is fatal to their claim for extraordinary relief. "It is well established that in election-related matters, extreme diligence and promptness are required." *State ex rel. Comm. for the Referendum of Ordinance No. 3543-00 v. White,* 90 Ohio St.3d 212, 214, 736 N.E.2d 873 (2000). "When a party fails to exercise diligence in seeking extraordinary relief in an election-related matter, laches may bar the claim." *McClafferty v. Portage Cty. Bd. of Elections,* 661 F.Supp.2d 826, 839 (N.D. Ohio Sept.

and early in-person voting."); *id.* ¶ 8 ("In general, expanding absentee voting requires additional funding because expanding the number of days the Board is open drives up costs") (Ex. P).

30, 2009), citing *State ex. Rel. Demaline v. Cuyahoga Cty. Bd. of Elections,* 90 Ohio St.3d 523, 526, 740 N.E.2d 241 (2000). "[A] party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted; and (2) prejudice to the party asserting it." *McClafferty,* 661 F.Supp.2d at 840.

Plaintiffs filed their Complaint on May 1 and stated therein that they would "seek a . . . preliminary injunction."[122] Plaintiffs then waited two months to file their motion seeking the injunction. Plaintiffs' delay in filing the motion that they obviously intended to file is far from the diligence required to obtain extraordinary relief in an election-related matter. *See McClafferty,* 661 F.Supp.2d at 826.

Plaintiffs' decision to hold off filing the motion greatly prejudices Defendants. Before filing the Complaint, Plaintiffs began compiling their hundreds of pages of evidence they use to support the motion. Plaintiffs retained one of their experts, Professor Roscigno, nearly three months before filing the motion.[123] But Plaintiffs failed to disclose Professor Roscigno's report, much less his identity, until Plaintiffs filed the preliminary injunction motion. In response to Plaintiffs' carefully-timed motion, Defendants will have to conduct unnecessarily expedited discovery, including taking and defending depositions in multiple cities over a span of little more than a week.

Plaintiffs' lack of diligence is especially egregious considering Plaintiffs acknowledge that their claims existed back in 2012 and that these claims were already being litigated in a case of which they were undoubtedly aware.[124] Plaintiffs made no attempt to join that lawsuit. And

---

[122] Doc. 1, Complaint, ¶ 6, PAGE ID # 4.

[123] Roscigno Depo. p. 13:2-4 (Ex. U).

[124] *Obama for America v. Husted*, S.D. Ohio Case No. 2:12-cv-0636; Doc. 1, Complaint ¶ 45, PAGE ID # 17.

this matter became an "emergency" only because Plaintiffs waited 98 days before early voting is to start and made the same arguments they could have made in 2012 or on February 25, 2014 when Directive 2014-06 was issued. Plaintiffs offer no explanation for this failure.

Now, as a result of Plaintiffs' delay, Defendants have been forced to respond to Plaintiffs' 51-page motion and hundreds of pages of exhibits and reports in just three weeks and two days. While election matters are sometimes expedited, it is because causes of actions arise naturally in the context of fast moving elections. They should not be expedited here, where the only "emergency" was created by the Plaintiffs' delay. Laches prohibits extraordinary relief where the need for emergency relief is created by the Plaintiffs' own lack of diligence that so clearly (and intentionally) prejudices Defendants.[125] Plaintiffs' motion for a preliminary injunction should therefore be denied.

## IV.    CONCLUSION

Plaintiffs have failed to meet their burden and establish that they are entitled to a preliminary injunction. For all of the foregoing reasons, Plaintiffs' motion should be denied.

---

[125] *Service Employees Int'l Union Local 1 v. Husted,* 698 F.3d 341, 345-46 (6th Cir. 2012) ("As a general rule, last-minute injunctions changing election procedures are strongly disfavored. . . . The plaintiffs' failure to act earlier in pursuing these claims significantly undermines their assertions of irreparable harm in the absence of the injunction."); *McClafferty,* 661 F.Supp.2d at 841 (delay of almost two years was "inexcusable" causing "the court to believe that the issue may be foreclosed by laches"); *White,* 736 N.E.2d at 875 ("In most instances, relators' delay of nearly four months in filing this action. . . , without justifiable excuse, warrants dismissal of relators' claims based on laches.").

Respectfully submitted,

MICHAEL DeWINE
Ohio Attorney General


/s/ Steven T. Voigt
STEVEN T. VOIGT (*pro hac vice*)*
　　*Lead and Trial Counsel*
BRIDGET E. COONTZ (0072919)
KRISTOPHER J. ARMSTRONG (0077799)
HALLI BROWNFIELD WATSON (0082466)
Assistant Attorneys General
Constitutional Offices Section
30 E. Broad Street, 16th Floor
Columbus, Ohio 43215
Tel:  614-466-2872; Fax: 614-728-7592
steven.voigt@ohioattorneygeneral.gov
bridget.coontz@ohioattorneygeneral.gov
kristopher.armstrong@ohioattorneygeneral.gov
halli.watson@ohioattorneygeneral.gov

*Counsel for Defendant*
*Ohio Secretary of State Jon Husted*


## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed electronically on July 23, 2014.  Notice of

this filing will be sent to all parties by operation of the Court's electronic filing system.


/s/ Steven T. Voigt
STEVEN T. VOIGT (*pro hac vice*)*
Senior Assistant Attorney General


41