# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| OHIO STATE CONFERENCE OF THE | : | |
| NATIONAL ASSOCIATION FOR THE | : | |
| ADVANCEMENT OF COLORED | : | Case No. 2:14-cv-00404 |
| PEOPLE, LEAGUE OF WOMEN VOTERS | : | |
| OF OHIO, BETHEL AFRICAN | : | |
| METHODIST EPISCOPAL CHURCH, | : | Judge Peter C. Economus |
| OMEGA BAPTIST CHURCH, COLLEGE | : | |
| HILL COMMUNITY CHURCH | : | |
| PRESBYTERIAN, U.S.A., A. PHILLIP | : | Magistrate Judge Nora McCann King |
| RANDOLPH INSTITUTE, and DARRYL | : | |
| FAIRCHILD, | : | |
| | : | |
|         Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| JON HUSTED, in his official capacity as | : | |
| Ohio Secretary of State, and MIKE | : | |
| DEWINE, in his official capacity as Ohio | : | |
| Attorney General, | : | |
| | : | |
|         Defendants. | : | |
| | : | |
| | : | |

---

## STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

---

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General to attend to the interests of the United States in any pending suit.  Given the Attorney General's broad authority to enforce the Voting Rights Act, *see* 42 U.S.C. § 1973j(d), the United States has a strong interest in the resolution of this matter, which implicates the interpretation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.

Plaintiffs allege, among other things, that recent Ohio legislation that eliminates the opportunity for the State's voters to simultaneously register and vote during the first week of early voting ("same-day registration") and Ohio Secretary of State directives that otherwise limit early voting hours during evenings and weekends deny minority voters equal access to the franchise in violation of Section 2.  In response, defendants and the Ohio General Assembly ("movant") have asserted a number of arguments that misconstrue the meaning and proper application of Section 2 to this case.  The United States submits this statement to address these arguments.  This Statement does not address any other issues pending before this court.

## I. Background

In the 2004 general election, Ohio voters encountered long lines and wait times on Election Day throughout the state.  At one location, conditions were so severe that wait times extended into the early morning of the following day.  *Obama for Am. v. Husted*, 697 F.3d 423, 426 (6th Cir. 2012); *see also League of Women Voters v. Brunner*, 548 F.3d 463, 477–78 (6th Cir. 2008).  In response to those problems, the Ohio General Assembly passed Substitute House Bill 234 ("HB 234") in 2005.  *See* 2005 Ohio Laws 40; *Husted*, 697 F.3d at 426.  Starting in 2006, HB 234 established no-excuse mail and in-person absentee voting ("EIP" or "early voting").  Ballots were required to be available no later than 35 days prior to any election and could be requested and cast, in-person, as late as the close of business on the day before the election.

-1-

Individual county boards of election had discretion to set their own hours of operation for purposes of allowing EIP voting during this 35-day period.

After implementation of HB 234, "a large number of Ohio voters chose to utilize the new early voting procedures in elections from 2006 through 2010." *Husted*, 697 F.3d at 426:

> Early voting peaked during the 2008 election, when approximately 1.7 million Ohioans cast their ballots before election day, amounting to 20.7% of registered voters and 29.7% of the total votes cast. In Ohio's twelve largest counties, approximately 340,000 voters, or about 9% of the total votes cast in those counties, chose to vote early at a local board of elections office. Using data from seven of Ohio's largest counties, one study projected that, in 2008, approximately 105,000 Ohioans cast their ballots in person during the final three days before the election. In 2010, approximately 1 million Ohioans voted early, and 17.8% of them chose to cast their ballots in person. In a poll conducted after the 2010 election, 29.6% of early voters reported voting within one week of election day.

*Id*. African-Americans made up a disproportionate share of EIP voters, and a large majority of EIP votes were cast in the evening, on weekends, and on the Monday before each election. *Id*. at 427.

After two election cycles in which Ohio voters used EIP voting, in 2011 the General Assembly tried to eliminate EIP voting during the last three days before an election. Legislative drafting oversights and a citizen referendum produced a statutory scheme with conflicting early voting deadlines for military and overseas voters. The Secretary of State issued advisories and directives in 2011 and 2012 that attempted to clarify that military and overseas voters were permitted to vote three days before an election, but other voters could not.

On July 17, 2012, Obama for America, the Democratic National Committee, and the Ohio Democratic Party ("OFA plaintiffs") filed a lawsuit in this court against the Ohio Secretary of State and Ohio Attorney General. They alleged that the State's restrictions on early voting, including the application of different early voting deadlines for different classes of voters,

violated the Equal Protection Clause.  *See* Complaint for Declaratory and Injunctive Relief, *Obama for Am. v. Husted*, 888 F. Supp.2d 897 (S.D. Ohio 2012) (No. 2:12-cv-00636).  The OFA plaintiffs moved for a preliminary injunction seeking to restore the last three days of EIP voting for the November election.  On August 31, 2012, this court granted the OFA plaintiffs' motion enjoining the State from implementing the shortened deadline for EIP voting.  Pointing to the disparate impact the challenged restrictions would have on low-income and minority voters, this court found that the restrictions imposed a significant burden on the right to vote, and the State had not justified this burden with evidence of an equally weighty state interest.  *See Obama for Am. v. Husted*, 888 F. Supp. 2d 897, 906–910 (S.D. Ohio 2012).  The Sixth Circuit affirmed this court's order on October 5, 2012.  *Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012).

On February 19, 2014, the General Assembly passed Amended Senate Bill 238 ("SB 238").  *See* Pls. Mot. Prelim. Inj. Ex. 32, ECF No. 18.  SB 238 required early voting to begin the day after the close of voter registration, thus shortening the period of time in which EIP voting and by-mail absentee ballots were available from 35 days to 29 days before an election.  Consequently, SB 238 eliminated the six-day period when voters had the opportunity to simultaneously register and cast an EIP ballot.

On February 25, 2014, the Secretary of State issued Directive 2014-06, which established early voting hours for the May 2014 primary election and November 2014 general election.  With only a few exceptions, the directive eliminated counties' ability to offer EIP voting during weekday evening hours, weekends, and the last two days prior to Election Day.[1]  Pls. Mot. Prelim. Inj. Ex. 36, ECF No. 18.

---

[1] The limited exceptions required counties to offer weekday evening early voting on only one Monday prior to the May 2014 primary election, and weekend early voting on one Saturday prior

-3-

On May 1, 2014, plaintiffs in this case filed their Section 2 action.  Meanwhile, the OFA litigation proceeded.  On June 11, 2014, this court issued an order granting the OFA plaintiffs' motion for summary judgment and request for a permanent injunction.  *Obama for Am. v. Husted*, No. 2:12-cv-00636, ECF Nos. 89 and 90.  The court found that the burden imposed on minority and low income voters by cutting EIP voting during the last three days before the election was not counterbalanced by a sufficiently weighty state interest.  The court emphasized "that where the State has authorized in-person early voting through the Monday before Election Day for all voters, the state may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at ECF No. 89, p. 6 (internal quotations and citations omitted).  Accordingly, the court enjoined the Secretary of State from enforcing the shortened deadline for EIP voting and ordered the restoration of EIP voting "on the three days immediately preceding all future election days for all eligible voters." *Id.* at ECF No. 90.

On June 17, 2014, the Ohio Secretary of State issued Directive 2014-17, which implements this court's order by establishing uniform days and hours for EIP voting for the three days before an election.  Pls. Mot. Prelim. Inj. Ex. 37, ECF No. 18.  Directive 2014-17 also establishes uniform days and hours for the other days of the early voting period.

While this court's June 11, 2014 opinion in *Obama for Am. v. Husted* ordered a portion of the relief being sought in the current litigation, the plaintiffs here allege that additional relief is necessary.  The OFA litigation did not challenge SB 238, which repealed same-day registration and remains in effect.  Moreover, the Secretary of State continues to prohibit counties from offering additional evening and weekend hours for EIP voting that would fall outside of the

---

to the May 2014 primary election and two Saturdays prior to the November 2014 general election.

-4-

schedule mandated in Directive 2014-17, including prohibiting nearly all Sunday voting.  Thus,

the issue addressed in this brief is whether these restrictions on same-day registration and early

voting opportunities during evenings and weekends result in African-American voters having

"less opportunity than other members of the electorate to participate in the political process and

to elect representatives of their choice," 42 U.S.C. § 1973(b), in violation of Section 2.

### II. Legal Standard

Section 2 prohibits the State of Ohio from imposing any voting qualification, prerequisite

to voting, or any standard, practice or procedure that would result in the denial or abridgment of

the right to vote on account of a person's race, color or membership in a language minority

group.  42 U.S.C. § 1973.[2]  Courts will find a violation of section 2 "if, based on the totality of

circumstances, it is shown that the political processes leading to nomination or election in the

State… are not equally open to participation" by a protected class in that they "have less

opportunity than other members of the electorate to participate in the political process and to

elect representatives of their choice." *Id.*  Thus, a court evaluating a Section 2 claim must engage

in a fact-intensive, localized inquiry to determine whether, as a result of the challenged practice,

members of a protected class have less access to the franchise.  *See Thornburg v. Gingles*, 478

U.S. 30, 79 (1986).  In its report on the 1982 amendments, the Senate Judiciary Committee

identified several factors, in addition to a finding of a discriminatory effect on a protected class

of voters, that may inform a court's evaluation of whether a challenged practice or procedure

denies a protected class an equal opportunity to participate in the political process and to elect

representatives of their choice on account of race.  S. Rep. No. 97-417 (1982), reprinted in 1982

---

[2] This prohibition applies to both intentional discrimination and voting measures that have a discriminatory result.  *See Chisom v. Roemer*, 501 U.S. 380, 394 & n.21 (1991).

U.S.C.C.A.N. 177 ("Senate Report").[3]  The Senate Committee indicated that this list was non-exhaustive, and that no particular factor or number of factors needs to be proved to sustain a Section 2 claim.  *See* Senate Report at 29.

Although vote dilution cases have been the majority of Section 2 claims brought thus far, the statute also applies to any discriminatory practices that prevent or hinder an eligible voter from casting a ballot or having his or her ballot counted.  *See Gingles*, 478 U.S. at 45 n.10 ("Section 2 prohibits all forms of voting discrimination, not just vote dilution."); Senate Report at 30 ("Section 2 remains the major statutory prohibition on all voting rights discrimination."). Courts have entertained such claims with respect to a wide range of practices, including restrictive voter ID laws, *Frank v. Walker*, Nos. 11-cv-01128, 12-cv-00185, 2014 WL 1775432 (E.D. Wisc. Apr. 29, 2014); unequal access to voter registration opportunities, *Operation PUSH v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987), *aff'd sub nom Operation PUSH v. Mabus*, 932 F.2d 400 (5th Cir. 1991); unequal access to polling places, *Spirit Lake Tribe v. Benson Cnty*., No. 2:10-cv-095, 2010 WL 4226614 (D.N.D. Oct. 21, 2010); *Brown v. Dean*, 555 F. Supp. 502 (D.R.I. 1982); unequal establishment of early voting sites, *Brooks v. Gant*, No. civ.12-5003-kes, 2012 WL 4482984 (D.S.D. Sept. 27, 2012); and underrepresentation of minority poll officials, *Harris v. Graddick*, 615 F. Supp. 239 (M.D. Ala. 1985).

---

[3] In *Gingles*, the Supreme Court recognized that the Senate Report is "the authoritative source for legislative intent" on amended Section 2.  478 U.S. at 43.

### III. Argument

### A. This Court should reject injecting an independent causation requirement into Section 2.

The essence of what both the defendants and the movant argue is that Section 2 requires showing that any denial of equal opportunity to participate is entirely attributable to the State's imposition of the challenged restriction. Thus, the defendants argue that even if minority voters will be disproportionately burdened by the cutbacks in early voting and the elimination of same-day registration, this court should "differentiate[ ]discrimination from inconvenience," because "'inconvenience does not result in a denial of "meaningful access" to the political process.'" (Defendant's Opposition, p. 19, ECF No. 41)("Defs' Opp'n") (quoting *Jacksonville Coal. for Voter Prot. v. Hood*, 351 F. Supp. 2d 1326, 1335 (M.D. Fla. 2004). Similarly, movant argues that the meaning of the phrase "opportunity … to participate in the political process" in Section 2(b) requires more than "a mere comparative difference in how this opportunity may be used by some and ignored by others in voter turnout for minorities." Movant's Opposition, p. 23, ECF No. 40 ("Mov. Opp'n."). Essentially, what defendants and movant are claiming is that as long as disparities in participation are the product of an interaction between government-imposed voting procedures and minority voters' actions or inactions, they are immune from challenge under Section 2.

They are mistaken. The law is quite clear: a practice that burdens minority voters disproportionately as compared to white voters violates Section 2 if it "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. Determining "whether the political processes are equally open [to minority voters] depends upon a searching practical

evaluation of the past and present reality" and a "functional view of the political process." *Id.* at 45 (internal citations and quotation marks omitted).   To be sure, the decisions individual minority voters make about whether and how to participate in the electoral system are relevant to the totality of the circumstances inquiry, but when those decisions are affected by the past and present inequities captured by the Senate Factors—as the plaintiffs allege here in this case— defendants may not disclaim responsibility for the ensuing results.

Consequently, defendants' and movant's reliance on cases where plaintiffs failed to prove that connection is misplaced.  In nearly all of the cases—only one of which involved either deliberate cutbacks to early and weekend voting or restrictions on simultaneous registration—the basis for the court's ruling was not a heightened causation standard of the kind defendants and movant demand but rather the plaintiffs' failure to present evidence to support their claim.

Two of the cases are distinguishable because the plaintiffs failed to establish any discriminatory impact at all–a necessary precondition to Section 2 liability.  In *Jacksonville Coalition*, a Section 2 challenge to the location and number of early voting sites in Duval County, Florida, four out of five early voting sites were placed in African-American communities.  351 F. Supp. 2d at 1334.  While defendants cite *Jacksonville Coalition* for the principle that "inconvenience does not result in a denial of meaningful access to the political process," Def's Opp'n. at 19 (internal quotations and citations omitted), this case really stands for nothing more than the commonsense acknowledgment that a Section 2 violation does not exist where minority voters have an equal opportunity to access the franchise as non-minority voters.  Similarly, in *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc), *aff'd on other grounds sub nom. Arizona v. Inter Tribal Council of Ariz.*, 133 S. Ct. 2247 (2013), a challenge to a voter ID statute, the Ninth Circuit found that plaintiffs "produced no evidence supporting [the]

allegation" that "Latinos, among other ethnic groups, are less likely to possess the forms of identification required under Proposition 200 to . . . cast a ballot." 677 F.3d at 407 (internal quotations omitted). Those cases thus say nothing about how a court should approach a Section 2 case where plaintiffs *have* shown that the challenged practice disproportionately burdens minority voters.

In another case, the court ultimately found that ameliorative aspects of the challenged law mitigated any potential disproportionate burden. In *Brown v. Detzner*, 895 F. Supp. 2d 1236 (M.D. Fla. 2012), the district court declined to enter a preliminary injunction against a Florida statute reducing the early voting period from 14 days to eight days for the November 2012 election. While the court recognized that a reduction in early voting days could have a discriminatory impact on minority voters, the court determined that other features of the Florida early voting statute would actually prevent such an impact. The court explained that the new law allowed Florida's county election officials to increase the number of voting hours in a day from 8 to 12 hours, and therefore provide more morning and evening hours than what had been offered in recent elections. *Id.* at 1252. The court also noted that, in contrast to this case, the new law also increased the availability of Sunday early voting for the State as a whole. *Id.* at 1252-53. Finally, the court found that while the number of early voting *days* had been contracted, there was evidence that most of the larger urban counties would not actually reduce the total number of overall early voting *hours*. *Id.* at 1254. For these reasons, the court determined that the statute's reduction in early voting days would not result in a discriminatory impact due to what the court viewed to be ameliorative aspects of the law. Accordingly, *Brown* is simply another example of a case in which the evidence presented did not indicate that minority voters would have less access than non-minority voters to the political process.

In three other cases, courts rejected the plaintiffs' claims because they failed to show how the interaction between the challenged practice and social and historical conditions produced unequal opportunity.  For example, in *Salas v. Sw. Tex. Junior Coll. Dist.*, 964 F.2d 1542 (5th Cir. 1992), the Fifth Circuit rejected a challenge to at-large elections in a jurisdiction where Latinos formed a majority of both the population and the registered voter electorate.  *Id.* at 1555–56.  The plaintiffs claimed that disparities in turnout rates nonetheless denied them an equal opportunity to elect candidates of their choice.  The court rejected that claim not as a matter of law, but because plaintiffs there failed to establish through credible evidence the continued existence of "practical impediments" to voting, and provided no direct evidence "linking . . . low turnout with past official discrimination" or with current socioeconomic conditions.  *Id.*  Having conducted an intensely local appraisal, *id.* at 1552, the court concluded that the lack of electoral success was therefore not caused by the challenged practice, *id.* at 1556.  *Salas* does not stand for a general proposition that a minority group fails to show a causal link when it does not take advantage of a particular political opportunity.  Instead, *Salas* stands in contrast to this case, where plaintiffs have submitted significant evidence, *see* ECF No. 18, Exs. 1-4, that the Senate Factors interact with the State's restrictions to affect black voters differently than white voters.

That same distinction similarly undermines the defendants' and movant's reliance on *Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352 (4th Cir. 1989), and *Ortiz v. City of Philadelphia*, 28 F.3d 306 (3d Cir. 1994).  In *Irby*, which involved a challenge to appointed school boards, the court pointed to the lack of statistically significant disparities with respect to several of the boards and then emphasized that it was unclear how the use of appointment, rather than election, explained any remaining disparities.  889 F.2d at 1358–59.  In *Ortiz*, a challenge to Pennsylvania's non-voting purge law, the Third Circuit affirmed the district court's rejection of a

Section 2 claim where there was "not even one iota of evidence introduced at trial or present in the record" to show that the purge statute was responsible for disparate turnout rates. 28 F.3d at 314. Indeed, the court emphasized that the plaintiffs had not challenged any voter registration procedures. Id. at 317.

Finally, *Wesley v. Collins*, 791 F.2d 1255 (6th Cir. 1986), provides even less support for defendants' and movant's position. That case rejected a Section 2 challenge to Tennessee's felon disenfranchisement statute. Felon disenfranchisement statutes, however, involve a unique factor—the 14th Amendment's explicit anticipation that states could disenfranchise persons convicted of a crime. United States Const. Amend. XIV, § 2. Given that constitutional authorization, nothing in *Wesley* sheds light on how to assess the early voting, Sunday voting, and same-day registration restrictions challenged here. Moreover, the *Wesley* court found no evidence of a discriminatory purpose underlying the felon disenfranchisement law, 791 F.2d at 1262–63, in further contrast to the facts plaintiffs have alleged in this case that the State restricted opportunities for early voting, Sunday voting, and same-day registration in the face of experience with those practices and "with the intention of suppressing the votes of African-American voters," Cmpl. at 32, ECF No. 1.

In contrast to the cases defendants and movant cite, the plaintiffs here have submitted evidence along with their motion for a preliminary injunction explaining how Ohio's restrictions interact with the relevant Senate Factors to result in African-American voters facing greater limitations on their ability to register, to vote, and to have their ballots counted. If this court concludes that plaintiffs have proven that socioeconomic disparities resulting from historical discrimination—including lower educational levels, lack of access to transportation, less flexibility for time off from work and family responsibilities, etc.—continue to affect African-

American voters in Ohio, it could conclude that  the abolition of same-day registration and the

reduction of opportunities for early voting, particularly on Sundays, would fall with

disproportionate force on the African-American community because it would face greater

difficulties in voting within the remaining time blocks and therefore could violate Section 2.

Thus, this case has nothing in common with *Smith v. Salt River Project Agric. Improvement &

Power Dist.*, 109 F.3d 586 (9th Cir. 1997), where the Ninth Circuit determined that plaintiffs

"effectively stipulated to the nonexistence of virtually every circumstance which might indicate

that [the challenged law] results in racial discrimination." *Id.* at 595.

       **B.**     ***Holder v. Hall* is inapposite to the early voting and same-day registration
            restrictions challenged here.**

      A fundamental error in movant's position stems from its misreading of the Supreme

Court's decision in *Holder v. Hall*, 512 U.S. 874 (1994).  Movant relies on *Holder* to argue that

because plaintiffs allegedly measure discriminatory results in comparison to the "previous voting

system," which they believe to be an inappropriate benchmark, and allegedly fail to provide "an

objective, non-arbitrary benchmark," they argue plaintiffs cannot establish a Section 2 claim.

Mov. Opp'n at 24-25.  *Holder*, however, does not say what movant asserts it does, and it does

not apply to the facts of this case.[4]

      *Holder* involved a Section 2 vote dilution challenge to a Georgia county's decision to use

a single-commissioner form of government rather than a multimember county commission.

Justice Kennedy's opinion announcing the judgment of the Court offers only the unremarkable

---

[4] Defendants also argue that under *Holder*, plaintiffs fail to establish an appropriate benchmark.
Defs' Opp'n at 24–25.  But they do so in a portion of their brief that assumes for argument's sake
that plaintiffs have presented a *vote dilution* claim.  *Id*. at 23.  Yet this argument misses the point
because, as discussed below, it is premised on defendants' erroneous view that plaintiffs have
improperly addressed Senate Factors in this *vote denial* case.  Regardless, defendants' *Holder*
argument is equally unavailing.

observation that "where there is no objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice, it follows that the voting practice cannot be challenged as dilutive under § 2."  512 U.S. at 881.  Applying that principle to a challenge to the size of a governing body, the Justices concluded that "[t]he wide range of possibilities" with respect to size "makes the choice inherently standardless."  *Id.* at 889 (internal quotations and citations omitted).

Plaintiffs' case here, however, does not allege a vote dilution claim.  Vote dilution claims traditionally challenge electoral practices such as methods of election for government bodies.  Vote dilution claims, as the Supreme Court has repeatedly recognized, pose a complex question: in a democratic system, when dealing with a racial group that is a numerical minority within the relevant jurisdiction, how is a reviewing court to distinguish between impermissible discrimination and "mere . . . political defeat at the polls"?  *Whitcomb v. Chavis*, 403 U.S. 124, 153 (1971); *see also Johnson v. DeGrandy*, 512 U.S. 997, 1012-13 (1994) (exploring the difficulty).  Section 2 itself forecloses the simplest benchmark: "[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."  42 U.S.C. § 1973(b).  At the same time, the relative successes of the majority and minority communities in electing candidates of their choice can be "one circumstance" relevant to the "totality of circumstances."  *Id.*

This case, by contrast, poses no such analytic difficulty in identifying a workable benchmark for determining whether the challenged provisions will result in African-Americans

having less opportunity to participate in the electoral process.[5]  The overall question is whether minority voters in Ohio have less opportunity than other members of the electorate to participate in the political process.  This court thus can look both to the relative impact on African-American and white voters of the cutbacks to early voting, Sunday voting, and same-day registration and to the relative ability of African-American and white voters to participate in the political process under the system created by SB 238 and Directive 2014-06.

Thus, the nature of plaintiffs' claim does not call for an existing electoral system to yield to a standardless or arbitrary benchmark.  The relevant comparison is made based on the conditions that are expected to prevail after the challenged voting practice is implemented.  The prior electoral system also may provide both relevant background regarding both the purpose and the consequences of the restrictions, as well as a detailed gauge of the likely effect of the new voting practice, as described in further detail in the next section.[6]  Congress clearly concluded that "[i]f the procedure [being challenged] markedly departs from past practices . . . that bears on the fairness of its impact."  Senate Report at 29 n.117.

C.   **Section 2's "totality of the circumstances" analysis can involve comparing a challenged voting practice with a prior practice.**

Defendants and movant incorrectly assert that any comparison between the challenged voting practice and the prior voting practice impermissibly imports the Section 5 analysis into a Section 2 claim.  Defs' Opp'n at 16-17; Mov. Opp'n at 33–34.  This is simply incorrect.  Section

---

[5] As the Supreme Court observed in *Chisom v. Roemer*, 501 U.S. 380 (1991), "[a]ny abridgment of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election." *Id.* at 397.

[6] In addition, movant's suggestion that the claim improperly seeks to maximize minority voting strength, Mov. Opp'n at 25, is unfounded.  Plaintiffs clearly allege that the cutbacks in early voting deny African-Americans an equal opportunity to participate in the political process, Pls. Mot. Prelim. Inj. at 30, ECF No. 17.

2 does not foreclose a comparison between an existing practice and a prior one.  Indeed, Justice

Kennedy, on whose opinion in *Holder* defendants and movant rely, performed precisely such a

comparison in *LULAC v. Perry*, 548 U.S. 399 (2006), explaining how "changes" to a legislative

district "undermined the progress of a racial group" in violation of Section 2.  548 U.S. at 439;

*see also United States v. Osceola Cnty.*, 475 F. Supp. 2d 1220 (M.D. Fla. 2006) (finding that the

County's at-large method of election system violated Section 2 and ordering the return to the

County's previous five single member district form of government) (remedial opinion at 474 F.

Supp. 2d 1254).  The inquiry in Section 2 cases differs materially from the inquiry in Section 5

cases.  Section 5 involves a narrow comparison between the preexisting and new election

systems to focus on whether minority voters are worse off under the new system.  The sole

remedy in a Section 5 case is to require the jurisdiction to retain, or return to, the prior practice.

By contrast, Section 2 considers the totality of the circumstances, and compares the overall

opportunity held by minority voters to the opportunities enjoyed by white voters.  While the

Section 2 standard involves a more nuanced totality-of-the-circumstances inquiry, changes to a

jurisdiction's election system can be one relevant factor in that inquiry.

The basic remedial principle in Section 2 cases is quite different.  If plaintiffs establish a

violation of Section 2, a district court should give "the appropriate legislative body the first

opportunity to devise an acceptable remedial plan."  *McGhee v. Granville County,* 860 F.2d 110,

115 (4th Cir. 1988).  If the proposed remedial plan is legally acceptable, then the district court

must "accord great deference to legislative judgments about the exact nature and scope of the

proposed remedy, reflecting as it will a variety of political judgments about the dynamics of an

overall electoral process that rightly pertain to the legislative prerogative of the state and its

subdivisions."  *Id.*  To be sure, in a case like this one, the appropriate remedy may well be to

-15-

return to prior practices.  But the mere fact that the remedy for a Section 2 violation may be to reinstate a past practice does not implicate Section 5 or take this claim outside the scope of Section 2.

> **D.**  **Section 2 requires an "intensely local appraisal," not a comparison to other states.**

Defendants and movant point out that some states offer fewer early voting opportunities than Ohio, and that some states do not offer early voting opportunities at all, and argue based on this that plaintiffs have failed to establish a Section 2 claim.  However, such a comparison is of, at most, limited utility in determining whether Ohio has violated Section 2, as the text of the statute requires an examination of the political processes "in the State or political subdivision" that is imposing the challenged standard, practice, or procedure.  42 U.S.C. § 1973(b).

Cases interpreting Section 2 also make clear that the core of a reviewing court's analysis must center on an "intensely local appraisal" of the challenged practice or procedure.  *Thornburg v. Gingles*, 478 U.S. 30, 78 (1986); s*ee also Stewart v. Blackwell*, 444 F.3d 843, 878 (6th Cir. 2006) ("[C]laims under the Voting Rights Act require 'an *intensely local* appraisal of the design and impact' of the challenged electoral practice") (citing *Gingles*, 478 U.S. at 78) (emphasis added); *Rural W. Tenn. African-American Affairs Council, Inc. v. Sundquist*, 209 F.3d 835, 841–842 (6th Cir. 2000) (listing the Senate Factors in terms of their application to the State of Tennessee for purposes of analyzing a Tennessee legislative redistricting plan); *Operation King's Dream v. Connerly*, No. 06-12773, 2006 WL 2514115 at *15 (E.D. Mich. Aug. 29, 2006) ("To bring a cause of action under section 2 … plaintiffs must allege that the challenged system or practice, in the context of all the circumstances *in the jurisdiction in question*, results in

-16-

minorities being denied equal access to the political process") (emphasis added) (internal quotations and citations omitted).

Section 2 requires a comparison between the political opportunity available to members of a minority group and the political opportunity available to "other members of the electorate." 42 U.S.C. § 1973(b). Defendants and movant, however, would have this court assess the political opportunity available to minority voters in Ohio by examining the political opportunity available to minority voters in other states. Under that analytical framework, so long as minority voters in other states have it worse than minority voters in Ohio, Ohio's voting restrictions would satisfy Section 2. That simply is not the law. This race-to-the-bottom approach would effectively immunize any State or political subdivision from Section 2 liability where it can be shown that minorities face even harsher restrictions in some other state or political subdivision. Congress clearly did not intend such a result.

The state-by-state comparison also fails to account for the fact that Ohio's early voting regime was instituted to respond to Ohio's specific experience. The General Assembly chose early voting as the option for dealing with the long lines and wait times experienced during the 2004 election. *Obama for Am. v. Husted*, 697 F.3d 423, 426 (6th Cir. 2012). And, as noted by the Sixth Circuit, African-Americans in particular have come to rely upon early voting options for participating in the political process. *Id*. at 427. Accordingly, simply pointing out that other states may offer fewer (if any) early voting options than Ohio does not provide any meaningful basis for assessing the level of political opportunity available to minority voters *in Ohio*. A state that has never offered early voting opportunities is patently different from Ohio, which introduced early voting opportunities (in response to a specific set of concerns) and now seeks to reduce those opportunities in a way that plaintiffs allege has a discriminatory result for African-

-17-

American voters in Ohio.  Thus, the impact Ohio's reductions to this regime will have on minority voters in Ohio can only be understood through an "intensely local appraisal" of the challenged electoral practice.

In *Brown v. Detzner*, 895 F. Supp.2d 1236, 1254 (M.D. Fla 2012), the court looked at early voting practices in other states as partial support for its determination that Florida's reduction of early voting days did not violate Section 2.  However, as discussed above, the court's decision primarily relied upon its examination of ameliorative aspects of Florida's early voting statute.  And after discussing the state-by-state comparison, the *Brown* court recast its analysis in local terms: "the court must consider whether the State of Florida, having decided to allow early voting, *has adopted early voting procedures that provide equal access to the polls for all voters in Florida*." *Id*. at 1254–55 (emphasis added).  Moreover, the court in *Jacksonville Coalition for Voter Protection v. Hood*, 351 F. Supp. 2d 1326 (M.D. Fla. 2004), which the *Brown* court cited, rejected comparisons to early voting systems in other jurisdictions or States as problematic in a Section 2 analysis.  *Id*. at 1335–36.  As demonstrated above, taking the Section 2 analysis outside of the jurisdiction imposing the challenged voting practice runs counter to the purpose and function of the Voting Rights Act, which is to protect minorities' ability to participate effectively in their own governance.

**E.**     **Addressing the Senate Factors is appropriate in a vote denial claim.**

Defendants argue that plaintiffs' discussion of the Senate Factors is "inapposite" because "[c]onsideration of the Senate Factors is proper only in the vote dilution context, which is not present here."  Defs' Opp'n at 23.  Defendants then assume for argument's sake that plaintiffs have presented a vote dilution claim, and having created this straw man, go on to argue that plaintiffs' cannot establish a vote dilution claim.  *Id*.

-18-

Defendants are wrong along both dimensions.  Plaintiff's claim here is a vote denial claim, not a vote dilution claim.  While courts have recognized that several Senate Factors are generally more applicable in vote dilution cases, some have also applied relevant Senate Factors in the vote denial context.  *See generally Farrakhan v. Gregoire*, 590 F.3d 989 (9th Cir. 2010) (explaining the difference between vote denial and vote dilution claims, and analyzing a vote denial claim under relevant Senate Factors), *rev'd en banc on other grounds* 623 F.3d 990; *see also Salt River*, 109 F.3d 586 & n.8 (dismissing Section 2 vote denial claim based on the plaintiff's stipulation to the absence of any Senate Factors); *but see Frank v. Walker*, Nos. 11-cv-01128, 12-cv-00185, 2014 WL 1775432, at *24, 31-35 (E.D. Wisc. Apr. 29, 2014) (court determining not to apply Senate Factors in photo ID context while nonetheless considering two Senate Factors: socio-economic disparities and the tenuousness of the state's justification for the law).  Indeed, the Senate Committee itself indicated that its list of factors was non-exhaustive, and that Section 2 also applies to "practices which, while episodic and not involving permanent structural barriers, result in the denial of equal access to any phase of the electoral process for minority group members."  *Operation King's Dream*, 2006 WL 2514115 at 13 n.8 (citing S. Rep. at 30).

Accordingly, there is no need for plaintiffs to establish the *Gingles* preconditions, as they are applicable only to vote dilution claims.  As defendants admit, plaintiffs state a claim of vote denial.  *See* Defs' Opp'n at 15.  And, as recognized by the courts, plaintiffs' discussion of the Senate Factors in the context of this case is perfectly appropriate.  When examining voting practices that affect an individual's ability to cast a ballot, including laws restricting registration or early voting, certain Senate Factors will be more relevant than others.  In the United States' view, Senate Factors One, Two, Five, Eight, and Nine—that is, (1), the jurisdiction's history of

official racial discrimination in voting; (2), the extent to which voting is racially polarized; (5), socioeconomic disparities attributable to racial discrimination that hinder the minority group's participation in the political process; (8), a lack of responsiveness to the minority group's needs; and (9), the tenuousness of the state's justification for the law—are the most relevant factors to assess in a case challenging restrictive voting procedures.[7]  A court's consideration of these factors helps in assessing whether the social, political, and historical conditions in a jurisdiction might cause an inequality in a minority group's participation opportunities relative to other voters.  *Cf. Gonzalez* v. *Arizona*, 677 F.3d 383, 405–406 (9th Cir. 2012) (en banc) (finding these factors relevant in a Section 2 challenge to Arizona's voter ID law), *aff'd on other grounds sub nom. Arizona* v. *Inter Tribal Council of Arizona,* 133 S. Ct. 2247 (2013).

**IV.     Conclusion**

For the foregoing reasons, the defendants' and movant's interpretations of Section 2 discussed above lack merit and cannot support the denial of plaintiffs' requested relief.

---

[7] In particular, a reviewing court considering the tenuousness factor should not permit speculative claims that a challenged practice serves a permissible government purpose to outweigh a demonstrated discriminatory impact on the opportunities of minority voters.  Thus, for example, a court could properly conclude that a practice fails the tenuousness inquiry where it has been proved to disproportionately burden minority voters and claims that such practice either prevents fraud or promotes public confidence rest on little or no evidence.  *See Frank v. Walker*, 2014 WL 1775432 *9-*10, 32 (E.D. Wis. 2014) (finding those interests "tenuous" in the context of a challenge to Wisconsin's voter ID law.)

Dated: July 30, 2014

Respectfully submitted,

MARK T. D'ALESSANDRO
First Assistant United States Attorney
Southern District of Ohio

JOCELYN SAMUELS
Acting Assistant Attorney General
Civil Rights Division

STEVEN M. DETTELBACH
United States Attorney
Northern District of Ohio

_/s/ J. Eric Rich_
T. CHRISTIAN HERREN JR.
ABEL GOMEZ
J. ERIC RICH
Attorneys
Voting Section
Civil Rights Division
U.S. Department of Justice
Room 7264 NWB
950 Pennsylvania Ave., N.W.
Washington, DC 20530
Telephone: 202-305-0107
Facsimile: 202-307-3961

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing Statement of Interest of the United

States of America was served on all parties by filing through the court's CM/ECF system, which

automatically sends notices of filing to all attorneys of record.

Dated: July 30, 2014.


By:     */s/ J. Eric Rich*
         J. ERIC RICH