1

1    UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF OHIO
2              EASTERN DIVISION

3

4    OHIO STATE CONFERENCE OF THE   )
     NATIONAL ASSOCIATION FOR THE   )
5    ADVANCEMENT OF COLORED PEOPLE, )
     ET AL.,                        )
6                                   )
                  Plaintiffs,   )   CASE NO. 2:14-cv-404
7                                   )
            vs.                 )
8                                   )
     JON HUSTED, ET AL.,            )
9                                   )
                  Defendants.   )
10                                  )
     _____ )
11

12

13       **TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING**
          BEFORE THE HONORABLE PETER C. ECONOMUS
14          MONDAY, AUGUST 11, 2014; 9:00 A.M.
                   COLUMBUS, OHIO
15

16   FOR THE PLAINTIFFS:

17       SEAN J. YOUNG, ESQUIRE
         DALE E. HO, ESQUIRE
18       FREDA J. LEVENSON, ESQUIRE

19

20   FOR THE DEFENDANTS:

21       STEVEN T. VOIGT, AAG
         KRISTOPHER J. ARMSTRONG, AAG
22
         Proceedings recorded by mechanical stenography,
23   transcript produced by computer.
     _____
24
              DENISE N. ERRETT, FCRR
25        FEDERAL OFFICIAL COURT REPORTER

2

1

2                              I-N-D-E-X

3

4

5      Plaintiffs' Argument by Mr. Young ............   Page    3

6      Defendants' Argument by Mr. Voigt ............   Page   26

7      Defendants' Argument by Mr. Armstrong ........   Page   42

8      Plaintiffs' Rebuttal by Mr. Young ............   Page   54

9      Defendants' Surrebuttal by Mr. Voigt..........   Page   61

10     Defendants' Surrebuttal by Mr. Armstrong......   Page   61

11

12

13                              - - -

14

15

16

17

18

19

20

21

22

23

24

25

3

1                     Monday Morning Session

2                       August 11, 2014

3                         9:00 a.m.

4      IN OPEN COURT:

5            COURTROOM DEPUTY CLERK:  The Court calls the case of

6      The Ohio State Conference of the National Association for the

7      Advancement of Colored People, et al., vs. Jon Husted, et al.,

8      Case Number 2:14-CV-404.

9            THE COURT:  Thank you, Denise.

10        Good morning.

11           MR. YOUNG:  Good morning, Your Honor.

12           MR. VOIGT:  Good morning, Your Honor.

13           THE COURT:  Are counsel ready to proceed?

14           MR. YOUNG:  Yes, Your Honor.

15           THE COURT:  You may go forward.

16        This is plaintiffs' motion.

17           MR. YOUNG:  May it please the Court, my name is Sean

18     Young, from the ACLU Voting Rights Project.  I'm here with my

19     colleagues from the ACLU on behalf of the Ohio State Conference

20     of the National Association for the Advancement of Colored

21     People, the League of Women Voters of Ohio, and several African

22     American churches and other civic organizations and volunteers

23     who have invested countless hours fighting to expand access to

24     the polls in Ohio.

25           Our clients have witnessed firsthand how, after the

4

1   Election Day meltdown of 2004, in response, Ohio created the

2   right to in-person early voting, including the opportunity to

3   register and vote on the same day.  They have seen and helped

4   thousands of Ohioans exercise and take advantage of and come to

5   rely on these precious voting opportunities.

6          As Chief Justice Roberts recently said, there is no

7   right more precious, more basic in our democracy than the right

8   to participate in electing our political leaders.  This year,

9   with SB 238 and a set of directives, the State has redefined

10  the in-person early voting period, resulting in significant

11  restriction of the rights of thousands of Ohio voters.

12         Now, there's one thing I want to make very clear, Your

13  Honor, because defendants have repeatedly said in their briefs,

14  and they're probably going to say it today, that this case is

15  about how many early voting days Ohio should have.

16         And let me be crystal clear.  This case is not only

17  about the reduction in the raw number of early voting days.  If

18  that's all that this case was about, it would be a completely

19  different case.

20         This case is about the elimination of specific voting

21  opportunities that place a special and unique burden on

22  primarily low-income and African American voters that come to

23  rely on these opportunities.  This includes the elimination of

24  same-day registration, a ban on weekday evening voting in the

25  early voting period for the first time since Ohio first created

1   the early voting period, and a dramatic reduction of all Sunday

2   voting to four hours on a single afternoon.

3        Plaintiffs are here to challenge this redefinition of

4   the in-person early voting period.  And, specifically, we're

5   asking this Court to enjoin SB 238 and order Secretary Husted

6   to set uniform and suitable hours on multiple Sundays and

7   weekday evenings.

8        First, I'll briefly describe why plaintiffs are likely

9   to succeed under the Fourteenth Amendment to the U.S.

10  Constitution.  Then we'll discuss why plaintiffs are likely to

11  succeed under Section 2 of the Voting Rights Act.  And, lastly,

12  we'll explain why each of the remaining preliminary injunctions

13  warrant granting plaintiffs the relief that we seek.

14       Under the Fourteenth Amendment, as Your Honor is more

15  than well aware, the State cannot roll back the right to vote

16  for thousands of voters without an adequate justification.  And

17  the greater the burdens that are imposed by the State, the

18  stronger their justification has to be.

19       Here, the State's redefinition of the in-person early

20  voting period imposes significant burdens that they do not even

21  come close to adequately justifying.

22       With respect to the burdens -- and Your Honor has read

23  all the briefs -- tens of thousands of Ohioans have exercised

24  the right to vote in reliance on the specific opportunities

25  being eliminated.

6

1     Now, defendants and their experts just kind of assume,

2     without any evidence, that, you know, everyone can just switch

3     to a different day whenever they want.  But one thing I want to

4     make clear, Your Honor:  This case is not about the

5     hypothetical middle- or upper-class voter, which probably

6     describes everyone in this room.  This case is about low-income

7     voters whose day-to-day reality is vastly different.

8     And it's very difficult for many of us to easily

9     comprehend, but we've tried to illustrate those burdens in the

10    many declarations that are unrefuted in this case.  Your Honor

11    easily recognized this in OFA when you noted the

12    disproportionate impact that eliminating the final weakened

13    would have on low-income voters.

14    These declarations show that low-income voters cannot

15    easily adjust to Ohio's redefinition of the in-person early

16    voting system.  First, with respect to the elimination of

17    same-day registration, before SB 238, low-income voters,

18    usually with the help of third-party organizations and

19    individuals like our plaintiffs, could simply go to the Board

20    of Election office and resolve all registration issues and vote

21    all in one shot.

22    The Northeast Coalition for the Homeless, for example,

23    helped hundreds of homeless voters vote during the same-day

24    registration period, and this opportunity was so precious, as

25    our declarations have shown, because, without same-day

1    registration, they would have had to separately register by

2    mail on their own.

3         And as explained by Jack Frech, who is the director of

4    the Athens County Jobs and Family Services, who has worked with

5    low-income clients for over 30 years, many low-income voters

6    distrust the mail and are so afraid of filling out a government

7    form without help that they fear that it will lead to the

8    denial of benefits.

9         Being able to resolve registration issues and voting in

10   one shot has been so important especially because low-income

11   Ohioans move three times as frequently as their well-to-do

12   counterparts, meaning they have to update their registration

13   three times as frequently.  And that assumes they even know

14   they have to update their registration, which many of them with

15   less educational background don't.

16        Now, with SB 238, that important opportunity is gone for

17   the very first time since Ohio created the in-person early

18   voting period.

19        Second, with respect to the elimination, or the ban, on

20   all weekday evening hours, the undisputed data in Exhibit 6

21   shows that lower-income Ohioans disproportionately rely on

22   weekday/evening voting, which is not a surprise, because people

23   who work in non-salaried lower-paying jobs have far less

24   flexibility to take time off work during regular business

25   hours.  And, because they face even greater transportation

8

1   difficulties, evening voting has been especially valuable for

2   those who want to vote on the way home from work.

3           THE COURT:  Let me ask you, do we have two separate

4   issues in this case:  whether SB 238 is constitutional and,

5   secondly, can you separate the two:  the early hours on

6   weekends and evening hours on weekdays?

7           MR. YOUNG:  Your Honor, I don't believe that you can

8   separate the two, because, as the Sixth Circuit instructed in

9   the Libertarian Party case, you have to look at the combination

10  of all of these cut-backs together and look at their combined

11  impact on voters, especially low-income voters.

12          THE COURT:  What impact do you think Obama for America

13  has since -- when you filed this complaint, there was a

14  preliminary injunction --

15          MR. YOUNG:  Yes.

16          THE COURT:  -- decided by this Court restoring the

17  last three days of voting.  And then that decision was made

18  final in June after, of course, your complaint was filed.

19          How do you feel that the impact has been as a result of

20  this Court's restoration of the three days before a general

21  election?

22          MR. YOUNG:  Well, Your Honor --

23          THE COURT:  As, for example, in this coming November

24  election, every voter in Ohio will have the right to vote, in

25  person, the final three days before the Tuesday election.  How

9

1    do you feel that impacts your case?

2         MR. YOUNG:  Well, Your Honor, two ways, Your Honor:

3    Number one, first of all, we welcome the restoration of the

4    final weekend.  Of course we do.

5         THE COURT:  It hasn't been appealed.  So, it's final.

6         MR. YOUNG:  That's right.  But that doesn't go far

7    enough, Your Honor, because we now, for the very first time in

8    Ohio early voting history, we have no evening voting.  Hours

9    are not perfectly fungible.  And, without evening voting, it

10   impacts those voters who have especially relied on that time.

11        THE COURT:  Each county had discretion to open its

12   doors for evening hours and additional weekend hours; is that

13   correct?

14        MR. YOUNG:  Yes and no, Your Honor.

15        In 2012, all counties had two weeks of evening voting.

16        THE COURT:  I know that, but that was never challenged

17   since I had established -- ordered -- Secretary of State Husted

18   to establish suitable hours, or uniform hours, during that last

19   weekend before the election in 2012.  But, other than that,

20   over the years, it's been the discretion of each county to

21   establish additional hours; evening hours, for example; right?

22        MR. YOUNG:  That's correct, Your Honor.  But, in 2010,

23   78 percent of the State's African Americans had access to

24   multiple Sundays for voting.  That was in the 2010 mid-terms.

25   And --

1        THE COURT:  I'm just trying to pull a distinction

2   here.  It's because of the Secretary of State's directive.  It

3   eliminated evening hours and additional weekend hours.

4   Correct?

5        MR. YOUNG:  That's absolutely correct.

6        THE COURT:  The Secretary of State took the discretion

7   away from the county boards of elections.

8        MR. YOUNG:  That's exactly right, Your Honor.

9        In 2012, the period in which they used to have

10  discretion is now over.  And that was a result, as Your Honor

11  is well aware, of a series of tie votes.

12       When boards of elections started voting along partisan

13  lines, Secretary of State Husted came in and, just right across

14  the board, eliminated all Sundays.

15       THE COURT:  Right.

16       MR. YOUNG:  It was only, of course, because of Your

17  Honor that we only got one Sunday back.

18       And then this year, again, across the board, this time,

19  he is eliminating all evenings for the first time in Ohio

20  history.

21       THE COURT:  Of course, the reason was that not every

22  boards of election could agree on evening and weekend hours.

23  Right?

24       MR. YOUNG:  That's true.

25       THE COURT:  I believe only five counties were open in

11

1    the 2012 election, in addition to the limitations -- I lost my

2    train of thought.  Someone came in the door.

3         But only five counties chose to be open, where other

4    counties couldn't agree, Montgomery County, for example.  And

5    then Secretary of State Husted came in and, through the

6    directive to set hours for -- established hours for every

7    county in the State.

8            MR. YOUNG:  That's correct, Your Honor.

9            THE COURT:  And then --

10           MR. YOUNG:  I apologize.

11           THE COURT:  Go ahead.

12           MR. YOUNG:  I believe that there were a series of

13    about four or five tie votes in 2012 where they couldn't agree.

14    And 'Defendant Husted, without waiting for any more tie

15    votes -- so, we actually don't know how many more there would

16    have been -- just kind of went right across the board and said

17    everyone has to have no Sundays and no weekend voting, at all,

18    until this Court restored the last weakened.

19           THE COURT:  How did that authority evolve?

20         Maybe I should ask that of Secretary Husted.

21           MR. YOUNG:  Well, that's an excellent question, Your

22    Honor.  You know, under the State's statutes, it provides for

23    the Secretary of State to --

24           THE COURT:  I understand.

25           MR. YOUNG:  Yeah, you're right.

12

1          THE COURT:  To break ties.  I know that.

2          MR. YOUNG:  Exactly.

3          THE COURT:  But to establish across-the-board

4    directives, that's relatively new, I believe, in Ohio.

5          MR. YOUNG:  It is relatively new, Your Honor.  I

6    believe the statute only provides for emergency situations in

7    which you can do that.

8          THE COURT:  Right.  It covers all disagreements, not

9    just voting.

10          MR. YOUNG:  Right.  Exactly, Your Honor.  I think

11    it's -- for emergency situations, I think it has to be within

12    90 days of the election.  And, if there is any reason to

13    believe that it's going to be permanent, it has to go through a

14    comment process, which none of these directives went through.

15          So, you're right, Your Honor, that it's a little bit

16    troubling, the kind of procedures that went through to bring

17    this about.

18          But more to the point, Your Honor, the number of African

19    Americans who had access to multiple Sundays, to evening hours,

20    even in the 2010 mid-terms, we're talking about seventy-eight

21    to eighty-one percent of the State's African Americans.  And

22    now that's gone.  And that's why we're here today.  And these

23    cutbacks for the evenings and the multiple Sundays do impose

24    significant burdens on many Ohio voters.

25          With respect -- and to answer Your Honor's question

13

1  about, you know, what happens after OFA, well, we have four

2  hours on a Sunday afternoon now, Your Honor, and that's

3  certainly better than zero. But, if I may, Your Honor, we have

4  to step back and really focus on the unique importance that

5  Sunday has to the African American community.

6       And I know Your Honor has read all of the briefs. So,

7  I'm not going to quote all of the declarations to you. But the

8  defendants don't even -- here is the point: The defendants

9  don't even dispute that Sunday voting is an African American

10 phenomenon.

11      You know we've quoted this individual many times as

12 saying that he's against Sunday voting because African

13 Americans use it. So, you have to keep that in context. And

14 we've also put forward declarations from people that have

15 described how one Sunday afternoon isn't enough to conduct all

16 of their "Souls to the Polls" activities.

17      In Exhibit 79, Your Honor, Reverend Snyder, from the

18 Bethel AME Church, one of our plaintiffs, describes that, on

19 Sundays, you have to pick people up, pick parents up from their

20 homes or their church, have them sign releases, drop their kids

21 off at church for babysitting, take them to the polls, take

22 them back from the polls, pick their children up, take them

23 back home. That whole process can take three to four hours,

24 and that's just for one trip.

25      And Jamie Simpson, from Omega Baptist Church, describes

14

1    how sometimes church services don't get out until 2:00 p.m.

2    The hours, now, are from 1:00 to 4:00.  And so, Your Honor, one

3    Sunday just is not enough for many voters here in Ohio.

4         And if I may, Your Honor, turn to the justifications,

5    because Your Honor granted the motion to file an amicus brief,

6    I believe, Your Honor, that they don't -- well, they do,

7    actually, repeat a lot of the same things that they said in the

8    opposition brief, but they've kind of brought in a few new

9    pieces of evidence, and we haven't had a chance to depose any

10   of these individuals that they've brought in.

11        But, if I may, Your Honor, this OGA amicus brief focuses

12   on two justifications for SB 238.  The first is voter fraud,

13   and the second is cost.

14        Now, with respect to voter fraud, as Your Honor well

15   knows, this is nothing more than, as defendants admit, a,

16   quote, specter.  And they haven't put forth a single case of

17   voter fraud that same-day registration has caused.  But let's

18   look at this new evidence that the OGA has put in on Friday.

19        First, one thing that I want Your Honor to pay attention

20   to is that each of these declarants are partisans and they're

21   leaders in the majority party leadership.  So, that's one --

22   that reason, alone, is enough to question the credibility of

23   these individuals.

24        First, Alex -- one of the individuals, Alex

25   Triantafilou, -- I may be mispronouncing that -- he points to

1   two ballots that are cast during the same-day registration

2   period that were not counted because their registrations

3   weren't verified.

4        Your Honor, that just proves that the system works.  And

5   the system is, when you cast a ballot during same-day

6   registration week and you register, your ballot is segregated.

7   And then the board of elections has weeks to verify your

8   registration, and your ballot isn't counted until your

9   registration is verified.

10       That system works, and there is no evidence to show that

11  it doesn't.  That system was actually created by Secretary

12  Husted, and there is no evidence that it doesn't work.  So,

13  these two votes that weren't counted because their registration

14  couldn't be verified, that proves the system works.

15       Second, Mr. Triantafilou points to four ballots that

16  weren't counted, but they should have been counted, because

17  they couldn't verify their registration in time, but their

18  inability to verify the registration in the 30 days has nothing

19  to do with same-day registration.  They don't point to anything

20  unique to the same-day registration process that made it take

21  longer for them to verify those registrations.

22       Mr. Steven Cuckler points to a handful of instances

23  where people attempted to vote in two different counties, but

24  he doesn't explain, again, how the unique process of same-day

25  registration increases the possibility of double voting.  Your

1    Honor, that's why we have a statewide voter registration

2    database:  to catch these type of errors.  So, you know, even

3    with their last-minute, you know, Hail Mary amicus brief, the

4    OGA still can't get its story straight on exactly what kind of

5    voter fraud that elimination of same-day registration is

6    supposed to prevent.

7         And the repeated failure -- you know, now this is their

8    second bite at the apple -- to justify SB 238 only underscores

9    how the specter of voter fraud is nothing more than a ghost

10   story.

11        Second, they talk about costs and administrative

12   convenience.  And, Your Honor, we've been down this road, like,

13   many times.

14        As Your Honor recognized and as the Sixth Circuit

15   recognized, vague testimony about costs is not enough.  You

16   have to show that the boards of elections have, quote,

17   struggled to cope with the voting restriction at issue.  And

18   there is no evidence that they have struggled to cope with

19   same-day registration.

20        Now, in their amicus brief, they do try a few new

21   tactics.  First, they try to put a price tag on how much

22   same-day registration will cost.  But these price tags are

23   questionable at the outset because same-day registration

24   doesn't require them to have any more office hours than they

25   already have.

1          Second, you can't trust these declarations because -- I

2    mean, not only because they're written by partisans, but

3    because OGA is talking out of both sides of their mouths.  They

4    say, wrongly, that no one uses same-day registration.  And then

5    they say it costs, like, a lot of money to do same-day

6    registration.

7          Well, if no one is using it, then why is it costing so

8    much money?  So, you can't really trust what they're saying.

9          And, third, even if you take these price tags at face

10   value, there is no evidence of the rest of the budget or any of

11   the other financial contexts to show that these costs are

12   unmanageable.

13          THE COURT:  The costs are borne by each county.

14          MR. YOUNG:  I'm sorry?

15          THE COURT:  The costs are born by each county,

16   correct?

17          MR. YOUNG:  Correct.  The costs are borne by each

18   county.

19          THE COURT:  So it's up to each county to budget, as

20   Cuyahoga County has pointed out in its amicus brief that it

21   believes the County has already budgeted for the 2014 election.

22          MR. YOUNG:  That's right, Your Honor.

23          THE COURT:  It would encompass early voting.

24          MR. YOUNG:  Exactly.  That's right, Your Honor.

25          And I would just direct Your Honor to the Sixth Circuit

18

1    case of Stewart v. Blackwell.

2        The Sixth Circuit said governments almost always attempt

3    to justify their conduct based on costs and administrative

4    convenience, which is why they have to show that these costs

5    are, quote, undue or unmanageable.

6        Now, some of these declarations do point to the fact

7    that budgets have been set in certain other counties; but, if

8    simply pointing to a budget were enough to justify burdening

9    the fundamental right to vote, then any voting restriction that

10   was passed before the end of the fiscal year would just be

11   automatically constitutional.

12       Again, the standard is whether it's unmanageable,

13   whether they've struggled to cope with these costs.  And they

14   haven't met that standard.

15       And the last two rationales, Your Honor, you know, they

16   kind of abandon in their amicus brief.  So, I don't know if I

17   should spend any time talking about it.  But they talk about

18   the cost of campaigns being reduced and buyers' remorse.

19       THE COURT:  I know.

20       MR. YOUNG:  You can read our replies.  Those defenses

21   aren't serious.

22       And, so, Your Honor, these proffered rationales just

23   don't justify the significant burdens imposed by Ohio's

24   redefinition of the early in-person voting period.  And,

25   therefore, plaintiffs are likely to succeed on the Fourteenth

1    Amendment.

2         And, of course, you can't discuss the significant

3    burdens on Ohio low-income voters without also discussing the

4    clear impact that this will have on African Americans in Ohio.

5         And plaintiffs are also likely to succeed on their

6    Section 2 claim.  The standard, as Your Honor knows, in Stewart

7    v. Blackwell is whether these cutbacks interact with social and

8    historical factors to cause African Americans to have less

9    opportunities to participate in the political process.  And

10   plaintiffs have satisfied that standard.

11        First, there is no dispute that African Americans

12   dispute face vast socioeconomic disparities that make it

13   directly harder for them to adjust to the elimination of these

14   voting periods.  And these statistics are important, but I'm

15   not going to reread them because Your Honor has read the briefs

16   and the defendants don't dispute any of these statistics.

17        And the reason we bring out these statistics -- they're

18   not just random statistics that we're just throwing at you.

19   It's precisely because of these socioeconomic disparities that

20   have made same-day registration and evening and Sunday voting

21   so important to the African American population, which is why

22   it will make it more burdensome for them to adjust to these

23   eliminations.  And you can't divorce this from any of the other

24   social and historical context here.

25        We've listed many different ways in which Africans have

20

1   been excluded, or have been attempted to be excluded, from the

2   political process.  Again, I will not reread the parts of the

3   brief where we lay those out.

4        So, when you consider all of these factors, the

5   elimination of same-day registration and early voting hours

6   most needed by the African community, it's no accident, Your

7   Honor, but it's a product of all of these social and historical

8   factors coming together, sort of making it --

9        THE COURT:  The total impact --

10       MR. YOUNG:  Exactly, Your Honor.

11       As the Sixth Circuit said, it's an intensely local

12   appraisal.  You look at all of these factors in combination.

13       Now, let's get to the -- I will briefly get to Your

14   Honor's most favorite part of this case, which is the experts.

15       The fact that African Americans clearly have a harder

16   time adjusting to these eliminations is enough to show a

17   disparate impact, but plaintiffs have also demonstrated that

18   African Americans indeed disproportionately use early voting in

19   Ohio.

20       First, we have five undisputed studies, many of which

21   Your Honor relied on in OFA, from Exhibits 4 to 8, which all

22   show a clear disproportionate impact on African Americans.  We

23   have a board of elections admission that Sunday voting is an

24   African American phenomenon.  And then we have three separate

25   analyses conducted by Dr. Daniel Smith, who, as you know, is a

1    tenured professor of political science at the University of

2    Florida.

3            And let me just back up a second, for a second, before I

4    just talk briefly about these methods of analyses here.

5            Ohio doesn't keep its voter data -- doesn't keep race in

6    its voter data files.  So, we don't know the race of a

7    particular individual who votes.  And this is in contrast to

8    other states who do keep that data, like North Carolina and

9    Florida.  And, so, it's very easy in those states to just see,

10   immediately, which percentage of what race is voting when.

11           In Ohio, you can't do that.  And, so, that's partly why

12   Dr. Smith uses multiple different methods to try to

13   demonstrate, try to see, are there many independent indicators

14   showing that African Americans disproportionately rely on early

15   voting.

16           And just a quick reminder, Your Honor, our burden is not

17   to prove beyond a reasonable doubt or to a mathematical

18   certainty that "x" many African Americans voted on "y" day.

19   Our burden is preponderance of the evidence.  And we think we

20   -- and we have amply satisfied that standard.

21           First, Dr. Smith runs a regression analysis, which

22   simply compares the percentage of the black voting age

23   population in a census block and how often people from that

24   census block cast a vote.  And we see that, as the percentage

25   of African Americans increases in a census block, the

1  percentage of early voting usage increases as well.  And

2  defendants don't dispute that all of his regressions show a

3  positive statistically significant relationship between those

4  two factors.  And what that --

5      THE COURT:  Instead of preponderance of the evidence

6  as the test, isn't it clear and convincing evidence?  We're in

7  equity.

8      MR. YOUNG:  We are in equity.  I believe that the

9  burden is preponderance of the evidence; and, in this posture,

10  we're to show that we're more likely than not to succeed.  And

11  we believe that we've met that standard.

12      And, even if the burden is clear and convincing, Your

13  Honor, we believe we have met that standard as well, because

14  defendants haven't performed any analysis that shows a negative

15  relationship, for instance, between African Americans and early

16  voting usage.

17      So, he runs a regression that shows a positive

18  statistically significant relationship.

19      Defendants proffered expert, Dr. Nolan McCarty,

20  submitted a rebuttal report last Friday.  He runs six different

21  regression analyses.

22      Now, we haven't had a chance to depose him or understand

23  what it is that he did exactly, but each one of those six

24  regression analyses show a positive statistically significant

25  relationship.

23

1          Then Dr. McCarty runs a, quote, non-linear regression

2    analysis.  And those two analyses show a positive relationship

3    between race and early voting usage.

4          So, no matter how many times you want to slice the data

5    here, you're showing a positive statistically significant

6    relationship.

7          On top of that, Your Honor, Dr. Smith runs a homogeneous

8    analysis, which looks at census blocks which are one hundred

9    percent black or one hundred percent white, which, by the way,

10   a majority of Ohio's census blocks are all black or all white,

11   you know, unfortunately.  And voters from all-black census

12   blocks consistently vote at higher rates than voters from

13   all-white census blocks.  Defendants quibble about some of the

14   underlying data, but they're not disputing the accuracy of

15   Dr. Smith's analysis.

16         And, lastly, Dr. Smith does the method of bounds

17   analysis, which looks at census blocks with ninety percent or

18   more of one particular race.  And that covers over seventy-five

19   percent of Ohio's population.  And, again, it shows a racial

20   disparity.

21         Now, Dr. -- or, again, it shows that voters from those

22   predominantly African American census blocks are voting at

23   early voting higher than white.

24         Now, Dr. McCarty, defendants' expert, says in his first

25   report that he should have done the method of bounds analysis

24

1   differently.

2       Well, Dr. Smith took Dr. McCarty's suggested formula,

3   applied it. And again it shows a difference in the usage of

4   early voting between blacks and whites.

5       And, lastly, Dr. Smith relies on U.S. Census Bureau

6   surveys from 2008 and 2012 which show a vast racial disparity

7   between blacks and whites usage of early voting. In 2008, you

8   had double the use of early voting by blacks. In 2012, you had

9   triple the use of early voting by blacks.

10       So, you know, all of these -- all of these different

11   methods, put together, Your Honor, plaintiffs have amply

12   satisfied that, whatever burden of proof, whether it's

13   preponderance or clear and convincing, we have amply satisfied

14   our standard of showing that African Americans

15   disproportionately rely on early voting.

16       And if I can just briefly, Your Honor, address this

17   vote-by-mail issue, you know, as Your Honor well knows, this is

18   the same argument that was raised in OFA, and it was rejected.

19   And the Sixth Circuit rejected it. And the defendants had

20   argued that vote-by-mail provides, quote, ample opportunities,

21   and the Sixth Circuit rejected that argument. But I wanted to

22   add that, you know, there is a good reason why that argument

23   was rejected.

24       For many low-income and African voters -- and this is,

25   again, in our declaration -- vote-by-mail is separate but not

1   definitely not equal.  The data shows that low-income and

2   African Americans vote by mail at lower rates.  And the

3   undisputed declarations describe how African American

4   communities tend to distrust vote by mail and want to see their

5   votes actually processed.

6        For example, David Morgan, from the A. Philip Randolph

7   Institute of Trumbull, explains:  "The African American

8   community had to fight to earn the right to vote."  So, the

9   ability to actually go to a voting site and cast a ballot is

10  empowering and especially important for some of the older

11  members of the community.

12       And keep in mind this is made even worse by SB 205,

13  which was passed this year, which allows election officials to

14  throw out mail-in ballots for not being, quote, complete,

15  whatever that means.  And that makes them more likely that

16  people will need more in-person help in filling out these

17  ballots.

18       And, so, that's why the District Court, in the Spirit

19  Lake case, was correct in recognizing that many of the Native

20  American tribes in that case distrust mail and would be

21  deterred from voting.

22       In sum, Your Honor, African Americans suffer an

23  undisputed host of socioeconomic disparities.  Several factors

24  are working together to make it more difficult for them to

25  participate in the political process, and African Americans

26

1  disproportionately rely on early voting more than whites.  So,

2  we've shown that these cutbacks interact with social and

3  historical factors to result in unequal opportunities for

4  African Americans to participate in the political process.

5       Lastly, Your Honor, just very briefly, on the remaining

6  preliminary injunction factors, no dispute:  Fundamental right

7  to vote is irreparable harm.

8       With respect to the balance of equities, defendants --

9  again, it's the same thing as in OFA.  They simply rely on

10  generic declarations about costs, but they don't establish that

11  they will, quote, be unable to cope with the remedy that we're

12  seeking here.  And that's fatal to their claim, Your Honor.

13  And, as far as the public interest, it favors permitting as

14  many qualified voters to vote as possible.  And, for all of

15  these reasons, plaintiffs' Motion for a Preliminary Injunction

16  should be granted.

17       If I may reserve some time for rebuttal?

18        THE COURT:  Thank you.

19        MR. VOIGT:  May it please the Court, my name is Steven

20  Voigt.  And I represent the Secretary of State and the Attorney

21  General.

22       I will be speaking today about plaintiffs' Voting Rights

23  Act claim and Secretary of State Directive 17.  And then I will

24  turn over the podium to my colleague, Mr. Armstrong, who will

25  discuss plaintiffs' Fourteenth Amendment claim and Senate Bill

27

1    238.

2         Plaintiffs are not entitled to a preliminary injunction.

3    And, with all due respect to my opposing counsel, he stated the

4    standard incorrectly.

5         Plaintiffs have failed to legally and factually prove by

6    clear and convincing evidence that they have a strong

7    likelihood of winning at trial.  That is the standard before

8    the Court today.

9         Ohio provides its citizens far more opportunities to

10   vote than do most other states.  Twenty-three states do not

11   allow no excuse mail-in voting.  Ohio does.  That means an

12   Ohioan can vote entirely by mail without ever going to a ballot

13   box, without ever going to the board of elections.

14        In the upcoming election, the Secretary of State will be

15   mailing unsolicited applications for ballots to nearly all of

16   Ohio's registered voters.  In 18 states, including large states

17   such as Pennsylvania, Missouri and New York, voting is

18   available on only one day, Election Day.  No state with an

19   African American population share equal to or greater than the

20   African American population share of Ohio offers more EIP

21   voting days than does Ohio.

22        The average EIP voting period across all jurisdictions

23   is between 12 and 13 days.  Ohio's EIP days in the upcoming

24   election will be spread across 28 days.  The average number of

25   EIP -- and, when I say "EIP," I mean early in-person voting.

28

1    The average number of EIP voting days across all jurisdictions

2    is 11.  Ohio, in the upcoming election, has twice that number,

3    22.  That consists of 188 EIP hours in addition to the 13 hours

4    of voting on Election Day.  Twenty-eight jurisdictions do not

5    offer any EIP voting on the weekends.  Ohio has two Saturdays

6    of EIP voting and one Sunday, and Ohio is only one of nine

7    jurisdictions that offers any EIP voting on a Sunday.

8         The breadth of Ohio's laws cannot be denied.  Even

9    plaintiffs' own expert, Professor Roscigno, agreed that Ohio's

10   voting opportunities are virtually unlimited because an Ohioan

11   can simply put his or her ballot in the mailbox at any time of

12   the day.

13        Needless to say, the implication of plaintiffs' claims

14   could be profound.  If Ohio's laws are found to violate the

15   Voting Rights Act, then this would mean that the laws of most

16   other states also violate the Voting Rights Act.  Such a

17   premise cannot be.

18        Plaintiffs claim that the days and hours set forth in

19   Directive 17 are invalid under the Voting Rights Act, but

20   plaintiffs have failed to specify to this Court the days and

21   hours for early in-person voting that they claim would be

22   permissible under the Voting Rights Act, and plaintiffs have

23   not offered any evidence to support whatever it is they claim

24   would be permissible.

25        In other words, plaintiffs are saying that Ohio falls

1    short of some unknown line, and they haven't specified what it

2    is that Ohio has to do to get across that line, and they

3    haven't introduced any evidence supporting their position.

4          Most of the evidence that the plaintiffs have put

5    forward relates to the 2012 presidential election, which, of

6    course, was an historic election involving an historic

7    presidency.

8          There are significant differences between presidential

9    and non-presidential elections, as this Court recognized in the

10   June, 2014, Obama for America opinion where this Court declined

11   to mandate specific voting hours in the 2014 mid-term election

12   based on the 2012 election because, quote, historically, voter

13   turnout is lower in a non-presidential election year.

14         THE COURT:  Just as a reminder, though, the issue was

15   different before the Court in the Obama case.  Counsel for both

16   sides asked me, directly, to determine appropriate hours.  And

17   that was my response.

18         MR. VOIGT:  Okay.

19         THE COURT:  It's a different issue.  It wasn't before

20   me -- what we have today was not before me in Obama for

21   America.

22         And counsel for both sides -- actually, the plaintiff in

23   that case asked me to set the same hours as the directive that

24   I had ordered back in -- instead, I ordered him to set hours

25   back in 2012.  They asked for the same hours.

30

1      So, the remedy is different here than the remedy that

2 was requested in Obama for America.

3          MR. VOIGT:  Your Honor, I apologize if I

4 misinterpreted your opinion.  But I think my point is that --

5          THE COURT:  Well, it was a different animal.

6          MR. VOIGT:  I understand.  And my point is the

7 presidential years and non-presidential years.

8          THE COURT:  Yeah, I understand that.  And that was the

9 difficulty I had with it, too.

10      I mean, let's get real.  Not the same number of voters

11 vote in a non-presidential election year.

12          MR. VOIGT:  Right.

13          THE COURT:  For example, this year, the turnouts are

14 very poor, frankly.  We all know that, over the years,

15 historically.  But more Ohio voters will vote in a presidential

16 election than they will in the gubinatorial election this year

17 and other countywide elections.  And then, in odd number years,

18 it's even worse.  There is not much on the ballot except

19 municipal races and some other things, school levies, I guess,

20 and so forth.

21          MR. VOIGT:  And, Your Honor, --

22          THE COURT:  You can't compare the two.  This is

23 something I have to deal with.  And the remedy, you know, if

24 plaintiffs succeed, is something I have to ponder.

25      To be fair to all Ohio voters, that's what it's all

1      about.

2                  MR. VOIGT:  Yes, Your Honor.  Actually, --

3                  THE COURT:  While I'm at it, though, there is one

4      thing I wanted to point out.

5            The brief filed by the Attorney General of the United

6      States disputes your claim that I should compare Ohio's liberal

7      voting to other states.  The Attorney General argues that

8      Section 2 requires an intensely local appraisal, not a

9      comparison to other states.

10                 MR. VOIGT:  And I respectfully disagree with that.

11           The prior cases -- the prior courts that have looked at

12     this -- and I'll get to this in a bit, but the prior courts

13     that have looked at this looked at a comparison of the voting

14     laws in the -- the challenged voting legislation against other

15     legislation in other states, including the Brown court,

16     which -- the Brown decision in Florida, which I'll get to.

17           And I think -- the issue here is having the opportunity

18     to vote.  And, so, it clearly -- when you are comparing a

19     regime in one state with opportunities in other states, it's a

20     helpful -- it's a helpful -- I'm not saying it's dispositive,

21     you know, reasoning; but it's a helpful comparison as to

22     whether or not there is an equal opportunity.

23                 THE COURT:  I think both sides are relying on the

24     Gingles case.  Aren't you as well?

25                 MR. VOIGT:  We are, Your Honor.  We had a discussion

32

1    on some points, yeah, --

2           THE COURT:  What did the Attorney General state that

3    --

4           MR. VOIGT:  -- although that was a dilution case.

5           THE COURT:  That's where the language came from,

6    "intensely local appraisal of the challenged practice or

7    procedure," cited in Gingles.

8           MR. VOIGT:  Right.  To distinguish that, the Gingles

9    case was a vote-dilution case, rather than vote-denial case.

10          THE COURT:  I understand.

11          MR. VOIGT:  The cases that we're dealing with here are

12   somewhat novel in that there have been very few vote-denial

13   cases thus far.  And, so, many of the frameworks that exist out

14   there were set forth under a different context, and

15   specifically in vote-dilution type context, or Section 5

16   context under the Voting Rights Act.

17          THE COURT:  Well, the Attorney General also rejects

18   your argument when it stated in its brief that the plaintiffs

19   claimed errors of vote-denial claim, not a vote-dilution claim.

20          Did you read the --

21          MR. VOIGT:  No.  No.  I think that we agree.  The

22   plaintiffs are claiming a vote-denial claim.

23          THE COURT:  Right.

24          MR. VOIGT:  Right.  Yes.

25          THE COURT:  Maybe I heard you wrong before, but I

33

1   thought you said this was a vote –– that Gingles applies to a

2   vote-dilution claim.

3         MR. VOIGT:  The point that I made was –– well, the

4   Gingles makes a lot of various propositions, but the underlying

5   issue in Gingles –– and we cited to it for various

6   propositions –– the underlying issue there was a vote-dilution

7   situation.

8         THE COURT:  Okay.

9         MR. VOIGT:  And, then, my only point is that the law

10  is not tremendously developed in this particular area.

11        THE COURT:  I agree with you.  Okay.

12        MR. VOIGT:  And, so, we were talking about the

13  differences between presidential and non-presidential years.

14  And this brings me to the next point.

15        Directive 17 accounts for the differences in turnout

16  between presidential and non-presidential year elections.

17        In 2016, for instance, there will be more voting hours

18  than there will be in 2014, and there will also be evening

19  hours.

20        As for Sunday voting, which plaintiffs' counsel

21  mentioned, there was one Sunday of EIP voting in 2012, as there

22  will be one Sunday of EIP voting in 2014.

23        Plaintiffs should not have waited until just months

24  before the 2014 election to challenge the Sunday voting

25  schedule that they could have challenged back in 2012.

34

1        Not only have plaintiffs failed to meet their factual

2   burden; but, on many critical issues, plaintiffs have

3   introduced absolutely no evidence at all.  There is nothing in

4   the record showing that African Americans vote EIP at a higher

5   rate than whites during the evenings.

6        Plaintiffs have introduced no evidence related to Ohio's

7   mail-in voting opportunities.  Plaintiffs have introduced no

8   evidence indicating that African Americans will use mail-in

9   voting in the upcoming 2014 election to a lesser extent than

10  whites.

11       Of course, the upcoming 2014 election is a

12  non-presidential year election.  Plaintiffs have introduced no

13  evidence with respect to early in-person voting turnout across

14  demographics for the entire State of Ohio for any mid-term

15  election.  This is an extremely important point.  Plaintiffs

16  have introduced no evidence indicating that individuals always

17  vote on the same day at the same time and using the same

18  method.

19       What plaintiffs are saying is that people won't vote

20  under Directive 17 -- people won't vote under the days and

21  hours set forth in Directive 17, but there is absolutely no

22  evidence of that.  There is no evidence in the record

23  indicating that the turnout in the upcoming election will be

24  anything remotely close to the turnout in a presidential year

25  election.

1    So, what evidence have plaintiffs put forward?

2    Well, plaintiffs proffered expert, Dr. Smith, put

3 together a couple of charts.  And these charts make two basic

4 points.

5    First, African American voting on -- African American

6 EIP voting before election days on Sundays is actually pretty

7 low, with the possible exception of the final Sunday before

8 Election Day.  And the final Sunday before Election Day is an

9 EIP voting day under Directive 17.

10    The second point is that, in his opinion, the highest

11 African American EIP voting days are the final seven days

12 before Election Day.  Again, under Directive 17, those seven

13 days are EIP voting days.

14    So, even taking plaintiffs' evidence and lack of

15 evidence at its face value, plaintiffs have failed to meet

16 their burden.

17    In addition to the fact deficiencies that preclude

18 plaintiffs from an injunction, plaintiffs' claims also fail for

19 various legal reasons which are set forth in detail in our

20 opposition brief, but I briefly wanted to mention three of

21 those reasons today.

22    First, plaintiffs are confusing Section 2 and Section 5

23 of the Voting Rights Act.  We even heard opposing counsel

24 mention that during his presentation, which I'll get to at the

25 end.

36

1        Plaintiffs are asking the Court to compare Directive 17

2   with the days and hours of EIP voting that existed previously.

3   This is called a regression analysis, and it is proper only in

4   a Section 5 context.  Ohio is not a preclearance state and

5   Section 5 does not apply here.  Therefore, a regression

6   analysis is not proper.

7        Second, instead of asking whether all Ohioans have

8   access to the political process, plaintiffs want this Court to

9   consider whether there is a disproportionate impact of the new

10  laws.

11       Again, this is not the correct analysis, because it is

12  part of a Section 5 analysis.

13       The plain language of Section 2 of the Voting Rights Act

14  speaks of the opportunity to participate in the political

15  process.

16       And I'd like to point out that other courts have

17  rejected the arguments that plaintiffs have put forward.  By

18  way of example, the Brown decision, from Florida, denied an

19  injunction trying to expand a much more limited EIP period

20  consisting of 48 to 96 hours of EIP voting over eight days.

21       If 48 to 96 hours of EIP voting is permissible,

22  certainly 188 hours of EIP voting must be permissible.

23       Just last Friday, three days ago, in a case called NAACP

24  versus McCrory, which we filed as a supplemental authority over

25  the weekend --

37

```
 1              THE COURT:  Right.

 2              MR. VOIGT:  -- the District Court of North Carolina

 3   denied an injunction challenging ten days --

 4              THE COURT:  When did that opinion come out?

 5              MR. VOIGT:  It came out on Friday.

 6              THE COURT:  You submitted it.  It's 120 pages, I

 7   believe?

 8              MR. VOIGT:  Yes.

 9              THE COURT:  I haven't had a chance -- I learned about

10   it this morning, of course, because you just filed it.  But it

11   was not your fault that you filed it on Friday, I guess, if the

12   opinion wasn't --

13              MR. VOIGT:  Yes, Your Honor.  In other words, the

14   opinion came out after the briefing.

15              THE COURT:  Right.

16              MR. VOIGT:  But we felt that it was relevant to the

17   discussion.

18         So, in that opinion, the District Court in North

19   Carolina denied an injunction challenging ten days of EIP

20   voting.

21         Again, if ten days of EIP voting is permissible,

22   certainly 22 days must be permissible.

23         I also think it's important to call out two portions of

24   the North Carolina opinion.  And I recognize you haven't read

25   it yet, but I just wanted to point to these two points.
```

38

1          First, in Footnote 61 of the opinion, the Court stated

2    that, quote:  Plaintiffs have cited no decision from any court

3    finding a state in violation of Section 2 for failing to

4    maintain a particular number of early voting days.

5          The same failure of proof, the same failure to find any

6    case supporting their position, is present in this case.

7          Second, on page 103 of the opinion, the North Carolina

8    District Court held that plaintiffs had failed to meet their

9    burden of proof, and there was nothing more than speculation

10   that certain demographics would not use the early voting

11   opportunities under the challenged legislation.

12         Again, speculation and absence of proof is what we have

13   here.

14         A third legal failure is that plaintiffs are unable to

15   prove causation.  They have not shown that a single person will

16   be denied the ability to vote based on Ohio's extremely

17   expansive voting opportunities.

18         The only mid-term election Dr. Smith considered was

19   2010, but Dr. Smith's analysis of 2010 was limited to only a

20   portion of five counties in Ohio, and Ohio has 88 counties.

21   Dr. Smith, himself, stated that his conclusion should not be

22   generalized to the entire State of Ohio.

23         In contrast with Dr. Smith's report, one of defendants'

24   experts, Sean Trende, ran calculations on all of Ohio's

25   counties in 2010 and found no statistical difference between

1    African American and white EIP voting.  And, again, that was in

2    2010.

3         Your Honor, the correct inquiry is whether, under the

4    totality of circumstances, the political process is equally

5    open.

6         Plaintiffs have put forward no evidence that one of the

7    most liberal voting regimes across all of America somehow

8    denies Ohioans the opportunity to vote.  And, as a final

9    point -- by the way, I wanted to just touch on a couple of

10   things the plaintiff said after I mention this.

11        THE COURT:  All right.

12        MR. VOIGT:  But, as a final point, early in-person

13   voting and early mail-in voting are both forms of absentee

14   voting.  Okay?

15        It is well established that there is no constitutional

16   right to absentee voting unless there is -- unless there is no

17   other opportunity to vote, such as voting on Election Day.  And

18   we see that in many states, where there is voting on only one

19   day, Election Day.

20        So what, in essence, plaintiffs are doing here is,

21   they're raising policy arguments that are better directed to

22   the legislature, and not to this Court.

23        Respectfully, their motion should be denied.

24        And, if I may, Your Honor, I would like to address just

25   a few points in plaintiffs counsel's presentation.

40

1          THE COURT:  Of course.

2          MR. VOIGT:  As I mentioned, they set forth the wrong

3    standard before the Court.  The correct standard is clear and

4    convincing evidence.

5          During counsel's presentation, he admitted that he is

6    arguing about the elimination of specific voting hours.

7          Again, this is a regression analysis, comparing the old

8    hours against the new hours.  Case after case has said that

9    this is not the proper analysis under Section 2.  That's a

10   Section 5 analysis.

11         Plaintiffs' claim that there is a ban on evening hours

12   is incorrect.  Directive 17 sets different hours for different

13   elections.

14         In 2014, there will be 13 hours of voting on Election

15   Day and two Saturdays and one Sunday.

16         In 2016, a presidential election, there will be more

17   hours, including evening hours.

18         And Directive 17 was specifically set up based on the

19   bipartisan recommendation of the OAEO, which has input from all

20   of Ohio's counties, with an effort to balance the needs of

21   small, medium, and large counties to come up with a uniform

22   system that would treat everyone fairly.

23         And, by the way, the ACLU has been arguing for

24   uniformity, as we set forth in our briefs.

25             THE COURT:  Right.

1    MR. VOIGT:  Plaintiffs' claims seem to be based on the

2    convenience of GOT, or Get-Out-the-Vote efforts.  But that's

3    not the correct test.  The test is whether, under the totality

4    of circumstances, the political process is equally open.

5    I think plaintiffs would have a hard time arguing that

6    one of the most liberal voting regimes in America -- under one

7    of the most liberal voting regimes in America the political

8    process is not equally open to all Ohioans.

9    Opposing counsel briefly mentioned 2010.  In 2010, the

10   boards of election had discretion to set their own hours.  In

11   the vast majority of cases -- the vast majority of counties had

12   no evening hours and shorter hours than exist under

13   Directive 17.

14   Plaintiffs' counsel also mentioned Secretary of State

15   Husted's decisions to break ties of the boards of elections.

16   When Secretary of State Husted broke those ties, he broke them

17   in favor of the boards' normal business hours.

18   Also, I believe there may have been a misstatement about

19   the length of time that no-fault early in-person voting has

20   been in existence.

21   Here in Ohio, no-fault early in-person voting of the

22   types of mail-in, no-excuse and in-person voting has been in

23   existence only since 2005.

24   THE COURT:  Right.  I didn't hear anything.

25   MR. VOIGT:  I'm sorry.  I may have misheard, and I

42

1    apologize for that, but I just wanted to clarify that.

2         THE COURT:  Okay.

3         MR. VOIGT:  And, lastly, the plaintiffs have quoted to

4    one individual who made some unfortunate and improper remarks,

5    and they somehow seek to use that to prove that Senate Bill 238

6    and Directive 17 are discriminatory or passed with a

7    discriminatory intent.

8         That was one individual.  And, by the way, the

9    individual was a Franklin County member of the board of

10   elections.  He was not a member of the General Assembly.  He

11   was not a member of the Secretary of State's staff.  Plaintiffs

12   have introduced nothing else and can't genuinely claim that

13   Directive 17 was passed with a discriminatory intent.

14        Thank you for your time.  And I'll pass the podium over

15   to my colleague.

16        THE COURT:  Thank you.

17        MR. ARMSTRONG:  Good morning, Your Honor.

18        THE COURT:  Good morning.

19        MR. ARMSTRONG:  Thank you for indulging us with two

20   bites at this apple.

21        THE COURT:  Sure.

22        MR. ARMSTRONG:  Assistant Attorney General Kris

23   Armstrong.  I'm lead counsel for the Attorney General in this

24   case.  And I will be addressing some different points from what

25   Mr. Voigt addressed.  I'm going to talk about some of the facts

1   regarding SB 238, and then talk about some points of law

2   regarding the Fourteenth Amendment claims as relate to both

3   SB 238 and Directive 2014-17.  But, first, a few facts with

4   respect to Golden Week, which is the main issue with respect to

5   SB 238.

6         As Your Honor knows from reading the briefs, prior to SB

7   238, there was approximately a week at the very beginning of

8   the early voting period where voters could register to vote and

9   could vote on the same day.  However, as plaintiffs' own

10  expert, Professor Smith, acknowledges, very few voters actually

11  took advantage of the essence of Golden Week, which was the

12  ability to register and to vote on the same day.

13        In the 2012 General Election, according to Dr. Smith's

14  report, only five-and-a-half percent of voters who were

15  registered to vote during Golden Week actually went on and cast

16  their ballot during Golden Week.  The other ninety-four-and-

17  a-half percent of people who came in and registered during

18  Golden Week either didn't vote or waited until later in the

19  voting cycle to vote.  And there is no evidence in the

20  record -- none -- regarding what percentage of the small number

21  of Ohioans who did register and vote during Golden Week, that

22  five-and-a-half percent, were African American or any other

23  race.  We just don't know what race they were.  There is no

24  evidence in the record that African American voters in Ohio

25  utilized same-day registration and voting at rates higher than

44

1    whites or other voters.

2          The best plaintiffs have with respect to Golden Week --

3    and, again, the essence of Golden Week being that you can

4    register and vote on the same day -- is some studies in other

5    states showing a modest increase in voter turnout in general,

6    across all voters, where same-day registration was introduced.

7          But, as Professor McCarty, one of the Defendants'

8    experts, testified, the same-day registration -- quote,

9    unquote, same-day registration laws in those states that were

10   studied in the studies that plaintiffs have submitted were so

11   different from Ohio's version of same-day registration as to

12   not really be probative of any changes -- the results of any

13   changes in Ohio's law.

14         The states in those studies permitted registration

15   either on Election Day itself or much closer to the election

16   than Ohio's former system in which same-day registration and

17   voting were only offered for a short time a month before the

18   election, which is a time when many voters are simply not yet

19   engaged, as illustrated by the fact, again, that

20   ninety-four-and-a-half percent of voters who registered during

21   Golden Week in 2012 waited until later to come back and cast

22   their votes.

23         It's undisputed in the academic literature and in this

24   case that the vast majority of voters vote closer to the

25   election.

1          Finally, with respect to the studies that they've

2    submitted, as plaintiffs have been keen to note in many of the

3    depositions, including Dr. McCarty's, those studies all dealt

4    with the effect of adding same-day registration.  There are no

5    studies that have been cited showing a reduction in turnout

6    from eliminating same-day registration.

7          Moreover, Ohio is far from alone in not having same-day

8    registration under the current law.  As shown in Sean Trende's

9    report, 35 other states, including large states like Ohio, with

10   equal or greater African American population shares than Ohio,

11   including New York, Pennsylvania, Michigan, and Missouri, all

12   do not have any form of same-day registration.

13         Finally, as shown in the declarations from various board

14   of elections officials that the General Assembly submitted and

15   which would be submitted at trial in this matter, Ohio's choice

16   to eliminate same-day registration does relate and will achieve

17   important government interest, including reducing the potential

18   for fraud by giving the boards of elections a better

19   opportunity to verify the registrants' identity before allowing

20   them to cast a ballot.

21         THE COURT:  What proof is there that you can give to

22   this Court that voter fraud accelerated after 2005?

23         MR. ARMSTRONG:  Your Honor, I don't believe that that

24   is in evidence, and that's -- that's not something that we're

25   claiming.

46

1      I think what's being claimed is that same-day

2  registration is one aspect of the voting regime that makes it

3  more difficult to verify people's identities before they're

4  allowed to cast a ballot.

5      The other measures -- the measure was supported by the

6  OAEO bipartisan organization comprised of Ohio's election

7  officials.  These are the people who are the boots on the

8  ground who are dealing with this day in and day out who

9  supported the elimination of same-day registration.

10      Finally, I would also note that, in the case that

11  Mr. Voigt mentioned, the North Carolina vs. McCrory case, or

12  North Carolina NAACP vs. McCrory case, the Court on Friday

13  denied a preliminary injunction on claims challenging the

14  elimination of same-day registration and the shortening of the

15  early in-person voting period, among several others.  And we've

16  submitted a copy of that.

17      Now I would like to make several points regarding the

18  Plaintiffs' Fourteenth Amendment claims, Your Honor.

19      First, it has long been settled by the U.S. Supreme

20  Court that there is no constitutional right to an absentee

21  ballot, as Mr. Voigt mentioned, unless there is no opportunity

22  to vote on Election Day.

23      Similarly, there is no constitutional right to same-day

24  registration.

25      The Supreme Court has sanctioned the registration

47

1    deadline 30 days before the election in the Crawford case.

2         So, the question before this Court, then, is whether

3    Ohio's choice to go above and beyond the constitutional floor

4    and have early voting on 22 of the 28 days before the election,

5    with registration ending on the 29th day before the election,

6    violates the Fourteenth Amendment.  It doesn't for several

7    reasons.

8         First, as argued in our brief, we believe the proper

9    test here is the rational basis test under the McDonald case,

10   but that's argued in our brief.

11        I'm going to go ahead and address the Anderson/Burdick

12   test, because that is something that was applied in North

13   Carolina and I think this Court has applied in the past.

14        In the event Anderson/Burdick does apply, plaintiffs

15   still can't show a likelihood of success on the merits.

16        First, as in the North Carolina case, plaintiffs cannot

17   show that the lack of same-day registration imposes a severe

18   burden on anyone's right to vote.

19        There is no way this could be so as the Supreme Court,

20   in Crawford sanctioned the registration deadline 30 days before

21   the election where no early voting is offered, and there is no

22   constitutional requirement to provide early voting at all.

23        So, if Ohio's lack of same-day registration severely

24   burdens voters, then so does the voting laws of 35 other

25   states.

48

1    Ohio's law requiring that registration end before early

2    voting begins isn't the type of restriction that imposes a

3    severe burden.  To the contrary, it's a reasonable,

4    nondiscriminatory restriction on the right to vote.

5    Similarly, Ohio's provision of 22 days of early voting,

6    including two Saturdays and a Sunday, coupled with 13 hours on

7    Election Day which include evening hours, cannot impose a

8    severe burden on Ohio's voters as Ohio is not required,

9    constitutionally, to offer any early voting at all.

10    If New York's voting laws are constitutional, Ohio's,

11    which go far beyond and, in fact, offer more opportunity than

12    42 other jurisdictions, including the District of Columbia,

13    are, too.

14    The retrogression analysis that plaintiffs urge, which

15    is comparing the opportunity under the current law with the

16    opportunity under the prior law, has no more place in the

17    Fourteenth Amendment analysis than it does under a Section 2

18    analysis.  In fact, it would be an affront to the very essence

19    of the Equal Protection Clause if that clause prohibited Ohio,

20    because it once offered a 35-day early voting period, from

21    reducing it to 28 days but would allow New York or another

22    state never having offered early voting to continue to do so,

23    thereby creating inequality amongst the states.  But even if

24    it somehow did -- even if it somehow did, plaintiffs have

25    failed to present any evidence that African American voters

49

1    would be severely burdened by the changes that plaintiffs

2    challenge.

3         There is no evidence in the record that African

4    Americans whose previously voted on days during which the polls

5    aren't open in 2014 will not simply switch to a different day.

6         Plaintiffs' expert, Professor Smith's, report in this

7    case contains no data on that.  Professor Smith's report is

8    descriptive, but it is not predictive.  It merely attempts to

9    establish what voting mechanisms African Americans have used in

10   the past.

11        And I would point out, with respect to Professor Smith's

12   report, I would urge Your Honor to read the depositions and the

13   reports of Professors Brunell and McCarty, who are professors

14   at the University of Texas at Dallas and Princeton University,

15   respectively, who take issue with many of the methodologies

16   utilized in Dr. Smith's report, not only the regression

17   analyses that are used, regression being a statistical

18   methodology that's distinct from retrogression, which is the

19   Section 5 analysis that plaintiffs are urging, just for

20   clarity.

21        We also take issue with his data collection.  It's

22   unclear that a lot of the data that Professor Smith relied on

23   is actually accurate given the inconsistencies in coding what

24   days people vote at the various counties' boards of elections.

25   It's entirely possible that votes were not necessarily recorded

1    on the dates in the early voting period in which they were

2    actually cast.

3         So, the important thing is that Professor Smith's report

4    contains no data on what any group of voters will do in the

5    future, but plaintiffs have introduced a study into the record

6    that addresses that issue, but it undercuts their claims.

7         If Your Honor looks at Exhibit 5 of Professor McCarty's

8    deposition, that's a study that was done by plaintiffs' own

9    expert, Professor Smith, and a co-author, Michael Herron.

10        In that study, Professors Smith and Herron looked at

11   what happened to voter turnout after Florida reduced the number

12   of early in-person voting days from fourteen to eight and

13   eliminated same-day registration -- I'm sorry -- and eliminated

14   the first Sunday.

15        I didn't mean to say same-day registration. I should

16   correct that.

17        They eliminated the final Sunday of early voting.  They

18   did this between the 2000 election and the 2012 election.  So,

19   they reduced the number of voting days, and they eliminated the

20   final Sunday of early voting.

21        What Professor Smith and Herron found was that African

22   Americans did utilize early in-person voting less in 2012 than

23   they had in 2008.  That was true.  But, importantly, as set

24   forth in Table 3 of the study, which is Exhibit 5 to Professor

25   McCarty's deposition, more African Americans voted in Florida

1    in the 2012 general election, overall, than had in 2008, and

2    the African American share of the voting electorate was more in

3    2012 than it was in 2008.

4         So, this means that, in Florida, despite the elimination

5    of those days, more African Americans voted in the election

6    overall; and, while they used the EIP voting less, they voted

7    on Election Day more; and their share of the electorate, their

8    power as a voting block, went up as well.  And there is no

9    evidence to suggest that Ohio's voters, of whatever race, won't

10   do the same as Florida's voters and adjust to the new schedule.

11        As plaintiffs have not shown that Ohio voters are

12   severely burdened by enjoying the ninth most liberal voting

13   system in the country, Ohio's choices are justified by the

14   important state interest of uniformity across Ohio's 88

15   counties, which is something that plaintiffs' counsel, the

16   ACLU, has long advocated for, and of reducing the potential for

17   fraud and on efficiently spending taxpayer dollars on board of

18   elections' resources, including employee salaries.  And they

19   must provide for employees to be there to register people and

20   to take their ballots.

21        Ohio has 88 counties.  They vary in size greatly.  For

22   example, Directive 2014-17 was based on a plan that was put

23   forth by the OAEO, which is representative of all Ohio's

24   counties, and attempted to take into account, as evidenced by

25   the affidavits from the OAEO folks, or the declarations, the

1  needs of not only Cuyahoga County, but Clinton County, to try

2  to find a plan that would be uniform, but that would also,

3  especially in a non-presidential election, accommodate the

4  resources and utilization of early voting in all of the

5  counties.

6       This interest is important.  As I said, the issue is a

7  years' long call for uniform hours across the state.

8       And it's important to note that if this Court strikes

9  down SB 238 and Directive 2014-17, no law will be in place that

10 requires any particular early voting schedule.  So, Ohio's

11 counties would be free, as they were in 2010, to set their own

12 schedules.

13      Some might set schedules that are broader than the one

14 in Directive 2014-17, but many will, undoubtedly, set schedules

15 that provide less early voting opportunities than does

16 Directive 2014-17.

17      Voters, including African American voters in Allen

18 County or Washington County, should have no less opportunity to

19 vote than voters in Cuyahoga County.  And, at the same time,

20 Ohio's counties do vastly differ in their resources, their

21 ability to provide for early voting and in their general

22 utilization of it.  That's why the OAEO suggested what it

23 suggested and why the Secretary did what he did in adopting the

24 current hours.

25      SB 238 and Directive 2014-17 are justified by these

1   legitimate State interests.

2        In sum, Your Honor, the statute and the directive

3   provide the same voting opportunities to all Ohioans no matter

4   their race, no matter where they live.  It's a generally

5   applicable nondiscriminatory voting regulation of the exact

6   type the Sixth Circuit said would be upheld in the Obama for

7   America case.

8        It, obviously, as Your Honor has acknowledged, differs

9   from the issues that were before this Court in the OFA case,

10  because in that case two classes of voters were subject to

11  different rules.  There were different rules for UOCAVA and

12  non-UOCAVA voters.  Here, the rules apply the same way to

13  everyone.

14       There is absolutely, moreover, no evidence in the record

15  of any intent on the part of the General Assembly or the

16  Secretary to disenfranchise African Americans.

17       Importantly, there is no evidence that the current

18  system makes it impossible for anyone to vote; rather, that

19  some voters may not be able to vote at the time or with the

20  method they may prefer or may have used in the past.  But Ohio

21  provides around-the-clock early voting by mail, voting on

22  Saturdays, voting on Sunday for this election and voting on 13

23  hours, including early morning and evening hours, on Election

24  Day itself, the latter of which, the voting on Election Day

25  itself, is all the residents of Pennsylvania, Michigan, New

54

1   York and dozen of other states are offered.

2        The goal in Ohio is to make it easy to vote and hard to

3   cheat.  And that's exactly what SB 238 and Directive 2014-17

4   do.

5        As in the North Carolina case, the plaintiffs here

6   haven't shown they're entitled to extraordinary relief by clear

7   and convincing evidence, which is the burden they bear here.

8        And we respectfully ask the Court to deny the motion for

9   a preliminary injunction.

10       Thank you.

11          THE COURT:  Thank you.

12          MR. YOUNG:  Your Honor, may I have a minute to confer

13  with my colleagues?

14          THE COURT:  Sure.

15       Do you want to take a short recess?

16          MR. YOUNG:  Sure.

17          THE COURT:  About ten minutes.

18          (Whereupon, a recess was taken from 10:25 a.m., and

19  the proceedings reconvened at 10:40 a.m.)

20                          - - -

21    IN OPEN COURT:

22          MR. YOUNG:  Your Honor, if we can just respond, real

23  briefly, to defendants' arguments, number one, this is a

24  case -- Your Honor is well aware this is not about the absolute

25  right to "X" number of days of early voting.  This is about how

55

1    Ohio has redefined its in-person early voting period to roll

2    back specific voting opportunities that Ohioans have

3    increasingly come to rely on over the years.

4         This is not about a comparison to other states. Your

5    Honor is well aware of that. That's not in OFA. And, under

6    Stewart, it requires an intensely local appraisal.

7         Another reason you can't compare it to other states is

8    because, other states, there are many different factors other

9    than raw number of voting days.

10        Florida/Miami-Dade County has 20 polling locations.

11   Ohio has one. Other states have different kinds of hours. Not

12   all hours are created equal.

13        Second, Your Honor, about the mid-term elections, this

14   case is not about turnout. Mid-term elections or low turnout

15   does not affect -- does not change the circumstances of a

16   low-income voter who cannot take time off work to vote. And

17   that's what the Secretary of State, in 2010, recognized when

18   she voted in favor of expanded evening and weekend hours in the

19   2010 mid-terms.

20        Also, just real briefly, when we talk about the mid-term

21   elections, it's kind of odd for defendants to kind of

22   characterize it as if it's not as important when both

23   defendants are running for reelection, we're voting for a

24   governor, we're voting for every single member of the Ohio

25   House of Representatives and half of the Ohio Senate, when

1    we've demonstrated history of difficulties of African Americans

2    winning those exact offices.

3            And, lastly -- not lastly, but the next point, which is

4    just a factual error, they say we haven't presented evidence

5    that African Americans use evening hours more than whites.  I'd

6    point to Exhibit 5 and Exhibit 7.

7            They've said that African Americans don't vote by mail;

8    we haven't shown that African Americans don't vote by mail.

9    I'd point to Exhibit 8 and Exhibit 6.

10           They've also pointed out that Dr. Smith said that there

11   weren't that many people who took advantage of same-day

12   registration.

13           Your Honor, defendants' own documents -- this is Exhibit

14   50 and Exhibit 52 -- showed that over 14,000 Ohioans took

15   advantage of same-day registration in 2012.  That's an increase

16   from the 12,600 voters who took advantage of same-day

17   registration in 2008.

18           Next, Your Honor, we talk about -- defendants talk about

19   this aspect of retrogression in Section 2.

20           Retrogression, you do look at.  You compare the old

21   versus the new.  And that is under Section 5.  But, as the

22   Sixth Circuit explained in Stewart, under Section 2, you're

23   comparing the relative burdens that are imposed by challenged

24   voting restrictions on blacks versus whites.

25           So, in Stewart, that was the challenge to old voting

57

1   technology.  In Frank v. Walker, that was a challenge to the

2   voter ID law.  And, in Operation Push, that was a challenge of

3   the failure to have satellite registration offices.

4           Next, let's talk very briefly about North Carolina,

5   which I understand Your Honor hasn't had a chance to digest.

6   But North Carolina is entirely distinguishable on the facts.

7           In North Carolina, they eliminated several days from the

8   early voting period.  But, as the District Court explained on

9   page 94 of its decision, quote:  The decrease in permissible

10  days is coupled with a required increase in voting hours.

11          And those boards of elections in North Carolina can meet

12  that requirement either by opening more voting sites or by

13  having more hours, including on evenings and weekends.

14          In Ohio, they can't open any more polling sites by law.

15  And, in Ohio, this year, they can't have any evening hours.

16  So, those -- that, alone, distinguishes this case from North

17  Carolina.

18          With respect to the North Carolina case's discussion of

19  the same-day registration issue, first of all, the Court

20  acknowledged that African Americans use same-day registration

21  more than whites.  But the Court rejected the same-day

22  registration claim because it found that there was not enough

23  time to verify the registration because, in North Carolina, the

24  same-day registration period extends all the way to Election

25  Day.

1    So, that's the critical difference here, Your Honor.

2    Here, same-day registration ends nearly 30 days before

3 Election Day.  There is plenty of time to verify the

4 registration.

5    Lastly, the North Carolina Court found -- and this is on

6 page -- I apologize.  I don't have the exact page number, but

7 the quote is:  Plaintiffs did not show any fewer Sunday hours

8 will be offered this year than in 2010.

9    Your Honor, we've shown here that, in 2010,

10 seventy-eight percent of the State's African Americans had

11 access to multiple Sundays.  This year, zero percent of the

12 States' African Americans will have access to multiple Sundays.

13    Real briefly about the argument about differential

14 treatment of voters, Your Honor well knows that the Sixth

15 Circuit explained, in Northeast Coalition for the Homeless, the

16 2012 case, that an absolute burden on the right to vote can

17 also violate the Constitution.

18    They make a point about causation:  that we haven't

19 showed that these restrictions make it impossible for people to

20 vote.

21    The Sixth Circuit, in Stewart, already rejected that

22 notion that we have to demonstrate outright denial of the right

23 to vote.

24    The next point they mentioned, Sean Trende, because --

25 this is very misleading, Your Honor, so I want to be very clear

1    about this -- they say that Sean Trende looked at data from all

2    88 counties in 2010 and found no racial difference in the use

3    of early voting.

4         I think this is on page 52 of Trende's report.  He

5    relies on U.S. Census Bureau survey data.  Okay?  He is not

6    relying on the State's data.  He is relying on survey data.

7    And, as Dr. Smith explains on page 140 of his deposition, the

8    survey sample from 2010 is too small to draw any reasonable

9    conclusions.  That's why he relies on 2008, which showed double

10   the rate, and 2012, which showed triple the rate.

11        And I also want to make sure Your Honor understands

12   defendants' three experts, Dr. McCarty, Dr. Brunell and Mr.

13   Trende, their qualifications in this case, Your Honor, are very

14   questionable.

15        Dr. Trende -- I'm sorry.  Mr. Trende doesn't have a

16   Ph.D.  He's a -- it's spelled p-s-e-p-h-o-l-o-g-i-s-t.  He is

17   that word, which I hadn't heard before.  And there is no degree

18   or professional certification in psephology.  There is no

19   university with a department in it, and there is no

20   professional associations in psephology.  And that is found in

21   Exhibit 70.

22        Dr. McCarty expressly admitted that he did not consider

23   himself an expert in early voting.  That's on page 37.  And

24   he's never written anything on the burdens imposed by

25   eliminating early voting, and he's never written about same-day

60

1  registration.  That's page 40 to 42.

2      Dr. Brunell conceded he's never written an article about

3  early voting, never did any empirical studies on early voting.

4  That's pages 43 to 45 and 51 to 57.  And defendants, again, are

5  repeating this kind of mantra about preferences and

6  convenience.

7      Your Honor, this is not about the hypothetical middle-

8  or upper-class person, which probably describes everyone here.

9  This case is about low-income voters.  And plaintiffs have

10  produced overwhelming evidence of the reality they face in

11  their day-to-day lives.

12      Lastly, Your Honor, this uniformity point.

13      Uniformity does not justify the elimination of hours

14  across the board.  It just as easily justifies adequate hours

15  across the board.

16      Your Honor, you should grant plaintiffs' motion for

17  preliminary injunction.

18      THE COURT:  All right.  Thank you.

19      If there is any misstatement to be corrected, otherwise,

20  what does defense have to add?

21      MR. VOIGT:  Just two quick points, if I may, Your

22  Honor.

23      THE COURT:  All right.

24      MR. VOIGT:  And, if I may, just -- my colleague could

25  maybe just have one quick point or two --

61

```
1          THE COURT:  All right.  Sure.

2          MR. VOIGT:  -- with your permission.

3          THE COURT:  All right.

4      In chambers, we said I'll allow rebuttal; but, if there

5  is something that needs clarified, I'm open to it.

6          MR. VOIGT:  Okay.

7      Real quickly, regarding the applicability of other

8  states' -- the voting laws of other states, obviously,

9  plaintiffs do not want this Court to consider the laws of other

10 states because Ohio has one of the most liberal voting systems

11 in the entire United States.

12         THE COURT:  Right.  I know that.  We've been over

13 that.  I even stated that in the Obama case.  I know that.

14         MR. VOIGT:  And other courts, in looking at these EIP

15 early voting issues, have looked at other states to compare

16 where they stand with the other states.

17     And one other quick point.

18     Dr. Smith, one of plaintiffs' experts, did not consider

19 in his report the time of day when individuals vote, either

20 African Americans or whites.  I just wanted to point that out.

21         THE COURT:  All right.  Thank you.

22         MR. ARMSTRONG:  Two very quick points, Your Honor, and

23 I appreciate your indulgence.

24     Point 1.  With respect -- and this is just in response

25 to plaintiffs' new statements regarding Professor McCarty's
```

1    qualifications.

2         I urge Your Honor to read Professor McCarty's report in

3    his deposition.  He is a professor at Princeton University.  He

4    is one of the most brilliant people I've ever met.  And the way

5    he addresses the issues, I think, is very, very easy to

6    understand for lay people.

7         His qualifications -- he is not an expert who has

8    published in early voting, but he is an expert in political

9    science.  He earned his Ph.D. in three years, his master's

10   degree and his Ph.D. in three years.  He's taught at Columbia

11   and Princeton.  He is an expert at doing the sorts of empirical

12   studies that he applied in this case to address Dr. Smith's

13   report.

14        My last point, Your Honor, plaintiffs' argument in this

15   case, if it prevailed, would create a system under which a

16   state could expand its voting opportunities, but could never

17   contract them.  No case says that Section 2 requires that.

18        Thank you, Your Honor.

19          THE COURT:  All right.

20        Thank you, Counsel.  This matter is submitted, and the

21   Court will take it under advisement.

22        (The proceedings were adjourned at 10:50 a.m.)

23                              - - -

24

25

63

C E R T I F I C A T E

United States of America

Southern District of Ohio


        I, Denise N. Errett, Official Court Reporter of the

United States District Court for the Southern District of Ohio,

do hereby certify that the foregoing 62 pages constitute a true

and complete transcription of my stenographic notes taken of

the proceedings held in the afore-captioned matter on the 11th

day of August, 2014.

        In testimony whereof, I hereunto set my hand on the

12th day of August, 2014.




                        /S/Denise N. Errett, FCRR
                        Denise N. Errett, FCRR
                        Official Court Reporter
                        Southern District of Ohio