## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **OHIO STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,** | **Case No. 2:14-cv-404** |
| **Plaintiffs,** | **Judge Peter C. Economus** |
| **v.** | **Magistrate Judge Norah McCann King** |
| **JON HUSTED, et al.,** | **MEMORANDUM OPINION AND ORDER** |
| **Defendants.** | |

Presently pending before the Court is the Plaintiffs' Motion for a Preliminary Injunction (Doc. 17). For the reasons that follow, the motion is **GRANTED** and the Court issues the preliminary injunctive relief specified herein.

### I.

Plaintiffs the Ohio State Conference of the National Association for the Advancement of Colored People; the League of Women Voters of Ohio; the Bethel African Methodist Episcopal Church; Omega Baptist Church; College Hill Community Church Presbyterian, U.S.A.; the A. Philip Randolph Institute; and Darryl Fairchild bring the instant action challenging the impact of a recent amendment to the Ohio Revised Code and directives issued by Ohio Secretary of State Jon Husted to Ohio's early in-person voting ("EIP voting") scheme under the Fourteenth Amendment to the Constitution of the United States and Section 2 of the Voting Rights Act of 1965. The Defendants include Secretary Husted and Ohio Attorney General Mike DeWine, both sued in their official capacities.

The Ohio General Assembly enacted the EIP voting scheme in 2005 as a result of the problems, including long lines and wait times, faced by voters during the 2004 presidential

election.  The scheme permits all voters to vote by absentee ballot either by mail or in person without having to provide an acceptable excuse as previously required for absentee voting.  OHIO REV. CODE. § 3509.02(A).[1]  Each county Board of Elections ("Board") is permitted to establish only one location for EIP voting.  *See* OHIO REV. CODE § 3501.10(C).  Prior to June 1, 2014, the Boards were required to provide absentee ballots for most voters for either EIP voting or mail-in voting starting on the 35th day before an election.  *Id.* § 3509.01(B)(2) (2014) (as amended Feb. 25, 2014).  As Ohio law requires citizens to be registered only thirty days prior to an election in order to be eligible to vote, OHIO CONST. § 5.01; OHIO REV. CODE § 3503.01(A), prior to June 2014, a several day period existed wherein a citizen could register to vote and cast a ballot on the same day.  The Plaintiffs refer to this period as "Golden Week."

On November 13, 2013, the Ohio Senate introduced Senate Bill 238 ("SB 238"), which was subsequently passed by the Ohio House of Representatives and Senate on February 19, 2014, and signed into law by Ohio Governor John Kasich on February 21st.  SB 238 amended subsection 3509.01(B) to read in part that, "[f]or all voters who are applying to vote absent voter's ballots in person, ballots shall be printed and ready for use beginning on the first day after the close of voter registration before the election."   OHIO REV. CODE § 3509.01(B)(3).  This amendment, which the Plaintiffs now challenge, eliminates Golden Week and reduces the available days for EIP voting from 35 to 28.  It became effective June 1, 2014.  SB 238's amendments thus apply to the 2014 general election, which is scheduled for Tuesday, November 4, 2014.  Races to be contested during the election include those for Governor, Attorney General, Treasurer, Auditor, seats for the United States House of Representatives, and seats in the General Assembly.

---

[1] Prior to 2005, a voter needed a statutorily approved "excuse" to vote absentee.  Possible excuses included being over age 62, having a physical disability or infirmity, or being out of his or her home county on Election Day.  (Parties' Joint Statement of Undisputed Facts ¶ 4, Doc. 62 (citing OHIO REV. CODE § 3509.02(A)(1)–(8) (2004).)

The Plaintiffs also challenge recent directives issued by Secretary Husted setting uniform EIP voting hours for the entire state for future elections.  On February, 25, 2014, Secretary Husted issued Directive 2014-06, which set hours for the 2014 primary and general elections but did not include EIP voting hours for the Sunday and Monday immediately preceding Election Day.  (Pls. Ex. 36, Doc. 18-36.)  Directive 2014-06 also did not include EIP voting hours for: Tuesday, September 30, 2014 through Monday, October 6th (days that could have been used for EIP voting but for the operation of SB 238[2]); Saturday, October 11th; Sunday, October 12th; Monday, October 13th (Columbus Day); Saturday, October 18th; Sunday, October 19th; and Sunday, October 26th.  (Pls. Ex. 36, Doc. 18-36.)  Moreover, Directive 2014-06 does not include evening EIP voting hours on any day, instead setting typical hours of 8 a.m. to 5 p.m. for all weekdays and 8 a.m. to 4 p.m. for Saturday, October 25th and Saturday, November 1st.  (Pls. Ex. 36, Doc. 18-36.)

On June 11, 2014, this Court issued a permanent injunction in *Obama for America et al. v. Husted et al.*, 2:12-cv-636, requiring Husted to restore EIP voting on the three days preceding all future elections and to set uniform voting hours for those days.  *Obama for Am. v. Husted*, Case No. 2:12-cv-636, Doc. 90 at 2 (S.D. Ohio June 11, 2014).  As a result, Secretary Husted issued Directive 2014-17, which superseded Directive 2014-06.  (Pls. Ex. 37, Doc. 18-37.) Directive 2014-17 is apparently intended to set uniform EIP voting hours for all future elections and includes three categories of elections: (A) Presidential General Elections; (B) Presidential Primary Elections and Gubernatorial General Elections; and (C) Regular Municipal Elections, Primary Elections, and Special Elections.  (*See* Pls. Ex. 37, Doc. 18-37.)  The section covering Gubernatorial General Elections, which would include the 2014 General Election, sets identical EIP voting hours as Directive 2014-06 when applied to the 2014 voting season except that it adds

---

[2] October 6, 2014 is the final day of voter registration for the 2014 general election.

voting hours on Sunday, November 2nd and Monday, November 3rd as required by the permanent injunction in *Obama for America*.  (Pls. Ex. 37, Doc. 18-37.)

Aside from the permanent injunction, which applies only to the final three days of early voting, Secretary Husted's legal authority for requiring the individual Boards to adhere to uniform EIP voting hours is unclear as no Ohio statute requires uniform EIP voting hours throughout the state.  Further, the Ohio Revised Code vests the Boards with general authority to set their own business hours, providing that:

> The board of elections in each county shall keep its offices, or one or more of its branch registration offices, open for the performance of its duties until nine p.m. on the last day of registration before a general or primary election. At all other times during each week, the board shall keep its offices and rooms open for a period of time that the board considers necessary for the performance of its duties.

OHIO REV. CODE § 3501.10(B).  Each Board is comprised of four members, and the Secretary of State is given the final authority to resolve tie votes or disagreements within individual Boards. *Id.* § 3501.11(X).  However, the Plaintiffs in neither *Obama for America* nor the instant case have directly challenged Secretary Husted's practice in attempting to set uniform voting hours, which began with the 2012 Presidential Election.  (*See* Parties' Joint Statement of Undisputed Facts ¶¶ 15, 17, Doc. 62 at 3.)

On May 1, 2014, the Plaintiffs filed their complaint stating claims under the Equal Protection Clause and Section 2 of the Voting Rights Act of 1965.  The Plaintiffs generally assert that SB 238's amendments to Ohio election law and the current EIP voting schedule established by Directive 2014-06 (now 2014-17) impermissibly burden the right to vote of various groups including African Americans, lower income individuals, and the homeless.  Specifically, the Plaintiffs argue that the voting opportunities for members of these groups are disproportionately impacted by the elimination of Golden Week, the lack of evening voting hours during the EIP

voting period,[3] and the lack of EIP voting opportunities on any Sunday during the voting period except for the last Sunday before an election.

On June 30, 2014, the Plaintiffs moved for a preliminary injunction enjoining the enforcement of SB 238 and requiring Secretary Husted "to set uniform and suitable in-person early-voting hours for all eligible voters that includes multiple Sundays and weekday evening hours." (Doc. 17 at 61.)  Following the completion of briefing and a hearing held on August 11, 2014, that motion is now ripe for consideration.  In deciding the motion, the Court has duly considered: the briefs, authorities, and evidence submitted by the Parties; their arguments at the hearing; the briefs and exhibits submitted by Amici Curiae the Ohio General Assembly, Cuyahoga County, Ohio, and the Ohio Senate Democratic Caucus and the Ohio House Democratic Caucus; and the statement of interest of the United States.

## II.

As an initial matter, Secretary Husted argues that the Plaintiffs' motion is barred by laches, pointing out that they filed the motion 98 days before early voting is to begin, 125 days after Directive 2014-06 was issued, and 60 days after they filed their complaint.  Secretary Husted acknowledges that the Plaintiffs provided notice in their complaint that they intended to seek a preliminary injunction, but argues that the delay in filing the motion greatly prejudices the Defendants because they will have to conduct unnecessarily expedited discovery.  He asserts that the "Defendants have been forced to respond to the Plaintiffs' 51-page motion and hundreds of pages of exhibits and reports in just three weeks and two days."  (Response, Doc. 41 at 48–50.)

"It is well established that in election-related matters, extreme diligence and promptness are required.  When a party fails to exercise diligence in seeking extraordinary relief in an

---

[3] The Court notes that Directive 2014-17 does provide for evening hours during the third and fourth weeks of EIP voting for presidential general elections.  (Pls. Ex. 37 at 1, Doc. 18-37.)

election-related matter, laches may bar the claim." *McClafferty v. Portage Count Bd. of Elections*, 661 F. Supp. 2d 826, 839 (N.D. Ohio 2009) (internal citations and quotation marks omitted). "Laches is the 'negligent and unintentional failure to protect one's rights,'" and "[t]he doctrine is rooted in the notion that 'those who sleep on their rights lose them.'" *Id.* at 840 (citations omitted). "To invoke . . . laches, a party must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir. 2003) (citation and internal quotation marks omitted).

The Court finds that Secretary Husted has not shown such a lack of diligence. While the Defendants have been forced to respond quickly to a 51-page motion and voluminous exhibits, Defendant Husted does not demonstrate how such extensive materials should have been produced sooner by the Plaintiffs. The Court therefore rejects Secretary Husted's argument regarding laches.

## III.

The Court will now summarize the evidence submitted by the Parties and Amici Curiae and its factual findings. The Court will first discuss EIP voting opportunities as they existed during the 2008, 2010, and 2012 elections. Second, the Court will discuss the origins of and asserted justifications for SB 238 and Secretary Husted's directives. Third, the Court will briefly discuss overall voting opportunities available to voters during the 2014 general election and the mechanics of voting by mail. Finally, the Court will consider the anecdotal and statistical evidence, including the opinions of the Parties' experts, either supporting or refuting the Plaintiffs' position that the combined effects of SB 238 and Directive 2014-17 disproportionately burden the voting rights of certain groups of Ohio voters.

### A. EIP Voting During the 2008, 2010, 2012 General Elections

As noted in Section I *supra*, prior to the 2012 election, each Board exercised its discretion to set EIP voting hours and days. (Parties' Joint Statement of Undisputed Facts ¶ 6, Doc. 62 at 2.) In the event that a Board reached a tie vote on voting hours, the Secretary of State broke such ties in favor of the Board's normal business hours. (Parties' Joint Statement of Undisputed Facts ¶ 6, Doc. 62 at 2.) As a result, the 2008 and 2010 elections presented a patchwork of available EIP voting days and hours throughout the State, especially with regard to the availability of weekend and evening voting hours.

In the 2008 election, seven of Ohio's 88 counties held EIP voting hours on the Sunday before the election, but not all were open for the same hours. (Parties' Joint Statement of Undisputed Facts ¶ 7, Doc. 62 at 2.) During that election six counties—Cuyahoga, Franklin, Summit, Lucas, Trumbull, and Montgomery—allowed EIP voting on more than one Sunday during the EIP voting period, but, again, all were not open for the same hours. (Parties' Joint Statement of Undisputed Facts ¶ 8, Doc. 62 at 2.) Further, Cuyahoga, Franklin, Hamilton, Summit, Greene, Delaware, Richland, Darke, Geauga, Montgomery, Harrison, Highland, Jackson, Lorain, Pickaway, Portage, and Trumbull Counties held voting hours on more than two Saturdays. (Parties' Joint Statement of Undisputed Facts ¶ 9, Doc. 62 at 2.) The record also indicates that, during the 2008 election, eight counties—Franklin, Greene, Hamilton, Highland, Jackson, Pickaway, Summit, and Trumbull—offered some weekday evening EIP voting hours in addition to being open until 9 p.m. on the last day of registration.[4] (Doc. 65-2.) Finally, 67,408 voters cast in-person ballots during the first week of EIP voting, and 12,842 voters registered or updated their registration and voted at the same time. (Parties' Joint Statement of Undisputed

---

[4] Pursuant to Ohio law, the Boards are required to remain open until 9 p.m. on the last day of registration. OHIO REV. CODE § 3501.10(B).

Facts ¶ 10, Doc. 62 at 3.)

Turning to the 2010 election, which like the upcoming general election included the race for Governor but not President, five counties held EIP voting hours on the Sunday before the election, but all were not open for the same hours.  (Parties' Joint Statement of Undisputed Facts ¶ 11, Doc. 62 at 3.)  Richland, Lorain, Geauga, Butler, Hamilton, Summit, and Greene Counties held EIP voting hours on more than two Saturdays.  (Parties' Joint Statement of Undisputed Facts ¶ 12, Doc. 62 at 3.)   Additionally, 13 counties—Butler, Cuyahoga, Franklin, Greene, Hamilton, Henry, Highland, Lucas, Medina, Montgomery, Pickaway, Summit, and Lorain—held EIP voting past 5 p.m. on at least one day other than the last day of registration.  (Parties' Joint Statement of Undisputed Facts ¶ 13, Doc. 62 at 3; Doc. 65-3 at 5 (Lorain County).)  During the 2010 election, 26,230 voters cast in-person ballots during the first week of the EIP voting period, and 1,651 voters registered to vote or updated their registration.[5]  (Parties' Joint Statement of Undisputed Facts ¶ 14, Doc. 62 at 3.)

A key issue in this case is the impact of SB 238 and Secretary Husted's directives on African American voters.  According to evidence submitted by the Plaintiffs, African Americans make up 13.4% of Ohio's population.  (Doc. 18-9 at 1.)  The majority live in urban areas, with nearly 4 out of 10 living in the cities of Columbus (Franklin County), Cleveland (Cuyahoga County), and Cincinnati (Hamilton County).  (*Id.*)  As of the 2010 census, the Ohio counties with the highest population of African Americans are, in order, Cuyahoga, Franklin, Hamilton, Montgomery, Lucas, Summit, and Mahoning.  (*Id.*)  These counties also have the highest percentage of African Americans when measured in proportion to total population. (Doc. 18-9 at

---

[5] Voter turnout is generally greater for Presidential elections than non-Presidential elections.  (Parties' Joint Statement of Undisputed Facts ¶ 18, Doc. 62 at 4.).

1.)[6]

The Plaintiffs argue that the limitations on Sunday voting opportunities imposed by Directive 2014-17 will burden the African-American voting phenomenon known as "Souls to the Polls," wherein African Americans have purportedly voted in person in large numbers following Sunday church services during the EIP voting period.  The Defendants point out that, during the 2008 and 2010 elections, only a handful of Ohio's 88 counties offered EIP voting on Sundays. (Damschroder Dec. ¶¶ 36–37, Doc. 41-9 at 7.)  However, the record reflects that the counties that did so include the very counties with the highest African American populations in the State. (Parties' Joint Statement of Undisputed Facts ¶ 8, Doc. 62 at 2 (Cuyahoga, Franklin, Lucas, Montgomery, Summit, and Trumbull Counties were open on more than one Sunday in 2008); Doc. 65-3 (Cuyahoga, Franklin, Lucas, Montgomery, and Summit Counties held Sunday voting in 2010); Doc. 18-9 at 1 (population statistics).)

Also at issue in this case is the impact on certain groups of voters of Directive 2014-17's lack of weekday evening voting hours during the EIP voting period.  For purposes of this Memorandum Opinion and Order, the Court defines evening hours as voting hours after 5 p.m. The Court notes that during the 2010 election, the 13 counties offering some weekday evening EIP voting hours in addition to being open until 9 p.m. on the last day of registration included Cuyahoga, Franklin, Hamilton, Lucas, Montgomery, and Summit; the six Ohio counties with the largest African American populations.   (Doc. 65-3 (voting hours); Doc. 18-9 (population statistics).)

As stated in Part I *supra*, for the 2012 Presidential Election, Secretary Husted set uniform hours for EIP voting to be followed by all Boards.  Directives 2012-35 (applicable to all but the

---

[6] African Americans make up 30.9% of Cuyahoga County's population; 27% of Hamilton County's population; 23.1% of Franklin County's population; 22.3% of Montgomery County's population; 20.9% of Lucas County's population; 17% of Mahoning County's population; and 15.7% of Summit County's population.  (Doc. 18-9 at 1.)

final three days of the EIP voting period) and 2012-50 established the following schedule during

the five weeks of the period: on the first week, 8 a.m. to 5 p.m. on Tuesday through Friday; on

the second week, on which Monday was Columbus Day, 8 a.m. to 9 p.m. on Tuesday (the last

day of voter registration) and 8 a.m. to 5 p.m. on Wednesday through Friday; on the third week,

8 a.m. to 5 p.m. on Monday through Friday; on the fourth week, 8 a.m. to 7 p.m. on Monday

through Friday; on the fifth week, 8 a.m. to 7 p.m. on Monday through Thursday, 8 a.m. to 6

p.m. on Friday, and 8 a.m. to 2 p.m. on Saturday; and on the week of Election Day, 1 p.m. to 5

p.m. on Sunday and 8 a.m. to 2 p.m. on Monday.  (Docs. 18-34, 18-35.)  Thus, the 2012 EIP

voting period included only one Saturday and one Sunday of voting but ten days with evening

voting hours not counting the second Tuesday of the period, which was the last day of

registration.   According to evidence submitted by the Defendants, during Golden Week before

the 2012 election, 89,224 voters voted in person and 5,844 voters registered and voted on the

same day.  (Levenson Dec. 7/30/2014 ¶ 52, Doc. 53-3 at 3.)

### B. SB 238 and Directive 2014-17

The EIP voting period schedule resulting from SB 238 and Directive 2014-17 largely

mirrors recommendations made by the Ohio Association of Election Officials ("OAEO") in a

report titled "Report and Recommendations for Absentee Voting Reform."  (*See* Doc. 41-19.)

The background section of the report states that:

> In 2010, the [OAEO] began exploring possible ways to reform our absentee
> voting statutes by commissioning a task force of six members from different
> political parties and different sized counties.  In 2012, the Task Force was
> reconstituted to include eight members, four from each political party, with
> adequate representation from small, medium and large counties.  This Task Force
> made a series of recommendations that were amended and passed by our bi-
> partisan legislative committee.  The amended recommendations were then ratified
> by the trustees of the OAEO.  Our board of trustees is comprised of 20 members,
> equal numbers of Republicans and Democrats, equal numbers of board members
> and staff, and representative of different sized counties.

10

(*Id.* at 2.) According to the report, "the courts have recently held that equal protection issues arise when absentee voters are treated differently. Thus, the association entered into discussions with the ultimate goal of creating uniform rules for absentee voters across the state." (*Id.*) The report's recommendations regarding EIP voting are to "[s]tandardize hours of early in-person absentee voting from county to county," "[d]ifferentiate between the various types of elections," and "[t]reat early in-person absentee voters the same as Election Day voters rather than the same as mail-in absentee voters." (*Id.* at 3.) The report then goes on to propose standard hours for three categories of elections that are very similar to those adopted by Secretary Husted in Directive 2014-17. (*See Id.* at 4.) Finally, with regard to Golden Week, the report states that "OAEO feels that the overall time frame should be shortened to eliminate 'Golden Week[.]'" (*Id.* at 4.)

The justifications behind the OAEO's recommendation to eliminate Golden Week were explained by Aaron Ockerman, Executive Director of the OAEO in testimony before the Senate State Government Oversight and Reform Committee. Concerning the overall reduction in EIP voting days, Ockerman testified that:

> While we understand that reducing the number of days of absentee voting may not be "politically correct," my members are not concerned about the politics of this proposal, but rather the policy reasons it makes sense. First, Ohio is an outlier in the days it allows for absentee voting to be conducted. Some states do not allow any in-person voting, while most allow 10 or 15 days of in-person voting. Those states that do allow in-person early voting presumably understand and accept what Ohio's election officials also recognize to be true; absentee voting is a good thing, if reasonable parameters are put in place.

(Doc. 41-20 at 2–3.) According to Ockerman, "despite [the convenience of Ohio's EIP voting scheme], our voter turnout numbers have dropped not risen, while the cost of administering elections has skyrocketed." (*Id.* at 3.) Thus, "reasonably shorten[ing] the period for casting

absentee ballots" would provide a way for Boards to "continue to be ultra-customer friendly and reduce lines on Election Day while being more efficient with our tax payer [sic] dollars." (*Id.* at 4.)

Regarding the elimination of Golden Week, Ockerman testified that:

A second reason for shortening the absentee voting period is to close what has come to be known as "Golden Week[.]" . . . While this unique confluence of laws has existed on the books for some time, it was greatly exacerbated when Ohio moved to no-fault absentee voting. Ohio law does not allow for this activity known as "same day registration" to occur on Election Day and a statewide ballot attempt to allow for this was resoundingly rejected by voters when it was put before them. Ohio has a registration system and a registration deadline for very clear purposes, namely so that we can confirm that a voter is who they say they are before they cast a ballot.

The overlap between the close of registration and the beginning of early in-person absentee voting places this system of checks and balances in jeopardy. I have had first hand conversations with election officials who have had votes count by people who fraudulently registered during this period, because the election officials could not confirm their registration status before Election Day. Only after their ballot was counted did they discover that the registration was fraudulent, but by then it was too late to do anything about it.

People from both political parties who led reform efforts in 2009 and 2010 understood that this was an issue. Bills sponsored by members of both parties passed their respective chambers with provisions to remedy this included.

(Doc. 41-20 at 4–5.)

The record contains other testimony offered in support of SB 238. Chris Long, President of the Ohio Christian Alliance, testified that the creation of Golden Week was a legislative oversight and that the "obvious problem was that no time was allowed to vet the registration of the voter." (Young Dec. Ex. 1, Doc. 54-3 at 5–6.) Dana Walch, Deputy Director of the Franklin County Board, testified that eliminating Golden Week would help to prevent fraud because, "[u]nder the current scenario, boards of elections must go through a lengthy process of holding a 'Golden Week' ballot until we gain confirmation that the newly registered person truly is who

they say they are."  (*Id.* at Ex. 2; Doc. 54-3 at 8, 9.)  Mary Siegel, one of the founders of the Ohio Voter Integrity Project also testified that Golden Week should be eliminated because of the potential for fraud—citing the case of a voter named "The God Devine Refinement Allah" who apparently registered and remained a registered voter (but did not cast a ballot) in Hamilton County between October 3, 2012 and October 2013.  (*Id.* at Ex. 3; Doc. 54-3 at 12–13.)  Ronald Koehler, former Deputy Director, then Director, of the Summit County Board, testified that during Golden Week, only few voters voted, which served as a drain on resources.  (*Id.* at Ex. 4; Doc. 54-3 at 15.)  He also suggested that eliminating Golden Week would help reduce voter fraud.  (*See id.*)  Finally, Senator Frank LaRose testified that "[s]ame day registration and voting has created a situation where boards of elections do not have adequate time to properly verify a registration application."  (Keeran Dec. Ex. 2; Doc. 54-4 at 10.)

Brian Davis, Director of Community Organizing for the Northeast Ohio Coalition for the Homeless, was among those testifying before the Ohio House of Representatives in opposition to SB 238.  According to Davis, "[t]he value of Golden week is that those who struggle with identification can register and vote at the same time, and the Board of Elections has 30 days to verify if this individual is a legitimate voter in Ohio."  (Doc. 18-31 at 1–2, 4.)  Davis further testified that:

> Allowing 35 days to vote and that overlap with Golden Week allows low income people to participate.  Very low income citizens move their primary residence a great deal, and since the housing crisis swept the United States, this has only exacerbated the displacement of low income residents.  Homeless people have an especially difficult time proving their residency since most of the acceptable forms of identification are tied to where you live.

(Doc. 18-31 at 2.)

Additionally, Secretary Husted submitted the declaration of Dana Walch.  According to Walch, "[i]n general, expanding absentee voting requires additional funding because expanding

13

the number of days the Board is open drives up costs.  We have to provide for the extra staffing,

extra security, facility costs, etc.  Expanding hours has the same effect, that is, more hours means

more money."  (Walch Dec. ¶ 8, Doc. 41-18 at 3.)  Walch also stated that Franklin County's

early-voting center employed a staff of between 50 to 70 people during the 2012 election.  (*Id.* at

¶ 13, Doc. 41-18 at 4.)  Similarly, Matthew Damschroder, Deputy Assistant Secretary of State

and State Elections Director, and former director of the Franklin County Board, states that:

> In order to facilitate additional evening and weekend in person absentee voting,
> boards of elections must ensure adequate staffing during those hours.  This can be
> burdensome and costly for boards that are already operating under tight budgetary
> restrictions.  In addition, these staff cannot complete other necessary tasks while
> tending to in person absentee voters.

(Damschroder Dec. ¶ 34, Doc. 41-9 at 2, 7.)  According to Koehler, the elimination of Golden

Week "will save [Boards] 20% of the cost of extra temporary workers, since they will be

working four weeks instead of five."  (Young Dec. Ex. 4; Doc. 54-3 at 15.)

 As exhibits to its brief, Amicus Curiae the Ohio General Assembly has submitted

several declarations, including those of Alex Triantafilou, Timothy Ward, and Mark Munroe.

According to Triantafilou, a member of the Hamilton County Board, the reinstatement of Golden

Week for the 2014 election would likely "cost the Board an estimated $8,000 to $12,000 in

staffing costs alone."  (Triantafilou Dec. ¶¶ 1, 10, Doc. 68-4 at 1, 3.)  Ward, Director of the

Madison County Board, states that if Golden Week is reinstated, it will cost the Board at least

$933.20, which the Board has not budgeted.  (Ward Dec. ¶¶ 1, 12, Doc. 68-2 at 1, 5.)  Ward also

states that increased hours during the 2012 election resulted in overtime costs of $5,027.36.  (*Id.*

at ¶ 15 , Doc. 68-2 at 6.)  Munroe, Chairman of the Mahoning County Board, estimates that

reinstating Golden Week during the 2014 election season would cost approximately $3,490.88.

(Munroe Dec. ¶¶ 1, 3, Doc. 68-5 at 1.)

The Ohio Revised Code requires election officials to verify absentee ballots before they are counted.  For instance, an absentee ballot may not be counted if the signature on the ballot's identification envelope does not match the signature appearing on a voter's registration card. OHIO REV. CODE §§ 3509.06(D)(1), 3509.07(B), 3509.09(C)(1).  Further, Husted's Directive 2012-36 provided procedures used during the 2012 election for ensuring that EIP votes cast during Golden Week would be properly counted.  Pursuant to this directive, if "the [registration] application is complete and valid, the Board must permit such voters to cast an absent voter's ballot following the board's normal in person absentee voting procedures" and "the Board must segregate the ballots from all others cast by voters who were previously qualified electors of the county prior to applying for an absent voter's ballot."  (Doc. 53-10 at 1.)  Then, the Board is required to send a voter acknowledgement card to the voter's address by non-forwardable mail on the same day that the voter had registered and voted.  (*Id.* at 2.)  If the card is not returned to the Board as undeliverable, the registration is presumably deemed valid.  (*See id.* at 2.)

### C. Voting Opportunities During the 2014 General Election and Voting by Mail

On Election Day 2014, the polls will be open for voting between 6:30 a.m. and 7:30 p.m. (Parties' Joint Statement of Undisputed Facts ¶ 25, Doc. 62 at 4.)  Further, Ohio voters wishing to vote absentee during the election may do so by (1) requesting an absentee ballot and returning it by mail or in person during the 28 days before Election Day, or by returning the ballot in person on Election Day, or (2) voting in-person during the 28 day period on the days and during the hours established by Directive 2014-17.  (Parties' Joint Statement of Undisputed Facts ¶ 26, Doc. 62 at 4.)  Voters were permitted to request absentee ballots for the coming election beginning on January 1, 2014.  (Parties' Joint Statement of Undisputed Facts ¶ 26, Doc. 62 at 4.)

The Ohio Revised Code does not distinguish between the application process for

obtaining an absentee ballot in person or by mail. Pursuant to § 3509.03, the application must include the following information:

> (A) The elector's name;

> (B) The elector's signature;

> (C) The address at which the elector is registered to vote;

> (D) The elector's date of birth;

> (E) One of the following:

>> (1) The elector's driver's license number;

>> (2) The last four digits of the elector's social security number;

>> (3) A copy of the elector's current and valid photo identification, a copy of a military identification, or a copy of a current utility bill, bank statement, government check, paycheck, or other government document, other than a notice of voter registration mailed by a board of elections under section 3503.19 of the Revised Code, that shows the name and address of the elector.

> (F) A statement identifying the election for which absent voter's ballots are requested;

> (G) A statement that the person requesting the ballots is a qualified elector;

> (H) If the request is for primary election ballots, the elector's party affiliation;

> (I) If the elector desires ballots to be mailed to the elector, the address to which those ballots shall be mailed.

OHIO REV. CODE. § 3509.03. If the director of elections determines that the application contains all required information, the director is required either to deliver the absentee ballot to the voter or to mail the absentee ballot, as applicable. *Id.* § 3509.04(B). If the director determines that the application is missing required information, the director shall "promptly" notify the voter of what additional information is required. *Id.* § 3509.04(A). The Boards are prohibited from providing postage for the return of an absentee ballot application or for the return of an absentee ballot

itself. OHIO REV. CODE §§ 3509.03 ("A board of elections that mails an absent voter's ballot application to an elector under this section shall not prepay the return postage for that application."); 3509.04 ("A board of elections that mails or otherwise delivers absent voter's ballots to an elector under this section shall not prepay the return postage for those ballots.").

### D. Evidence of the Potential Impact of SB 238 and Directive 2014-17

### 1. Plaintiffs' Testimonial Evidence

The Plaintiffs have submitted various declarations in support of their motion for a preliminary injunction, including those of Ray Wood, Carrie Davis, Dale Snyder, Plaintiff Darryl Fairchild, Jamie Simpson, Robert E. Jones, Delores Freeman, David Morgan, Gerald Cooper, Joseph Copeland, Shawn Braxton, Jack Frech, Josh Spring, Erik Crew, Georgine Getty, Glorianne Leck, and Mark Freeman.

Ray Wood, who is African American, is president of the NAACP's Toledo Chapter and was involved in "get-out-the-vote efforts" in 2008, 2010, and 2012. (Wood Dec. ¶¶ 2, 8, 12–13, 15, Doc. 18-10 at 1–2.) According to Wood, while transportation to the polls was provided on Saturdays in the get-out-the-vote efforts he was involved with in Toledo, Sundays were a bigger focus:

> Traditionally, in the Toledo African-American community, Sunday has always been the day of the week when everyone gets together. Many older and elderly African Americans simply do not leave the house all week except on Sundays. Many generations of African Americans get together for church, and then gather together for the Sunday meal.

(*Id.* at ¶ 24, Doc. 18-10 at 3.) Wood states that "Sunday was a focal point also because many churches already provide transportation to take people to church, and carpools are also arranged so that everyone is together." Wood reported that he personally observed long lines of African Americans waiting to vote on Sundays during the 2008 early-voting period. (*Id.* at ¶¶ 25–26,

Doc. 18-10 at 4.)

According to Wood, voting by mail is "not acceptable" to many African Americans he has spoken with because they do not believe their votes will be counted—rather, "[w]hen they go to a machine, they can actually feel like their vote is counted." (Wood Dec. ¶ 30, Doc. 18-10 at 4.) In 2008, when multiple Sundays were available for voting in Lucas County, it was much easier to coordinate the Souls to the Polls efforts among the 80 to 90 churches involved; in 2012, with only one Sunday of voting, Wood felt "a lot more pressure." (*Id.* at ¶ 32, Doc. 18-10 at 5.) Wood also states that evening voting hours are important, as many people who work hourly wage jobs simply cannot vote during lunch breaks or before work in the morning. (*Id.* at ¶ 33, Doc. 18-10 at 5.)

Regarding Golden Week, Wood states that the NAACP provided transportation to the polls so that people could register and vote on the same day, and that efforts were made in lower income areas to raise awareness of the possibility. (Wood Dec. ¶ 34–35, Doc. 18-10 at 5.) Further, Wood states that people in the African-American community in Toledo move frequently, especially since the 2008 recession. (*Id.* at ¶ 36, Doc. 18-10 at 5–6.)

Carrie Davis is the Executive Director of Plaintiff, the League of Women Voters of Ohio, which directs voter education efforts toward individuals under 25, women, and racial and ethnic minorities, many of whom also tend to be lower-income and working-class. (Davis Dec. June 24, 2014 ¶¶ 2, 11, Doc. 18-11 at 1, 3.) According to Davis, women will be negatively impacted by reductions in non-traditional voting times, as they are likely to have family caretaking responsibilities. (*Id.* at ¶ 42, Doc. 18-11 at 11.)

Dale Snyder has been the Senior Pastor at Plaintiff Bethel African Methodist Episcopal Church ("Bethel AME") in Columbus since 2007. (Snyder Dec. ¶ 4, Doc. 18-12 at 1.) The

church's congregation is predominantly African American and it is located in a predominantly African-American neighborhood with very high rates of poverty. (*Id.* at ¶¶ 10–11, Doc. 18-12 at 2–3.) The church believes strongly in encouraging African Americans in its community to vote and has engaged in get-out-the-vote efforts, including registering voters during Golden Week and Souls to the Polls. (*See id.* at ¶¶ 14, 17, 18, Doc. 18-12 at 2.)

Plaintiff Darryl Fairchild is an ordained Elder in the United Methodist Church and a community organizer who has been involved with get-out-the-vote efforts and work with lower-income populations and persons with disabilities in Dayton, which is located in Montgomery County. (Fairchild Dec. ¶¶ 2, 4–10, Doc. 18-13 at 1.) He states that multiple Sundays are important to people from lower-income backgrounds because they "often have irregular working hours" and "have less stable and more unpredictable lives." (*Id.* at ¶ 22, Doc. 18-13 at 4.) He also states that "multiple Sundays are also important for people with disabilities" because "[t]here are some days when a person with a disability wakes up and doesn't have the energy to move, or there might be something else wrong physically," so "they need multiple Sundays in case something goes wrong on that day." (*Id.* at ¶ 23, Doc. 18-13 at 5.)

Jamie Simpson is a member of Plaintiff Omega Baptist Church in Dayton, often speaks to students in predominantly African-American high schools about the importance of voting, and has worked on the church's Souls to the Polls efforts. (Simpson Dec. ¶¶ 6–7, 10, Doc. 18-14 at 1–2.) She states that she "[doesn't] know how we will continue to coordinate transportation without Sunday voting." (*Id.* at ¶ 20, Doc. 18-14 at 3.) As for voting by mail, she states that "many people in my community are scared to vote by mail and are very apprehensive about it," "can be confused by the [unfamiliar] forms," and "do not believe that their vote will be counted if they vote by mail." She states that she "encountered many people who were apprehensive

19

about voting by mail who[m] I drove to the polls." (*Id.* at ¶ 26, Doc. 18-14 at 4.)

Robert E. Jones served as a pastor at Plaintiff College Hill Community Church Presbyterian, U.S.A. ("College Hill") until his retirement in March 2014. (Jones Dec. ¶¶ 6–7, Doc. 18-15 at 2.) College Hill "advocates for issues that relate to social and economic justice" and "has taken part in efforts to encourage early voting and helped transport voters to the polling place during early voting periods." (*Id.* at ¶ 13, Doc. 18-15 at 3.) He states that, "[i]f Sunday voting is eliminated, we will lose voters," and that it was easier "to take people to the polls on Sunday because many churches already have drivers [who] take people to the Sunday service." (*Id.* at ¶ 17, 19, Doc. 18-15 at 4.)

Delores Freeman is the President of the Youngstown Chapter of Plaintiff the A. Philip Randolph Institute ("APRI") and treasurer of the Greater Youngstown Community Mobilization Coalition, a group "consist[ing] of about 16 organizations committed to increasing political awareness and assisting individuals in exercising their right to vote." (Delores Freeman Dec. ¶¶ 8–9, Doc. 18-16 at 1–2.) The APRI Youngstown Chapter has been involved in get-out-the-vote efforts for about five or six years. (*Id.* at ¶ 10, Doc. 18-16 at 2.) During the early-voting period, these efforts involved driving voters to the polls, and during the 2012 election and 2014 primary election, most of the people who requested rides were African American. (*Id.* at ¶¶ 19, 21, Doc. 18-16 at 3.) During the 2004 Election, Freeman witnessed voters leave polling places without having voted due to long lines. (*Id.* at ¶¶ 27–30, Doc. 18-16 at 4.)

David Morgan has been a member of the Trumbull County Chapter of the APRI for over 40 years and is a past President of the APRI in Ohio. (Morgan Dec. ¶¶ 6–8, Doc. 18-17 at 1.) According to Morgan, the APRI Trumbull County chapter has a long history of involvement with get-out-the-vote efforts, and individuals who have registered to vote and been provided

transportation to the polls have been predominately African American.  (*Id.* at ¶¶ 9, 17, Doc. 18-17 at 1, 3.)

Gerald A. Cooper is the pastor at Dayton's Wayman Chapel African Methodist Episcopal Church, which is predominantly African American.  (Cooper Dec. ¶¶ 3–4, Doc. 18-19 at 1.)  The church participates in get-out-the-vote efforts and he encourages his congregation to vote and to vote early, and emphasizes the importance of Golden Week.  (*Id.* at ¶¶ 5–7, Doc. 18-19 at 1–2.)  He states that "[o]ne Sunday for Souls to the Polls is not enough for people in my community" due to inflexible work schedules; he also predicts that a single Souls to the Polls day "will also pose a logistical challenge" due to "many variables including the number of people to take, how long the lines are and when to leave the polls to get back in time for another group."  (*Id.* at ¶¶ 10–11, Doc. 18-19 at 3.)

Joseph Copeland has served as the Associate Minister of The Greater New Hope Missionary Baptist Church in Cincinnati for 20 years and helped coordinate Souls to the Polls efforts in the Cincinnati area in 2011 and 2012.  (Copeland Dec. ¶¶ 3–5, Doc. 18-20 at 1.)   In 2012, the efforts involved 12 to 15 churches, 80% of which were African American.  (*Id.* at ¶ 5, Doc. 18-20 at 1.)

Shawn Braxton is the Pastor at New Life Cathedral in East Cleveland and has worked with African-American churches on get-out-the-vote efforts for approximately four years.  (Braxton Dec. ¶¶ 4–5, Doc. 18-21 at 1.)  These efforts included Souls to the Polls and helping voters vote during evening voting hours.  (*Id.* at ¶ 6, Doc. 18-21 at 1.)

Jack Frech has been the Director of the Athens County Department of Job & Family Services for over 30 years.  (Frech Dec. ¶ 1, Doc. 18-22 at 1.)  His department serves "the poor and working-class families and individuals in Athens County," and is required to provide voter

registration opportunities for its clients.  (*Id.* at ¶¶ 4, 9, Doc. 18-22 at 1–2.)  According to Frech, his department's clients overwhelmingly register to vote when given the opportunity to do so in person, but almost never do so when given the opportunity over the telephone or by mail as "day-to-day life is chaotic and focused on survival.  Taking the time to fill out a voter registration form and then finding transportation to get to a post office is simply not going to happen for many of our clients."  (*Id.* at ¶¶ 11–13, Doc. 18-22 at 2–3.)  Further, many of Frech's clients are distrustful of government and the mail, and are fearful that filling out a form or failing to fill out a form and send it in the mail could lead to a denial of benefits.  (*See id.* at ¶¶ 14–16, Doc. 18-22 at 3.)  Frech declares that, "[a]lthough we are in a sparsely populated, rural county, the poor people in our county need these evening[] and Sunday voting opportunities just as much as the poor in more populated counties need them."  (*Id.* at ¶ 32, Doc. 18-22 at 6.)

Josh Spring is the Executive Director of the Greater Cincinnati Coalition for the Homeless ("GCCH").  (Spring Dec. ¶ 6, Doc. 18-23 at 2.)  The population served by GCHC in Cincinnati is disproportionately African American, and one study suggested that 66% of Cincinnati homeless are African American, although, according to Spring, the study likely underestimates that percentage.  (*Id.* at ¶ 11, Doc. 18-23 at 3–4.)

Erik Crew is employed by the Ohio Justice & Policy Center and has been involved in helping people register and vote during Golden Week.  (Crew Dec. ¶¶ 4, 6, Doc. 18-24 at 1–2.)  According to Crew, the people experiencing homelessness taken to register and vote during the 2008 Golden Week were predominantly African American.  (*See id.* at ¶ 20; Doc. 18-24 at 4.)

Georgine Getty is the former Executive Director of the GCCH.  (Getty Dec. ¶ 3, Doc. 18-25 at 1.)

Glorianne Leck was a precinct committee member working at the Wick Park polling

place in Youngstown during the 2004 election. (Leck Dec. ¶ 5, Doc. 18-26 at 1.) She states that approximately 51% of the voters at the polling place were African American, and she personally observed individuals leave the voting line without voting because of the length of the wait. (*Id.* at ¶¶ 5, 7, 9, Doc. 18-26 at 1–2.)

Mark Freeman is the former superintendent of the Shaker Heights City School District in the Cleveland Area. (Mark Freeman Dec. ¶ 1, Doc. 18-27 at 1.) He personally witnessed the long voting lines at facilities owned by the school district during the 2004 election, and estimates that between a quarter to a third of those standing in the long lines were African American. (*See* Mark Freeman Dec. ¶¶ 2–9, Doc. 18-27 at 1.)

The remaining relevant testimony of the declarants regarding Golden Week, Souls to the Polls, weekend voting hours, evening voting hours, voting by mail, the difficulties generally encountered by lower-income voters, and the effects of EIP voting in Ohio is summarized below:

**Golden Week:**

- It is Davis' understanding that same-day registration is effective and boosts voter participation among lower-income voters; same-day registration is also important to people who frequently move. (Davis Dec. June 24, 2014 ¶¶ 24, 26, Doc. 18-11 at 6.)

- Golden Week is important to lower income people who are more transient; lower income people also tend to have lower education and are unaware of requirements for updating registration, or registration deadlines. (Fairchild Dec. ¶ 12, Doc. 18-13 at 3.)

- According to Snyder, Golden Week is important to people in Bethel AME's neighborhood because they are typically very transient and voter registrations need to be updated whenever a voter moves. (*See* Snyder Dec. ¶ 17, Doc. 18-12 at 2.)

- In each of 2010 and 2011, Fairchild helped about 25 to 40 first-time student voters to register and vote on the same day during Golden Week. (Fairchild Dec. ¶¶ 16–17, Doc. 18-13 at 3.)

- Registration and voting on the same day is important because it is a one step process for people who "spend their days looking for housing, jobs, social services,

23

and meeting with caseworkers." (Spring Dec. ¶ 21, Doc. 18-23 at 6.)

- According to Crew, "[b]eing able to register and vote at the same time was especially helpful for people experiencing homelessness because of their more transient lifestyle, where their address might change frequently or they may have no address at all.  Such individuals need to update their registration frequently." (Crew Dec. ¶ 14, Doc. 18-24 at 3; *see also* Getty Dec. ¶ 15, Doc. 18-25 at 3.)

**Souls to the Polls/Weekend Voting:**

- Many people can vote in person only during the weekends. (Davis Dec. June 24, 2014 ¶ 34, Doc. 18-11 at 9.)

- The League of Women Voters of Ohio believes that the limited weekend voting schedule established by Directive 2014-17 for the 2014 general election will result in very long lines during weekend voting. (Davis Dec. June 24, 2014 ¶ 35, Doc. 18-11 at 9.)

- "'Souls to the Polls' is important to the African Americans in [Snyder's] congregation and community.  It is a way for family members across 2 and 3 generations to vote together.  As we take bus rides to the polls, we share the stories of the sacrifices that people have made to give us the right to vote.  We share with the younger generation of voters what Jim Crow was like.  We sing freedom songs on the way to the polls.  It is a sense of pride and honor that most of our young people don't get to experience living here in America.  Many of our young people are discouraged and won't participate in the electoral process unless older generations encourage them." (Snyder Dec. ¶ 24, Doc. 18-12 at 5; *see also* Jones Dec. ¶ 18, Doc. 18-15 at 4 ("Sunday voting has become a communal event").)

- "'Souls to the Polls' [has been] critical to helping African Americans in [Snyder's] congregation and community to vote.  Many of them cannot vote during regular business hours because they cannot get off of work"; without Souls to the Polls, many people around Bethel AME and poor neighborhoods would not be able to exercise their right to vote because of lack of transportation, babysitting, and lack of information. (Snyder Dec. ¶¶ 20, 22, Doc. 18-12 at 4.)

- Snyder saw long lines of predominantly African American voters on the only Sunday of early voting before the 2012 election. (*See* Snyder Dec. ¶ 21, Doc. 18-12 at 4; *see also* Simpson Dec. ¶ 17, Doc. 18-14 at 3 (long lines in Montgomery County); Copeland Dec. ¶ 8, Doc. 18-20 at 2 (long lines in Hamilton County).)

- Fairchild observed very long voting lines on the final Sunday before the 2008 election when a high number of African Americans voted; in 2010, he was involved with efforts that provided transportation to the polls on Sundays during the early-voting period for hundreds of voters. (Fairchild Dec. ¶¶ 19–20, Doc. 18-13 at 4.)

- Because there can be only one location for EIP voting per county and because Sunday hours are usually limited, lines for Sunday voting can be long.  (Morgan Dec. ¶ 21, Doc. 18-17 at 3; *see also* Cooper Dec. ¶¶ 10–11, Doc. 18-19 at 3 (one Sunday of early voting is not enough).)

**Evening Voting Hours:**

- Lack of evening voting hours can impact the ability of working-class individuals to vote.  (Davis Dec. June 24, 2014 ¶ 37, Doc. 18-11 at 10; Fairchild Dec. ¶ 26, Doc. 18-13 at 5.)

- Evening voting hours have helped members of Snyder's congregation vote who work during the day and who cannot use vacation or sick time to vote.  (*See* Snyder Dec. ¶ 27, Doc. 18-12 at 5*; see also* Freeman Dec. ¶ 24, Doc. 18-16 at 3.)

- In Fairchild's experience, during the early-voting period, workers at the Montgomery County Board would be processing absentee ballots after hours even when no in-person voting was allowed for that evening.  (Fairchild Dec. ¶ 28, Doc. 18-13 at 6.)

**Voting By Mail:**

- Some voters do not trust voting by mail.  (Davis Dec. June 24, 2014 ¶ 30, Doc. 18-11 at 8; Delores Freeman Dec. ¶ 26, Doc. 18-16 at 4; Copeland Dec. ¶ 14, Doc. 18-20 at 2; Spring Dec. ¶ 24, Doc. 18-23 at 6–7 (voters experiencing homelessness).)

- "Some [voters] take pride in going to the booth and pulling the lever" and "for some, as in the African-American community, [voting] is a cultural tradition because it is a right that was fought hard for and they want to experience it in person."  (Davis Dec. June 24, 2014 ¶ 30, Doc. 18-11 at 8; *see also* Morgan Dec. ¶ 25, Doc. 18-17 at 4.)

- According to Davis, Senate Bill 205 prohibits prepaid postage for ballots and requires all fields on the ballot envelope to be completed.  (Davis Dec. June 24, 2014 ¶ 31, Doc. 18-11 at 8.)

- According to Fairchild, "[m]any of the people from lower-income backgrounds that I've worked with do not trust voting by mail.  Even organizers do not encourage it because it is a multi-step process where you must find postage, mail-in an absentee ballot request, then find postage again, and mail in the absentee ballot.  Lower-income people with less educational attainment are often living chaotic lives and are often unable to understand this process."  (Fairchild Dec. ¶ 29, Doc. 18-13 at 6.)

- According to Braxton, "'Vote-by-Mail' is not a sufficient alternative to [EIP] voting.  First, most of the people I interact with regularly do not even pay their bills by mail anymore, so many people overlook traditional mail as a means to cast their

vote since it is not a traditional medium for voting. And, second, minority communities I have worked with distrust the vote-by-mail system and want to see their ballots actually processed." (Braxton Dec. ¶ 15, Doc. 18-21 at 2–3.)

**Difficulties Encountered by Lower Income Voters:**

- According to Davis, "many working-class people in Ohio rely on public transportation," and use of public transportation to get to polling places can entail a large time commitment; "this time commitment is usually compounded with other concerns working-class people face and manage daily, including family obligations, work and health care." (Davis Dec. June 24, 2014 ¶ 27, Doc. 18-11 at 7; *see also* Braxton Dec. ¶ 12, Doc. 18-21 at 2.)

- Long voting lines can present challenges to voters with health problems, those relying on others for transportation, and those with family obligations. (Davis Dec. June 24, 2014 ¶ 36, Doc. 18-11 at 9–10.)

- Cuts in early-voting opportunities negatively impact those with lower education because they may not learn of the changes. (Davis Dec. June 24, 2014 ¶ 40, Doc. 18-11 at 10–11.)

**Effects of EIP Voting in Ohio:**

- "[D]ue to early voting, counties do not need as many precincts on Election Day and are consolidating precincts"; "these changes can benefit [Boards] and save them money and resources." (Davis Dec. June 24, 2014 ¶ 33, Doc. 18-11 at 9; *see also* Fairchild Dec. ¶ 31, Doc. 18-13 at 6–7.)

### 2. Expert Opinions and Other Statistical Evidence

Before discussing the report of Plaintiffs' statistical expert, Dr. Daniel A. Smith, the Court notes that some significant limitations exist regarding the available election data. Ohio's 88 county Boards use five different election management software systems and adopt their own policies for using these systems to track election data. (Damschroder Dec. ¶ 18, Doc. 41-9 at 4.) Thus, statistics of when absentee votes are cast or whether a voter cast an EIP vote or actually voted by mail, may possibly not be consistently tabulated from county to county making county to county comparisons or statewide totaling difficult. Further, statistics such as when votes are actually counted during the early-voting period may not be accurate at all. As an example, when

an absentee ballot requested in person is taken home but returned by mail, some counties may count that as an EIP vote, while others may count it as an absentee vote by mail. (*Id.*) Conversely, an absentee vote requested by mail and returned in person may be counted differently by different counties. (*Id.*) As another example, counties vary on whether they count an EIP vote as recorded on the date it is cast versus the date on which the registration is verified. (*Id.*)

Furthermore, statistics from Franklin County suggest that voters do not consistently cast ballots during the same portion of the EIP voting period from election to election. For instance, "of the 8,534 in person absentee voters during 'golden week' in 2008, only 259 (or 3.35%) voted in person during 'golden week' in 2012." (Damschroder Dec. ¶ 39, Doc. 41-9 at 7.) Further, "only 61 electors in Franklin County [ ] voted in person absentee during 'golden week' in each of the last three federal general elections (2008, 2010, and 2012)." (*Id.*) Of the 15,432 Franklin County EIP voters during the last five days prior to the 2008 election, only 2,326 voted during the last five days before the 2012 election. (*Id.*)

### a. Plaintiffs' Expert, Dr. Daniel A. Smith

Plaintiffs' primary expert, Dr. Daniel A. Smith, Professor of Political Science and University of Florida Research Professor, is a nationally renowned expert on electoral processes and the effect of political institutions on political behavior. He has extensive research, consulting, and academic experience in his field and has been widely cited, including by the U.S. Supreme Court. (Smith Report, Doc. 18-1 at 2.) He submitted an expert report titled "Analysis of Effects of Senate Bill 238 and Directive 2014-06 On Early In-Person (EIP) Absentee Voting By Blacks and Whites in Ohio" (Doc. 18-1) and an expert rebuttal declaration (Doc. 53-11), and the record contains his deposition taken on August 1, 2014 (Doc. 64-3).

Plaintiffs' counsel asked Smith "to assess whether reductions in EIP absentee voting resulting from the passage of [SB 238] in 2014 and Secretary of State Jon Husted's Directive 2014-06 are likely to have differential effects on black and white voters in Ohio."  Because the Smith Report "was largely written prior to June 11, 2014, when the court ordered Secretary Husted to set uniform hours including the last two days of the early voting period," its "analysis therefore includes the last two days of the early voting period."  (Smith Report, Doc. 18-1 at 1, n.1.)[7]

Drawing on public data sources and using standard statistical methods, Smith concludes that:

> there is strong empirical evidence in Ohio that a greater proportion of blacks not only cast EIP absentee ballots than whites but do so on early voting days that have been eliminated by SB 238 and  Directive 2014-06. As such, blacks in Ohio will likely be disproportionately and negatively affected in 2014 by the reduction in EIP absentee voting days caused by SB 238 and Directive 2014-06.

(Smith Report, Doc. 18-1 at 4.)

Smith compares usage of EIP voting by African-American Ohioans to white Ohioans in the 2010 midterm and 2012 presidential elections.  For his analysis of the 2012 election, Smith includes data from 84 of Ohio's 88 counties; for the 2010 election, he includes data from the five most populous counties: Cuyahoga, Franklin, Hamilton, Montgomery, and Summit.  (Smith Report, Doc. 18-1 at 7, 10, App'x A 1.)  He had insufficient time to include more complete data because the "considerable heterogeneity across the state's 88 [Boards] with respect to their data collection, data formatting, and public access, mak[e] the collection and subsequent analysis of EIP absentee voting records fairly arduous."  (*Id.* at App'x A 1.)  Defendants' expert argues that these five counties "are so unrepresentative of the state in terms of several factors such as racial

---

[7] Smith's Rebuttal Report restores these days, finding that the results are consistent with his original report.  (Smith Rebuttal, Doc. 53-11 at 12–14.)

composition, partisanship, urban density, [that he does] . . . not believe that inferences from the 2010 data about the effects of SB 238 and Directive 2014-06 statewide are valid."  (McCarty Report, Doc. 41-4 at 3, n.1.)  Nonetheless, Smith argues, and the Court agrees, that the findings from these five counties, which account for over one-third of the state's population and nearly 73% of Ohio's African-American population, are highly probative.  (Smith Report, Doc. 18-1 at 10; Smith Rebuttal, Doc. 53-11 at 23.)  Because Ohio does not record voters' races, Smith "use[d] U.S. Census data to determine the geographic breakdown of the Ohio voting age population ['VAP'], by race, at the census block level—the smallest geographic unit for which the Census Bureau reports data."  (Smith Report, Doc. 18-1 at 12.)

Smith "[uses] a combination of aggregate-level and individual-level data, . . . rely[ing] on three standard ecological inference techniques to draw inferences about the EIP absentee voting rates of blacks and whites in Ohio."  (Smith Rebuttal, Doc. 53-11 at 2.)  He asserts that "[e]ach of these methods is sound and appropriate," and his "findings across these different methods are consistent, reinforcing their validity and reliability."  (*Id.*)

Bivariate correlation.  Smith first examines the bivariate correlation between the percentage of the African-American VAP in a particular census block to the percentage of EIP votes cast in that block.  (Smith Report, Doc. 18-1 at 13.)  Smith found that, the greater the percentage of the African-American VAP, the greater the percentage of EIP votes that were cast.  (*Id.* at 13–15, Fig. 1 (2012 election), 22–23, Fig. 7 (2010 election).)  The same is true of votes cast on the eliminated days.  (*Id.* at 15–16, Fig. 2, 23–24, Fig. 8.)

Homogeneous area analysis.  In the 2012 election, looking at only racially homogeneous census blocks, that is, census blocks comprised either entirely of African Americans or entirely of whites, Smith found that "the rate of EIP absentee ballots cast in 100% black census blocks

was more than twice the comparable rate in 100% white census blocks." (Smith Report, Doc. 18-1 at 17–18, Fig. 3.) "[I]n homogenous black census blocks, roughly one in five voters . . . cast an EIP absentee ballot," while "fewer than one in 10 votes cast by voters living in 100% white census blocks . . . was an EIP absentee ballot." (*Id.*) Finally, "in homogenous black census blocks, the rate [of EIP absentee ballots] was two to four times the rate in homogenous white census blocks during the first week of early voting." (*Id.*)

As for the 2010 election, Smith found that, in racially homogeneous census blocks, the EIP absentee voting rate was higher in black census blocks than in white census blocks on nearly every day of EIP absentee voting, and "blacks . . . were more likely than comparable whites to utilize EIP absentee voting." (Smith Report, Doc. 18-1 at 24–25, Fig. 9.) "Specifically, the EIP absentee voting rate in 100% black census blocks was roughly four times the comparable rate in completely homogeneous white census blocks." (*Id.* at 25.)

<u>Method of bounds analysis applied to nearly homogeneous census blocks</u>.  According to Smith, "[a] limitation of homogeneous area analysis is that the observed behavior in such areas ... may not be identical to rates in racially heterogeneous census blocks." (Smith Report, Doc. 18-1 at 18.) To address this possibility, Smith also analyzed *nearly* homogeneous census blocks, defined as census blocks which are at least 90% all-black or all-white. (*Id.* at 18–19.) Smith explains that, "when applied to nearly homogeneous black census blocks," the "method of bounds" analysis "specifies both a minimum and a maximum possible black EIP absentee voting rate." (*Id.* at 19.)

Applying this method, Smith found that "EIP absentee voting rates in nearly homogeneous black census blocks were consistently higher than those in nearly homogeneous white census blocks" in the 2012 election.  (Smith Report, Doc. 18-1 at 19–20, Fig. 4.)

Examining votes cast only on days that would have been eliminated had SB 238 and Directive 2014-06 been in effect for the 2012 election, Smith found that "nearly homogenous black census blocks had greater rates of EIP absentee voting than nearly homogenous white census blocks." (*Id.* at 21, Fig. 5.)

Smith also found that "EIP absentee voting rates in nearly homogenous black census blocks were higher than comparable EIP absentee voting rates in nearly homogeneous white census blocks in the 2010 General Election." (Smith Report, Doc. 18-1 at 26, Fig. 10.)  Looking at votes cast only on days that would have been eliminated had SB 238 and Directive 2014-06 been in effect for the 2010 election, Smith found that "census blocks with at least 98% black VAP had higher EIP absentee voting rates than comparable white census blocks"; however, "[a]s the bounds characterizing near racial homogeneity are relaxed, the true values of black and white EIP absentee voting on [those days] . . . become more difficult to distinguish." (*Id.* at 27–28, Fig 11.)

Current Population Survey.  Smith also examines data from the Current Population Survey Voting and Registration Supplement ("CPS"), which is conducted during election years by the U.S. Census Bureau and the U.S. Bureau of Labor Statistics and is "one of the most accurate among all election surveys." (Smith Report, Doc. 18-1 at 28 n.31 (citation omitted).) Smith concludes that the CPS data "provides additional evidence that black voters in Ohio were disproportionately more likely to cast EIP absentee ballots in the 2012 and 2008 General Elections." (*Id.* at 28–29.)  Specifically:

> [I]n the 2012 General Election, 19.55% of blacks reported voting EIP absentee ballots in Ohio, whereas 8.91% of whites in the state reported they voted EIP absentee ballots.  The statistically significant results indicate that black voters were more likely to cast EIP absentee ballots in the 2012 General Election than white voters.  Similarly, according to the 2008 CPS November Supplement, 19.88% of blacks reported casting EIP absentee ballots in Ohio, whereas 6.18% of

whites reported doing so. Again, the results are statistically significant, indicating that blacks were more likely than whites to cast EIP absentee ballots in the 2008 General Election. These individual-level findings bolster the homogeneous area and method of bounds analyses previously discussed.

(*Id.* at 31.)

Overall, Smith concludes:

The foregoing analysis using public data and employing standard social science methods indicates that blacks in Ohio have higher EIP absentee voting rates than whites, and that in the two most recent General Elections, blacks disproportionately cast EIP absentee ballots on days that would have been eliminated under SB 238 and Directive 2014-06. In addition, individual-level CPS data indicate that blacks in Ohio relied more heavily on EIP absentee voting than whites in the 2008 and 2012 General Elections. Overall, my findings provide strong empirical evidence that in future elections voting age blacks residing in Ohio will be disproportionately affected by the reductions in EIP absentee voting.

(Smith Report, Doc. 18-1 at 31.)

### b. Plaintiffs' Expert, Professor Vincent Roscigno, Ph.D.

Professor Vincent Roscigno, Ph.D., a Distinguished Professor of Arts & Sciences in Sociology at The Ohio State University, has extensive academic experience and research expertise on the topics of "social inequality, its persistence within and across a host of institutional domains, and the mechanisms underlying it including discrimination."[8] (Roscigno Report, Doc. 18-2 at 4.) He submitted an expert report titled "Racial Inequality, Racial Politics and the Implications of Recent Voting Restrictions in Ohio: Analyses of Senate Factors One, Two, Three, Five, Six and Seven of the Voting Rights Act; Expert Report Submitted on Behalf of Plaintiffs in NAACP v. Husted" (Doc. 18-2), and the record contains his deposition taken on July 10, 2014 (Doc. 41-23).

---

[8] While Defendants call Roscigno "a sociologist with no meaningful experience in election law," they apparently do not dispute his findings regarding the disparities faced by African American Ohioans. (Response, Doc. 41 at 36.)

Roscigno's report "provides an overview of the historical and contemporary status of racial/ethnic minorities in the state of Ohio" focusing on Senate Factors One, Two, Three, Five, Six, and Seven.[9]  (Roscigno Report, Doc. 18-2 at 3.)

Senate Factor Five.  Focusing on "the extent to which minority group members [specifically African-Americans] bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process," Roscigno describes "stark and persistent racial inequalities . . . [in] work, housing, education and health" with roots "in both historical and contemporary discriminatory practices." (Roscigno Report, Doc. 18-2 at 3.)  He states that these inequalities "create unique and compelling resource, transportation, time and informational disadvantages" as to voting and opines that "[r]ecently instituted voting restrictions will have a further disparate, negative impact on minority but also poorer, working class, and aging populations in Ohio and their capacities to vote."  (*Id.* at 3.)

Specifically, Roscigno states that "African Americans . . . face entrenched, persistent and quite profound disadvantages when it comes to employment and returns to employment." (Roscigno Report, Doc. 18-2 at 5.)  While these inequalities "are partially explained by a long history of racial exclusion, educational segregation, and their consequences," "[c]ontemporary research makes very clear" that these inequalities "continue to be driven by segregation, the relegation of minority employees to lower return and more precarious jobs and ongoing minority vulnerability to discrimination in hiring, firing, promotion, demotion and harassment." (*Id.* at 5.)

Drawing on data from the 2012 American Communities Survey of the U.S. Census ("ACS"), Roscigno states that "Whites (32%) are significantly overrepresented relative to

---

[9] The "Senate Factors," cited by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 37 (1986), are discussed more fully in Section IV.A.2 *infra*.

African Americans (19%) in upper-tier positions in the professional, managerial and financial occupational ranks, where job security, flexibility, benefits and rewards are significantly higher," and "African Americans (29%) are more likely than Whites (22%) to work in service and sales related occupations and, to a lesser extent, in administrative and office support positions." (Roscigno Report, Doc. 18-2 at 5–6.) This data is somewhat parallel to data from 2012 reports from the Equal Employment Opportunity Commission, which shows that approximately 31.7% of White Ohioans and 13% of African Americans "held top positions in the upper echelons of the occupational hierarchy (executives, managers and professionals)," and "36.2% of African Americans versus 23.1% of whites" held "lower-rung service and sales work positions— positions with significantly lower earnings and benefits, less autonomy and scheduling flexibility, more likely to pay hourly wages rather than a salary, and with more volatility in terms of job security." (*Id.* at 7.)

Roscigno states that "[s]ubstantial bodies of social science research . . . often conclud[e] that contemporary institutional practices and discrimination play a significant role [in causing these inequalities], especially when the disparities are as large as they are in Ohio." (Roscigno Report, Doc. 18-2 at 7.) Research shows that "there continues to be significant 'minority vulnerability' in the course of employer decisionmaking," impacting minority hiring, promotion, demotion, and firing in significant ways." (*Id.* at 8.) "Such analyses typically statistically control for important background attributes such as education, experience and skill levels in order to capture the extent to which explicitly racialized processes are likely occurring." (*Id.*)

Racial occupational inequalities are linked to disparities in income, poverty status, residential and schooling options, and health status. (Roscigno Report, Doc. 18-2 at 10.) Job

scheduling and flexibility have a direct impact on voting and its barriers, and other disparities affect cost calculations regarding voting and the barriers to voting. (*Id.*)

Roscigno states that substantial residential segregation exists in Ohio; in fact, Cleveland, Cincinnati, and Columbus are among the most segregated cities in the nation. (Roscigno Report, Doc. 18-2 at 10–11.) According to ACS data, 72.8% of white households in Ohio and 38.5% of African American households are homeowners rather than renters. "It is within low-end rental markets than one finds high levels of residential mobility and instability," and 21.6% of African Americans compared to 12.9% of whites reported a residential move over the prior year. (*Id.* at 12.)

Roscigno finds that this residential segregation is caused by the financial implications of employment inequalities as well as continuing discriminatory practices by realtors, landlords, and lending and insurance institutions. (Roscigno Report, Doc. 18-2 at 12–15.) Consequences include limited access to employment, increased segregation of schools, "neighborhood instability, limited institutional supports, heightened criminal victimization and declines in overall trust in neighbors, institutions and politics." (*Id.* at 15.)

According to Roscigno, these disparities have "specific and direct consequences for voting." (Roscigno Report, Doc. 18-2 at 16.) First, they result in disparate access to transportation. According to ACS data, African American Ohioans have an average of 1.2 vehicles per household, compared to 2.2 vehicles for whites, and are about three times as likely to rely on public transportation or walk to work. (*Id.*) Second, "African Americans in Ohio are disparately located in non-salaried, lower-paying jobs where it is much more difficult to take time off to vote during regular business hours." (*Id.* at 17.) Third, the inequalities make it more difficult to arrange childcare during the day. According to ACS data, "72% [of] African

American households in Ohio are single parent families with at least one child under eighteen years old compared to 25% of White households." (*Id.* at 18.)

Senate Factors One and Three.  Noting that Senate factors one and three overlap, Roscigno considers them together.  Examining "the history of official voting-related discrimination in the state," he states that "[o]fficial voting-related discrimination against racial/ethnic minorities was a cornerstone in Ohio from the very outset of its establishment as a state," considering that the state constitution originally limited voting rights to only white males. (Roscigno Report, Doc. 18-2 at 26.)

As for "the extent to which the state . . . has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group," Roscigno states that "there are other and much more recent voting practices and changes with implications for discrimination against minority voters in the state."  (Roscigno Report, Doc. 18-2 at 28.)  He asserts that poll watchers during the 2012 election disparately targeted "certain, high minority concentrated areas and greater residential mobility or non-clarity regarding permanent addresses."  (*Id.*)  He also cites changes to early-voting days and hours as well as the recent passage of voter identification laws in states with high minority populations and higher minority and low-income voter turnout in 2008.  (*Id.*)

Senate Factor Two.  As to whether voting in the jurisdiction remains or is "racially polarized," Roscigno cites exit poll data showing that dramatically polarized voting in the 2008 and 2012 presidential elections and substantial polarization in the 2004 election.  (Roscigno Report, Doc. 18-2 at 32.)  Specifically, in 2012 and 2008, respectively, approximately 41% and 46% of white voters and 96% and 97% of African American voters voted for Barack Obama.  In 2004, approximately 44% of white voters voted for John Kerry versus 84% of African American

voters. (*Id.*)  Roscigno cites other examples of racially polarized voting in the 2008 Democratic Primary election, the 2010 gubernatorial election, and the 2010 and 2012 elections for Senate. (*Id.* at 33–34.)

Senate Factor Six.  Considering whether there continue to be "overt or subtle racial appeals" in the electoral process, Roscigno suggests that the explicit racial appeals of the past have been mostly replaced by "more subtle, race-laden messages—messages that draw on more general stereotypes (e.g., minority criminality or welfare dependency) in an effort to motivate white voters in a particular direction."  (Roscigno Report, Doc. 18-2 at 34.)  He cites a 2010 campaign for State Treasurer that portrayed an African American opponent as corrupt and connected to Muslim mosques and those of Arab descent.  (*Id.* at 35.)  Another example is a television commercial "displaying a shouting African American woman in inner city Cleveland alongside mostly other African Americans, claiming that Obama gave her a phone." (*Id.* at 36.)

He also notes that "explicitly racial appeals . . . became apparent among at least some portion of the white electorate," citing a shirt at a rally for Mitt Romney which read, "PUT THE WHITE BACK IN THE WHITE HOUSE," as well as a highly publicized article titled "America Needs a White Republican President."  (Roscigno Report, Doc. 18-2 at 35–36.)  Roscigno asserts that such examples "suggest a political climate in Ohio that remains somewhat tolerant of explicit race politics." (*Id.* at 36.)

Roscigno cites as an example of intimidation of African American and Hispanic voters the placement of 60 billboards reading "VOTER FRAUD IS A FELONY!" in disproportionately African and low income neighborhoods of Columbus and in predominantly African American and Latino neighborhoods in Cleveland.  (Roscigno Report, Doc. 18-2 at 37.)

Finally, Roscigno quotes two politicians discussing early voting.  First, "[i]n August 2012, Doug Preisse, the Republican Party Chairman of Franklin County, in a campaign supporting cutbacks to Ohio's early voting program, stated [in an e-mail to a reporter] 'I guess I really actually feel we shouldn't contort the voting process to accommodate the urban—read African-American—voter turnout machine.'"  (Roscigno Report, Doc. 18-2 at 38.)  Roscigno asserts that Preisse's "willingness to admit to the need to suppress African-American votes in a written e-mail again illustrates the tolerance for racial appeals in Ohio."  (*Id.*)  Second, during a February 2014 discussion about early voting in the House Policy and Legislative Oversight Committee, State Representative Matt Huffman stated, "'There's that group of people who say, 'I'm only voting if someone drives me down after church on Sunday.' . . . Really?  Is that the person we need to cater to when we're making public policy about elections?'"  (*Id.*)

Senate Factor Seven.  As for "the extent to which members of the minority group have been elected to public office," Roscigno states that "Ohio has made significant progress" in that its U.S. congressional representation underrepresents its African American population only by a small margin.  (Roscigno Report, Doc. 18-2 at 38.)  However, African Americans are significantly underrepresented, "both historically and contemporarily, in the most important, visible and influential elected state posts."  (*Id.* at 38–39.)

### c. Defendants' Expert, Sean P. Trende

Sean P. Trende, the Senior Elections Analyst for RealClearPolitics, is an "expert in the fields of psephology, voter behavior, voter turnout, polling, and United States demographic trends and political history."  (Trende Declaration, Doc. 41-3 at 3, 5.)  He has "studied and written extensively about demographic trends in the country, exit poll data at the state and federal level, public opinion polling, and voter turnout and voting behavior" and states that "[t]he overarching purpose of [his] writings . . . is to try to convey more rigorous statistical

understandings of elections than is typically found in journalistic coverage of elections to a lay audience." (*Id.* at 6.)  Trende submitted a Declaration (Doc. 41-3), and the record contains his deposition taken on July 29, 2014 (Doc. 64-1) as well as a deposition taken on June 6, 2014 in separate litigation (Doc. 53-6).

Trende's declaration examines how the challenged reductions in Ohio's voting schedule fit into the national context, whether those changes are expected to decrease minority voter turnout, and whether the apparent disparate usage of early voting by African Americans in the 2008 and 2012 elections are expected to continue.  (Trende Declaration, Doc. 41-3 at 3.)

Trende states that "Ohio maintains one of the most expansive systems of early voting in the country," with an early-voting period twice the national median.  Ohio is among a minority of states with weekend voting hours and only about a dozen states with Sunday voting hours. Trende states that "a large majority of United States jurisdictions" do not offer same day voter registration.  (Trende Declaration, Doc. 41-3 at 4–4, 8–21.)

Trende concludes that, even assuming that African American Ohioans disproportionately use early voting, "there is little evidence that these voters would fail to adjust their behavior ... and vote during the 22 days of early voting remaining (or on Election Day)."  Trende asserts that "the data suggest that this is exactly what occurred in states that did not have these sorts of laws in place."  (Trende Declaration, Doc. 41-3 at 4.)

Comparing voting trends in and outside Ohio, Trende concludes that "African-American participation was up more-or-less across-the-board in 2008 and 2012, regardless of the amount of early voting a state offered," and was largely a function of exogenous forces including the historic nature of the Obama candidacy.  Trende asserts that "the fact that African-American participation in early voting in 2010 was down substantially, and was statistically

indistinguishable from non-Hispanic white participation makes it difficult to draw any firm conclusions about whether the apparent racial disparity in usage of early voting in presidential elections is permanent or transitory." (Trende Declaration, Doc. 41-3 at 4, 22–33.)

Trende presents a multi-state data analysis evaluating the effects of the number of days of early voting on African-American voter turnout, and finds that "it is difficult to conclude that early voting enhances African-American turnout, however measured." (Trende Declaration, Doc. 41-3 at 33–40.) He states that a recent study concluded that "early voting does not actually make voting easier" because "[a] voter still has to make a trip to the voting booth." (*Id.* at 5.) "Moreover, by diluting the effect of mobilization efforts and the social experience of Election Day, early voting might even reduce turnout on balance." (*Id.* at 5, 43–44.) Trende conceded at a deposition in separate litigation, however, that he was "aware of a scholarly consensus that same-day registration increases turnout." (Trende Dep., June 6, 2014, Doc. 53-6 at 252:24–253:1.)

### d. Defendants' Expert, Dr. Nolan McCarty

Dr. Nolan McCarty, the Susan Dod Brown Professor of Politics and Public Affairs and the chair of the Politics Department at Princeton University, is widely published on the effects of electoral rules on legislative partisanship and polarization and is the co-author of a PhD-level textbook on the application of mathematical models in political science. (McCarty Response, Doc. 41-4 at 2.) McCarty submitted a Response to Expert Report of Daniel A. Smith (Doc. 41-4), and the record contains his deposition (Doc. 64-5). In his report, McCarty evaluates "the appropriateness of [Smith's] methodologies, the quality of [his] analysis, and the reasonableness of [his] inferences." (McCarty Response, Doc. 41-4 at 2.)

McCarty criticizes Smith's report for possible aggregation bias and asserts that Smith shows only a weak positive correlation between EIP voting rates and black VAP at the census

block level.  McCarty finds a stronger negative correlation at higher levels of aggregation such as at county level.  (McCarty Response, Doc. 41-4 at 15.)  Smith responds that any possible aggregation bias is "dramatically worsen[ed]" by aggregating up from census block to county level.  (Smith Rebuttal, Doc. 53-11 at 6.)  Smith also provides two additional analyses, rerunning his regressions compensating for counties' different characteristics and then rerunning his regressions using data aggregated at the census tract level.  Under both additional methods, Smith arrived at results consistent with his original report.  (Smith Rebuttal, Doc. 53-11 at 9–10.)

McCarty argues that Smith's analysis of homogenous and nearly homogenous census blocks "omit information about thousands of Ohio voters and therefore may not provide a reasonable estimate the statewide racial discrepancy in EIP voting rates."  (McCarty Response, Doc. 41-4 at 8, 9, 15.)

He also suggests that Smith misapplied the method of bounds analysis to nearly homogenous census blocks by omitting information about how Smith estimated the total number of votes cast by white and African Americans in each census block.  (McCarty Response, Doc. 41-4 at 8–10, 15.)  Smith responds that McCarty provides no empirical evidence contradicting Smith's "implicit assumption . . . that turnout in the 2012 General Election in Ohio was taken as equivalent in homogenous and nearly homogenous black and white VAP census blocks."  (Smith Rebuttal, Doc. 53-11 at 17.)

Finally, McCarty asserts that "the evidence shows that reductions in the window of EIP voting does not reduce turnout."  (McCarty Response, Doc. 41-4 at 16.)

### e. Defendants' Expert, Dr. Thomas Brunell

Dr. Thomas Brunell, Ph.D., Professor of Political Science at the University of Texas at Dallas, has published dozens of articles as well as a book titled, "Representation and Redistricting: Why Competitive Elections are Bad for America."  (Brunell Declaration, Doc. 41-

5 at 3.)  Brunell submitted a Declaration (Doc. 41-5), and the record contains his deposition (Doc. 64-2).  Asked to respond to Smith's report, he finds that its usefulness is limited by several problems.

First, he states that Smith assumes the last Sunday and Monday before the election would not be early-voting days.  (Brunell Declaration, Doc. 41-5 at 2.)  This a problem is remedied by the analysis contained in Smith's Rebuttal Report, which confirmed his original findings, even after restoring the final Sunday and Monday of early voting.  (Smith Rebuttal, Doc. 53-11 at 12–14.)

Second, Brunell suggests that voters may simply change their behavior to accommodate the elimination of some early-voting days, a suggestion that Smith does not purport to cover in his report.  Finally, Brunell criticizes the limitations of Smith's data set, which includes only two elections, and only five counties as to one of those elections.  (Brunell Declaration, Doc. 41-5 at 2.)

Brunell also cites recent research by Barry C. Burden and others for the proposition that early-voting opportunities actually reduce voter turnout.  (Brunell Declaration, Doc. 41-5 at 3–4.)

Apparently either ignoring or disputing the various barriers to voting discussed by Roscigno, Brunell asserts that "[p]eople who want to vote will pay the costs of voting. These costs are usually quite low—register to vote and then cast a ballot (go to polls, send in absentee ballot, etc[.])."  (Brunell Declaration, Doc. 41-5 at 6.)

### f. Plaintiffs' Expert, Dr. Barry C. Burden

Dr. Barry C. Burden, Professor of Political Science at the University of Wisconsin-Madison, coauthored an article cited by Defendants' experts for the proposition that the availability of early voting decreases voter turnout.  (Burden Declaration, Doc. 53-4 at 1–2.)  Burden states that Defendants' experts fail to adequately represent four crucial aspects of his

article's analysis—aspects which "make[] clear that our study is not especially relevant to this case." (*Id.* at 2.)

First, Burden states that the "study does not address the specific and unique circumstances of Ohio," but rather "define[s] 'early voting' as any option allowing a person to vote without an excuse before election day." He states that "[i]t would ... be unwarranted to jump from the general pattern we observed to make strong claims about the effects of offering early voting in any particular jurisdiction ... because the precise form that early voting takes and how it interacts with other laws and demographics of the state are quite variable." (Burden Declaration, Doc. 53-4 at 2–3.)

Second, "the negative effect of early voting that [Burden et al.] observed holds only in states with early voting but without same day registration"; when a state offers both, "there is not a negative effect on turnout." (Burden Declaration, Doc. 53-4 at 3.)

"Third, our study did not analyze African Americans' response to early voting," but rather reflected behavior of the predominately white national electorate. Burden opines that "it is likely that effects of offering early voting would be different for non-whites who bring different demographic characteristics, skills, experiences to the election process." (Burden Declaration, Doc. 53-4 at 3.)

Finally, Burden asserts that "it is inappropriate to draw inferences from our study to situations where voting opportunities are removed" because his study examined introduction of "convenience voting" options, rather than removal of voting opportunities. (Burden Declaration, Doc. 53-4 at 4.)

### g. Plaintiffs' Expert, Dr. Paul Gronke

Paul W. Gronke, Professor of Political Science at Reed College and Director of the Early Voting Information Center, was retained to evaluate whether Defendants' expert reports

"accurately cite the complete body of [his] scholarship regarding early voting and turnout and more broadly the state of academic research regarding early voting and voting behavior." (Gronke Declaration, Doc. 53-5 at 2–3.)  He makes the following conclusions.

First, Gronke states that Defendants' expert reports frequently use the term "early voting" imprecisely and cite literature which does not distinguish between EIP voting and voting by mail.  Gronke asserts that "the failure to distinguish between the two renders those materials of limited value in assessing the effect of early in-person voting."  (Gronke Declaration, Doc. 53-5 at 3.)

Second, Defendants' expert reports cite literature based on data from 2008 or earlier, with most data from 2004 and earlier, and fail to account for significant changes in more recent history.  (Gronke Declaration, Doc. 53-5 at 3–4.)

Third, Gronke reports that "[t]he literature concerning same-day registration consistently finds that same-day registration is associated with higher turnout."  (Gronke Declaration, Doc. 53-5 at 4.)

Finally, he criticizes Defendants' expert reports' citations to literature concerning situations where early-voting opportunities are added, rather than eliminated.  He opines that "[t]he difference is critical, because literature that specifically addresses situations where early voting opportunities have been removed suggests that removing such opportunities has had a negative effect on voters."  (Gronke Declaration, Doc. 53-5 at 4.)

### h. Analysis of Expert Evidence

While Smith's analysis necessarily relies on limited data, the Court finds his conclusions regarding disproportionate use of EIP voting by African American Ohioans to be well-supported. Smith's report has significant probative value and sufficiently demonstrates that African

44

Americans rely on EIP voting at far greater rates than whites in Ohio, including on the days and times eliminated by SB 238 and the 2014 Directives.

The Court accepts Roscigno's undisputed findings regarding employment disparities as well as significant disparities in residential, transportation, and childcare options; and concludes that these disparities significantly increase the cost of casting a vote.

### i. Other Statistical Reports and Studies

In addition to the above expert opinions, the record contains other statistical reports and studies tending to support the conclusions of the Plaintiffs' experts, including the following:

First, a report analyzing racial early-voting patterns in Cuyahoga County during the 2008 presidential election estimated that, while white voters exercised the vote-by-mail option at greater rates than African Americans, African American voters were 26.6 times more likely to have utilized EIP voting during that election than white voters.  "Despite accounting for a mere 28.6% of the estimated overall vote, African American voters cast an estimated 77.9% of all EIP ballots in Cuyahoga County in 2008."  (RUSSELL WEAVER, PH.D & SONIA GILL, ESQ., LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, EARLY VOTING PATTERNS BY RACE IN CUYAHOGA COUNTY, OHIO; A STATISTICAL ANALYSIS OF THE 2008 GENERAL ELECTION, October 2012, Doc. 18-8 at 14.)  The report cautions that the results do not indicate that "Cuyahoga County minority voters necessarily will be precluded from voting because of the proposed [limitations to EIP voting]" but that "a reasonable interpretation of [the] results is that elimination opportunities to vote early in person effectively raises the cost of voting for many more African Americans than whites."  (*Id.* at 6.)

Second, another analysis of 2008 EIP voting in Cuyahoga County concluded that "African-American, white, and Hispanic voters who used EIP voting had significantly lower

incomes than members of those same groups who voted on election day or by mail." (NORMAN

ROBBINS & MARK SALLING, RACIAL AND ETHNIC PROPORTIONS OF EARLY IN-PERSON VOTERS IN

CUYAHOGA COUNTY, GENERAL ELECTION 2008, AND IMPLICATIONS FOR 2012, *available at*

http://urban.csuohio.edu/publications/center/northern_ohio_data_and_information_service/Racia

l_and_ethnic_proportions_of_early_in-person_voting.pdf, Doc. 18-6.)

Third, a report prepared by the Franklin County Board concluded that, during the 2008

election, "a disproportionately higher amount of African Americans utilized EIP voting," and

"21% of all weekday EIP voting took place after 5pm." (DANIEL BRILL, FRANKLIN COUNTY

BOARD OF ELECTIONS, 2008 EARLY IN-PERSON VOTING, Aug. 16, 2012, Doc. 18-5 at 2.)

Fourth, another report focusing on the 2010 election concluded that "early voters

[including those voting by mail] were more likely than election-day voters to be women, older,

and of lower income and education attainment." (RAY C. BLISS INSTITUTE OF APPLIED POLITICS,

UNIVERSITY OF AKRON, A STUDY OF EARLY VOTING IN OHIO ELECTIONS, Doc. 18-3 at 1.)

## IV.

Rule 65 of the Federal Rules of Civil Procedure authorizes the Court to grant preliminary

injunctive relief. "A preliminary injunction is an extraordinary remedy which should be granted

only if the movant carries his or her burden of proving that the circumstances clearly demand it."

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). A

district court is to consider the following four factors when deciding to issue a preliminary

injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether

the movant would suffer irreparable injury without the injunction; (3) whether issuance of the

injunction would cause substantial harm to others; and (4) whether the public interest would be

served by the issuance of the injunction. *See Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d

219, 233 (6th Cir. 2011).  "[T]he four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied."  *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992) (citation omitted). "These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements."  *Id.*

### A. Likelihood of Success on the Merits

Plaintiffs assert that they have demonstrated a strong likelihood of success on the merits of their first (Equal Protection) and third (Voting Rights Act) claims for relief.  The Court will consider each of these claims in turn.

### 1. Equal Protection Claim

The Plaintiffs' Equal Protection challenge to SB 238 and Directive 2014-17 is brought pursuant to 42 U.S.C. § 1983.  The Plaintiffs allege that the combined effects of these measures burden the right to vote of certain groups of voters in a manner not justified by the Defendants' asserted justifications.

The right to vote is a fundamental right.  *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966).  "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined."  *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

"The Equal Protection Clause applies when a state either classifies voters in disparate ways, or places restrictions on the right to vote."  *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (internal citation omitted).  As the Supreme Court has stated, "[i]n decision after decision, this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."  *Dunn v.*

*Blumstein*, 405 U.S. 330, 336 (1972).  On the other hand, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  *Storer v. Brown*, 415 U.S. 724, 730 (1974).

The Sixth Circuit has described the appropriate standard for evaluating Equal Protection challenges within the voting context as follows:

> The precise character of the state's action and the nature of the burden on voters will determine the appropriate equal protection standard. *See Biener v. Calio*, 361 F.3d 206, 214 (3d Cir. 2004) ("The scrutiny test depends on the [regulation's] effect on [the plaintiff's] rights.").
>
> If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used. *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807–09, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969) (applying rational basis to a state statute that prohibited plaintiffs' access to absentee ballots where no burden on the right to vote was shown); *Biener*, 361 F.3d at 214–15 (applying rational basis where there was no showing of an "infringement on the fundamental right to vote"). On the other extreme, when a state's classification "severely" burdens the fundamental right to vote, as with poll taxes, strict scrutiny is the appropriate standard. *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992); *see also Harper*, 383 U.S. at 670, 86 S.Ct. 1079 ("We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined.").
>
> Most cases fall in between these two extremes. When a plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters, we review the claim using the "flexible standard" outlined *in Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). *See Hunter*, 635 F.3d at 238 (applying *Anderson–Burdick* balancing in an equal protection challenge to the counting of provisional ballots).  Although *Anderson* and *Burdick* were both ballot-access cases, the Supreme Court has confirmed their vitality in a much broader range of voting rights contexts. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204, 128 S.Ct. 1610, 170 L.Ed.2d 574 (Scalia, J., concurring.) ("To evaluate a law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process—we use the approach set out in Burdick. . . . "). The *Burdick* Court stated the standard as follows:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights."

*Burdick*, 504 U.S. at 434, 112 S.Ct. 2059 (quoting *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564). This standard is sufficiently flexible to accommodate the complexities of state election regulations while also protecting the fundamental importance of the right to vote. There is no "litmus test" to separate valid from invalid voting regulations; courts must weigh the burden on voters against the state's asserted justifications and "make the 'hard judgment' that our adversary system demands." *Crawford*, 553 U.S. at 190, 128 S.Ct. 1610 (Stevens, J., announcing the judgment of the Court).

*Obama for Am.*, 697 F.3d at 428–29.

Accordingly, in determining whether the Plaintiffs have demonstrated a strong likelihood of success on the merits of their Equal Protection claim, the Court must first determine the appropriate standard for considering the impacts of SB 238 and Directive 2014-17 on voting in Ohio.  The Defendants assert that the Court should apply a rational basis review, noting that Supreme Court has held that an individual does not have a constitutional right to vote absentee.[10] However in the Court's view, the Plaintiffs' Equal Protection claim is about more than the privilege to use an absentee ballot standing in a vacuum.  Rather, the essence of their claim is the equal treatment of all voters within Ohio's EIP/absentee voting scheme.  Having decided to enact a broad scheme of EIP/absentee voting, Ohio and Secretary Husted may not capriciously change or implement that system in a manner that disproportionately burdens the right to vote of certain groups of voters:

> The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and

---

[10] *See McDonald*, 394 U.S. at 807–08.

disparate treatment, value one person's vote over that of another.

*Bush v. Gore*, 531 U.S. 98, 104–05 (2000).  Further, the fact that no-fault absentee and EIP voting were established to remedy the problems faced by Ohioans during the 2004 election (problems that are in evidence before the Court), cannot be forgotten in considering changes to Ohio's voting system.  As such, this case is about more than just the use of absentee ballots standing alone and a heightened form of scrutiny must apply.

The Plaintiffs allege that the voting schedule created by SB 238 and Directive 2014-17 burden the right to vote of African Americans, lower income individuals, and the homeless.  SB 238 could possibly burden voters in two separate ways.  First, it reduces the overall potential time for conducting EIP voting from 35 to 28 days.  Second, it eliminates the potential for voting and registering on the same day.  With regard to the reduction in days, the record reflects that in 2008, 67,408 voters cast their ballots during Golden Week; in 2010, 26,230 voters did so, and in 2012, 89,224 voters did so.  Thus, the Plaintiffs have demonstrated that tens of thousands of voters have utilized Golden Week voting opportunities during past elections.  Further, the Court has credited expert Daniel Smith's conclusion that African American voters in Ohio tend to utilize EIP voting at a greater rate than white voters.  It is true that the statistical evidence before the Court cannot predict whether SB 238's reduction of the EIP voting period from 35 to 28 days will actually reduce voter turnout.  In other words, it is impossible to predict whether voters who have voted during Golden Week in past elections would not now vote during a different time of the EIP voting period.  However, turnout itself is not determinative of the Equal Protection analysis.  Rather, the question is whether a burden has been imposed on the fundamental right to vote.  Accordingly, it is reasonable to conclude that a reduction in the total time available for EIP voting will burden those groups that use EIP voting.  As the Plaintiffs have demonstrated that

African American voters use EIP voting at higher rates than other segments of the population, the Court concludes that SB 238's reduction in the EIP voting period therefore burdens the voting rights of African Americans.

The Court likewise concludes that SB 238's elimination of Golden Week itself similarly burdens the voting rights of lower income and homeless individuals.  The record reflects that in 2008, 12,842 voters utilized Golden Week to register or update their registration and vote; in 2010, 1,651 voters did so; and, in 2012, 5,844 voters did so.  While these figures may be small in comparison to the millions of votes usually cast in Ohio elections, thousands of voters have utilized Golden Week during each of the last several elections.  Additionally, the Plaintiffs' evidence paints a portrait illustrating the importance of Golden Week to those struggling on the margins of society.  Such individuals are more likely to move frequently and lack access to transportation.  Day to day life for such individuals can be chaotic and merely focused on survival.  (*See* Frech Dec. ¶ 13, Doc. 18-22 at 2–3.)  If a voter moves, he or she is required to update his or her voter registration.  Lack of transportation means that travelling to the voting location can present its own hardships.  For these reasons, the opportunity to register and vote at the same time during Golden Week is more than a mere convenience to poorer individuals and the homeless, it can make the difference between being able to exercise the fundamental right to vote and not being able to do so.  Accordingly, the elimination of Golden Week burdens the right to vote.

The Plaintiffs argue that two aspects of Directive 2014-17 burden the voting rights of African American and lower-income voters—the Directive's complete lack of evening voting hours for non-presidential elections and the fact that only one Sunday of voting is available during the early-voting period.  The record reflects that since EIP voting was first introduced

following the 2004 election, African Americans have taken advantage of the ability to vote on Sundays during the early-voting period through Souls to the Polls initiatives.  Prior to the 2012 election, only a handful of Ohio counties held voting on any Sunday during the early-voting period, but those that did so, including those that offered multiple Sundays of voting, tended to be counties with high African-American populations.  During the 2012 election, Sunday voting was possible in all counties, but only on the final Sunday before the election between the hours of 1 p.m. and 5 p.m.  On that Sunday, those involved in coordinating Souls to the Polls efforts described long voting lines consisting largely of African-American voters.

The record also reflects that Souls to the Polls has developed into a civic component of African-American church life in Ohio, where community leaders raise awareness of voting and encourage and assist members of the community to vote.  Sadly, African Americans in Ohio tend to be of lower socio-economic standing than other voters, and many of the churches conducting souls to the polls initiatives are located in poorer neighborhoods.  For example, African Americans in Ohio have a median household income of $26,039 whereas the median household income overall for Ohio is $45,400.  (Doc. 18-9 at 2.)  Accordingly, it is significant that Souls to the Polls initiatives leverage church resources to provide transportation to voting locations to members of church congregations.  Absent the use of transportation provided by the churches, many members of these communities could find it difficult to cast a vote as those in lower socio-economic groups tend to be more constrained in terms of transportation options.  Given evidence of long lines occurring when only one Sunday with limited hours was available during the early-voting period, the Court holds that Directive 2014-17's limitation of Sunday voting to a single day with limited hours, burdens the voting rights of African Americans who have come to rely on Souls to the Polls initiatives.

The Court further holds that Directive 2014-17's lack of evening voting hours will burden lower-income voters. These voters are more likely to rely on public transportation and work wage-based jobs wherein they are less likely be able to find the time during lunch and other breaks to travel to polling location between the hours of 8 and 5. As previously stated, each county is permitted to operate only one early-voting location. As such, a given voter may be forced to travel a great distance to reach the single location. While public transportation may be available to reach the polling place, it may not be possible for lower income wage-earners to timely take advantage of that transportation.

The Court characterizes the overall degree of burden on voting imposed by SB 238 and Directive 2014-17 as significant although not severe. In so characterizing these burdens, the Court is mindful of the expansive nature of Ohio's early-voting system. For instance, as currently established, the 2014 early-voting period will allow for voting on the final two Saturdays of the early-voting period between 8 a.m. and 4 p.m. and the Court recognizes that it would be possible for Souls to the Polls initiatives to be conducted on those Saturdays. On the other hand, the record reflects that Sundays following church services are times when African Americans congregants are already gathered together in one place, a fact which has undoubtedly made transporting voters to the polls using church resources more efficient, especially considering that some of the churches also provide transportation to and from Sunday services. Thus, conducting Souls to the Polls efforts on a Saturday would impose some burden on the churches conducting such efforts as they would not be able to use their transportation resources as efficiently.

In determining that SB 238 and Directive 2014-17 significantly burden the right to vote of African Americans, the homeless, and lower-income individuals, the Court has also

considered the impact of the ability of all absentee voters in Ohio to vote by mail.  According to the Defendants, because all voters can request an absentee ballot and vote entirely by mail, something that can be accomplished at any time and on any day and in a manner that all voters can equally take advantage of, any burden to the ability of the enumerated groups to partake in EIP voting is nullified.  In other words, it does not matter that there may be fewer EIP voting opportunities because a ballot cast by mail is exactly the same as an absentee ballot cast in person.  Defendants also note the different combinations that can be used in order to cast a ballot.  For example, a voter can request an absentee ballot by mail and drop it off in person, sometimes to special ballot boxes that are accessible outside normal business hours.

While the presence of vote by mail undoubtedly ameliorates some of the burdens on voting imposed by SB 238 and Directive 2014-17, the record before the Court reflects that it cannot completely eliminate or lesson those burdens to the extent that they become less than significant.  In this regard, the record is undisputed that African Americans, lower-income individuals, and the homeless are distrustful of the mail and/or voting by mail or would prefer to vote in person for unrelated reasons.  Further, and perhaps more significantly, in reaching its conclusion, the Court also looks to the very mechanics of voting by mail, which consist of filling out an application requiring detailed information, paying postage, correctly filling out more detailed information when the ballot is received, and paying additional postage to return the ballot.  The associated costs and more complex mechanics of voting by mail, coupled with other information in the record concerning the enumerated groups including homelessness, lower educational attainment, more limited financial resources, reliance on public transportation, and transience, indicate to the Court that voting by mail may not be a suitable alternative for many voters.  While it is true that the application information that must be provided is the same

whether voting by mail or in person, it is easy to imagine how the process could become difficult if conducted entirely through mail, as with situations where a voter incorrectly fills out a form or does not understand what information is required.  Finally, it is worth noting that SB 238 also reduced the overall period for voting by mail by the same amount as the time for EIP voting.  *See* OHIO REV. CODE § 3509.01(B)(2) (absentee ballots for use for other than in-person voting to be ready the first day after the close of voter registration).  Thus, under the current status quo, there is less time to accomplish voting by mail than there was under the previous rules.

Having determined that SB 238 and Directive 2014-17 combine to significantly burden the right to vote of the enumerated groups, the Court must now balance the burden imposed against the offered justifications for the measures as this case falls in between those presenting a severe burden to voting on the one extreme and no burden at all on the other.  In doing so, the Court holds that the offered justifications fail to outweigh the burdens imposed.  Accordingly, the Plaintiffs have demonstrated a substantial likelihood of success on the merits of their Equal Protection claim.

Turning first to SB 238, the Defendants put forth fraud prevention and cost as justifications for the elimination of Golden Week and reduction in the period for EIP voting. However, as explained below, neither of these justifications withstand careful evaluation.  The Defendants attempt to justify the elimination of Golden Week as a means to prevent election fraud.  In doing so, they cite, inter alia, the testimony of OAEO Executive Director Ockerman who testified prior to the passage of SB 238 that he was aware of the votes of fraudulently registered voters being counted because "election officials could not confirm their registration status before Election Day."  (Doc. 41-20 at 4.)

As noted in Section III.B *supra*, Ohio law requires the registration of absentee voters to

be confirmed before their votes are officially counted.  (*See* Clyde Dec. ¶ 16, Doc. 58-16 at 6; Damschroder Dec. ¶ 27, Doc. 41-9 at 6.)  With that fact in mind, Ockerman's justification for eliminating Golden Week—that it could lead to situations where officials do not have time to verify voter registrations prior to Election Day—does not withstand logical scrutiny, but instead is perhaps better characterized as a justification for limiting the registration deadline itself to beyond 30 days before the election.  This point is illustrated by the simple hypothetical of a voter (under the status quo imposed by SB 238) registering to vote 30 days before the election and then returning to his local Board to cast an EIP ballot on the 29th day before the election.  The potential that that voter's registration could not be verified in time is nearly exactly the same as a voter who could previously register and vote on the 30th day before the election.  In fact, if the potential for fraud is measured in relation to time before the election, that potential would increase as the election grew closer because less time remains to verify absentee voter registrations.  In sum, the potential for fraud identified by Ockerman exists whether voters are allowed to register and vote on the same day or not, and is best combatted by election officials following the law and applicable procedures and not counting absentee votes prior to the proper verification of registration.

The same logical flaw regarding voter fraud also exists in the testimony of Chris Long, Dana Walch, Mary Siegel, Ronald Koehler, and Senator Frank LaRose.  (*See* Young Dec. Exs. 1–4, Doc. 54-3; Keeran Dec. Ex. 2, Doc. 54-4.)  Their testimony all indicates that fraud could result because of a failure to properly verify registration, when as illustrated above, that issue has more to do with the registration process and verification of absentee ballots and almost nothing to do with instances of registering and voting on the same day.  (*See* Young Dec., Doc. 54-3.) The Court reaches the same conclusion regarding the issue of voters registering and attempting

to vote in multiple counties.  (Cuckler Dec. ¶¶ 3–5, Doc. 68-3 at 1–2.)  These issues can be resolved through proper verification of registrations, including through checking the Ohio voter registration database, and the potential for fraud has little to do with same-day registration if ballots cast during Golden Week are properly segregated pending verification.

The Defendants have also attempted to justify SB 238 as a cost-saving measure.  (*See* Doc. 41-20 at 3 ("the cost of administering elections has skyrocketed").)  With regard to the use of costs to justify burdens on the right to vote, the Sixth Circuit has stated, in a slightly different context:

> Ohio has used cost as if it were a silver bullet. Any change from the status quo necessarily involves some cost.  The State has failed to put forth any evidence indicating that it cannot manage the costs and instead, the evidence indicates that the State has either budgeted for the transition from its own funds or through funds provided by the federal government.  The mere fact that there is some cost involved does not make that factor compelling.

*Stewart v. Blackwell*, 444 F.3d 843, 869 (6th Cir. 2006).

As with voter fraud, the Court is not persuaded by the Defendants' attempts to justify SB 238 as a cost saving measure.  In this regard, despite generalizations made by Damschroder, Ockerman, and Walch concerning the added costs of providing more voting days and hours, the record is generally lacking in specific evidence regarding the costs to Ohio counties of operating the early-voting system for 35 days.  While Triantafilou, Ward, and Munroe have provided specific cost estimates for reinstating Golden Week ($8,000 to $12,000 in staffing costs alone for Hamilton County: $933.20 in added staffing costs for Madison County; $3,490.88 for Mahoning County), their figures are lacking a frame of reference.  For instance, $12,000 could be significant to a Board budget of $100,000 but not necessarily to one of $1,000,000.  Additionally, regarding Koehler's assertion that the elimination of Golden Week "will save [Boards] 20% of the cost of extra temporary workers, since they will be working four weeks

instead of five" (Young Dec. Ex. 4; Doc. 54-3 at 15), there is nothing in the record establishing what the total cost of temporary workers tends to be for counties throughout the state or demonstrating that the extra 20% presents added costs that cannot be managed by the counties.

Similarly, there is no evidence before the Court comparing costs of maintaining the 35-day early-voting period to the previous system or to the new status quo. *See Obama for Am.*, 697 F.3d 423 at 433 ("the State has shown no evidence indicating how this election will be more onerous than the numerous other elections that have been successfully administered in Ohio since early voting was put into place in 2005"). While the elimination of Golden Week will certainly save the Boards money, the more appropriate question is whether the previous 35-day system that included Golden Week was financially unworkable for the Boards, and nothing in the record tends to demonstrate that the old system created undue or burdensome costs. To the contrary, Amicus Curiae Cuyahoga County represents that it has already budgeted money for Golden Week and days of weekend voting during the 2014 election. (*See* Doc. 28 at 8–9.)

In terms of costs of maintaining Golden Week, the Court notes that during the final week of voter registration, county Boards are presumably open during normal business hours to register voters and prepare for the upcoming election. Additionally, state law requires them to be open until 9 p.m. on the last day of registration. Further, while state law allows the Boards to conduct EIP voting at either their main offices or at a satellite location, see Ohio Rev. Code § 3501.10(C), the record indicates that during the 2008 election only five of 88 counties— Franklin, Hardin, Knox, Lucas, and Summit—held EIP voting at sites other than the regular Board offices. (*See* Doc. 65-2.) In 2010, only Hardin, Knox, Lucas, Summit, and Union counties utilized offsite, EIP voting locations. (*See* Doc. 65-3.) Franklin, Lucas, and Summit are among the largest counties in the state. (*See* Doc. 41-17.)

The facts that EIP voting during Golden Week would take place during times when Boards are already open for business and that only a few Boards have operated separate locations for EIP voting, undermine the Defendants' attempt to justify SB 238 on the basis of cost. Because the Boards are already open, there is little likelihood that overhead costs such as heating or cooling buildings would "skyrocket" as a result of the Boards being required to accept EIP votes during Golden Week. Further, given that so few Boards choose to operate separate locations during the early-voting period, there is less likelihood that particularly small counties would be exposed to substantial extra costs associated with operating a separate facility for an additional several days. While some cost must accompany additional voting times and hours, the record is lacking evidence tending to establish that those costs would generally place undue burdens on the finances of Ohio's counties.

Finally, the Defendants attempt to justify SB 238 as a means of limiting the cost of political campaigns. However, they have failed to produce any evidence that the elimination of several days of the early-voting period would have that effect.

Turning to Directive 2014-17, Secretary Husted's purported justification for requiring all Boards to set the same EIP voting days and hours is uniformity. While Directive 2014-17 imposes a uniform voting schedule throughout Ohio during the early-voting period, the Court has also determined that features of that schedule significantly burden the voting rights of certain groups of voters by prohibiting counties from offering evening voting hours and additional Sunday voting. As such, it is not the case that the uniformity imposed by Directive 2014-17 "ensures that all Ohioans will have the same opportunity to vote." (Doc. 41 at 47.) In other words, there is nothing in the record tending to establish why a uniform voting schedule could not include evening and additional Sunday voting hours. Further, Secretary Husted has offered

no explanation as to why uniformity, standing alone, should be considered an interest important enough to effectively make it harder for groups of citizens to vote.  Nor has he cited any authority standing for that proposition.

The Court must now weigh the significant burdens placed on voting by SB 238 and Directive 2014-17 against the offered justifications.  As stated above, the Court has found these justifications to be relatively hollow, and, in some cases, not necessarily supported by logic. Accordingly, while the burdens imposed on the voting rights of African Americans, lower income voters, and the homeless are not severe, it cannot be said that they are outweighed by the offered justifications.  For instance, there is virtually nothing in the record tending to justify why a uniform voting schedule could not include evening voting hours and additional Sunday voting, especially considering that such voting opportunities have been successfully offered by individual counties in past elections.  While the Defendants have frequently noted that Ohio's system of absentee voting is one of the most expansive in the entire Country, one of the touchstones of the Fourteenth Amendment's Equal Protection guarantee in the context of voting rights is that actions of a State must "avoid arbitrary and disparate treatment of the members of its electorate."  *Bush v. Gore*, 531 U.S. 98, 105 (2000).  Here, despite the expansiveness of Ohio's voting system, the weakness of the offered justifications supporting SB 238 and Directive 2014-17 render them essentially arbitrary action when viewed against the burdens they impose on groups of voters.  Such action is prohibited by the Equal Protection Clause.  Thus, the Court's conclusions regarding the Plaintiffs' Equal Protection claim are easily summarized as follows: SB 238 and Directive 2014-17 arbitrarily make it harder for certain groups of citizens to vote.

For the above-stated reasons, the Court concludes that the Plaintiffs have demonstrated a strong likelihood of success on the merits of their Equal Protection claim.

## 2. § 2 Claim

Plaintiffs also challenge SB 238 and the Secretary's directives under § 2 of the Voting

Rights Act of 1965, 42. U.S.C. § 1973.  Section 2, as amended, provides that:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

"Section 2, unlike other federal legislation that prohibits racial discrimination, does not

require proof of discriminatory intent.  Instead, a plaintiff need show only that the challenged

action or requirement has a discriminatory effect on members of a protected group[.]"  *Moore v.

Detroit Sch. Reform Bd.*, 293 F.3d 352, 363 (6th Cir. 2002).  The Plaintiffs' § 2 theory is that SB

238's elimination of Golden Week and Directive 2014-17's lack of evening voting hours for the

2014 general election and lack of additional Sunday voting disproportionately impact African

American voters resulting in less opportunity to participate in the political process than other

voters.

The Voting Rights Act should be interpreted in "'a manner that provides the 'broadest

possible scope' in combating racial discrimination.'"  *Stewart*, 444 F.3d at 877 (quoting *Chisom*

*v. Roemer*, 501 U.S. 380, 403 (1991) (internal quotations omitted)).  "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."  *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).  Whether "the political processes are equally open depends upon a searching practical evaluation of the past and present reality."  *Gingles*, 478 U.S. at 78 (quotations and citations omitted).  Further, while the Defendants have sought to compare Ohio's voting scheme to those of other states, the evaluation of a § 2 claim "require[s] 'an intensely local appraisal of the design and impact' of the challenged electoral practice."  *Stewart*, 444 F.3d at 878 (quoting *Gingles*, 478 U.S. at 78 (internal quotations omitted)).

The Defendants and Amicus Curiae the Ohio General Assembly argue that it is improper under a § 2 analysis for the Court to compare the schedule for EIP voting imposed by SB 238 and Directive 2014-17 to the voting opportunities from previous elections.  According to the Defendants, such a comparison improperly grafts a § 5 "retrogression" analysis onto a § 2 claim.  However, in the Court's view, a comparison between past and current EIP voting days and hours is relevant to the totality of the circumstances inquiry that the Court must conduct and to the ultimate question of whether the voting rights of African Americans in Ohio have been abridged by SB 238 and Directive 2014-17.  As the Supreme Court has stated:

> The term "abridge[" ]—whose core meaning is 'shorten,' [ ]—necessarily entails a comparison.  It makes no sense to suggest that a voting practice "abridges" the right to vote without some baseline with which to compare the practice.  In § 5 preclearance proceedings—which uniquely deal only and specifically with *changes* in voting procedures—the baseline is the status quo that is proposed to be changed: If the change "abridges the right to vote" relative to the status quo, preclearance is denied, and the status quo (however discriminatory *it* may be) remains in effect. In § 2 or Fifteenth Amendment proceedings, by contrast, which involve not only changes but (much more commonly) the status quo itself, the comparison must be made with a hypothetical alternative: If the *status quo*

"results in [an] abridgement of the right to vote" or "abridge [s] [the right to vote]" relative to what the right to vote *ought to be,* the status quo itself must be changed.

*Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 333–34 (2000) (citation omitted).

In *Thornburg v. Gingles*, the Supreme Court cited the following factors relevant to § 2 claims:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>
> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
>
> 6. whether political campaigns have been characterized by overt or subtle racial appeals;
>
> 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
>
> 8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
>
> 9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36–37.   These factors had been identified by the Senate Judiciary Committee majority report accompanying the 1982 amendments to § 2.  *See* S. REP. NO. 97-417,

at 28–29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07.  The list of factors is "neither exclusive nor controlling."  *Wesley v. Collins*, 791 F.2d 1255, 1260 (6th Cir. 1986).  Regarding the ninth factor identified above, Senate Report also states:

> If the procedure markedly departs from past practices or from practices elsewhere in the jurisdiction, that bears on the fairness of its impact.  But even a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process.

S. REP. NO. 97-417, at 29 n.117, 1982 U.S.C.C.A.N. at 207.

The Court will now consider the evidence produced by the Plaintiffs to determine if they are likely to succeed in establishing that SB 238 and Directive 2014-17 interact with social and historical conditions to cause an inequality in the opportunities to vote afforded African-American voters in Ohio.

As described in detail in Part III.D.2.b *supra*, the report of Plaintiffs' expert, Professor Vincent Roscigno, examines Senate Factors 1, 2, 3, 5, 6, and 7.  Regarding the fifth factor, Roscigno discusses "stark and persistent racial inequalities . . . [in] work, housing, education and health" with roots "in both historical and contemporary discriminatory practices."  (Roscigno Report, Doc. 18-2 at 3.)  According to Roscigno, "[s]ubstantial bodies of social science research ... often conclud[e] that contemporary institutional practices and discrimination play a significant role [in causing these inequalities], especially when the disparities are as large as they are in Ohio." (Roscigno Report, Doc. 18-2 at 7.)  Further, racial occupational inequalities are linked to disparities in income, poverty status, residential and schooling options, and health status.  (Roscigno Report, Doc. 18-2 at 10.)  Job scheduling and flexibility have a direct impact on voting and its barriers, and other disparities affect cost calculations regarding voting and the barriers to voting.  (*Id.*)

Regarding factors one and three, Roscigno determined that Ohio did have a history of official voting-related discrimination against racial minorities and that more recent voting practices and procedures, such as poll watchers disparately targeting areas with higher minority populations, enhance the opportunity for discrimination against minority groups.  As to the second factor, he cites the polarized nature of recent elections in Ohio.  For the sixth factor, he provides several examples of subtle or direct racial appeals that have occurred in Ohio during recent elections.  Finally, for the seventh factor, he notes that African Americans are significantly underrepresented, "both historically and contemporarily, in the most important, visible and influential elected state posts."  (*Id.* at 38–39.)

The Court looks to the these and other factors in concluding that SB 238 and Directive 2014-17 interact with the historical and social conditions facing African Americans in Ohio to reduce the opportunity to participate in the political process relative to other groups of voters. Accordingly, the Plaintiffs have demonstrated a strong likelihood of success on the merits of their § 2 claim.

The Court has already determined that SB 238's reduction of the early-voting period will burden the voting rights of African Americans because they use EIP voting at higher rates than other groups of voters.  The elimination of Golden Week's same-day registration will also impact African Americans as the record and Professor Roscigno indicate that they tend to disproportionately make up the groups that benefit the most from same-day registration: the poor and the homeless.  Similarly, the Court has previously discussed how the limitation to only one Sunday of voting during the early-voting period burdens the voting rights of African Americans by arbitrarily limiting Souls to the Polls voting initiatives.  The lack of evening voting hours also burdens African Americans given that those of lower socio-economic standing tend to work

hourly jobs and can find it difficult to find time to vote during normal business hours.

The burdens created by SB 238 and Directive 2014-17 arise largely from the lower socio-economic standing of African Americans in Ohio, which, per the fifth factor, can be seen as resulting from past and current discrimination. The impact of fewer early-voting opportunities on the African American community was adequately summarized by Professor Roscigno as follows:

> 1) African Americans already have greater difficulty securing transportation and allowing enough time to travel to the one early voting site in the county. Current cutbacks will disproportionately exacerbate this difficulty by restricting the times that are available for them to make the trip and by decreasing the probability of carpooling options, since voting hour options have been increasingly restricted in the direction of "normal" working hours.
>
> 2) African Americans already have greater difficulty taking time off of work (usually unpaid) to vote, owing to occupational inequalities. The cutbacks will exacerbate that difficulty by eliminating evening hours and Sundays—times that were previously available if the voter was unable to take time off of work during the day.
>
> 3) African Americans are significantly more likely to be single parents and, owing to lower incomes and higher rates of poverty, experience a disparate burden in arranging for childcare in order to vote. The cutbacks exacerbate this difficulty by reducing flexibility and making it harder for such voters to perhaps find friends or relatives available to look after their children in times that are available and convenient to potential, alternative caregivers, such as evenings and Sundays.
>
> 4) Lastly, and layered on top of these impacts, patterns of work and residential inequality and discrimination have been shown to lead to a sense of powerlessness when it comes to political participation, efficacy and voice. That is, the inequalities about which I am speaking create a diminished sense of political efficacy and sense of possibility for poorer and minority voters.

(Roscigno Report, Doc. 18-2 at 19–20.)

The Court also considers the ninth factor identified by the Supreme Court to be particularly relevant to its determination that Plaintiffs have established a likely § 2 violation. In this regard, the Court noted in Part IV.A.1 *supra*, that the Defendants' offered justifications in support of SB 238 and Directive 2014-17 are relatively weak when subjected to careful

66

examination. As such, the policies underlying these measures can be described as tenuous at best. Further, both SB 238 and Directive 2014-17 depart markedly from past practices—SB 238 reduces the early-voting period by 20%, whereas Directive 2014-17 prevents individual counties from offering evening voting hours or additional Sunday voting hours during specified elections as they had previously done. These departures are especially significant given that Ohio EIP voting scheme was enacted in response to the issues encountered during the 2004 election.

The Defendants again point to the fact that a reduction in the overall period of voting does not necessarily mean that voter turnout will be reduced by SB 238 and Directive 2014-17. However, by its plain terms, § 2 is not necessarily about voter turnout but about opportunity to participate in the political process compared to other groups. Despite the fact that individual voters may simply choose to vote at other times during the current early-voting period, the socio-economic and other factors identified by the Plaintiffs coupled with the reductions to EIP voting caused by SB 238 and Directive 2014-17 result in fewer voting opportunities for African Americans than other groups of voters, as it will be more difficult for African Americans to vote during the days and hours currently scheduled than for members of other groups. Finally, for the same reasons discussed in Part IV.A.1 *supra*, the Court concludes that voting by mail does not eliminate or nullify the effects of SB 238 and Directive 2014-17 on the voting rights of African Americans.

In conclusion, the Plaintiffs have made the requisite connection required by § 2: African Americans in Ohio are more likely than other groups to utilize EIP voting in general and to rely on evening and Sunday voting hours. As such, given that Directive 2014-17 and SB 238 reduce the overall period for EIP voting, prohibit evening voting hours during the 2014 general election, and limit Sunday voting to a single day, the Court concludes that the Plaintiffs have

demonstrated a strong likelihood of establishing that the combined effects of SB 238 and Directive 2014-17 result in fewer *opportunities* for African Americans to participate in the electoral process.  Plaintiffs have accordingly established a strong likelihood of success as to the merits of their § 2 claim.

### B. Irreparable Injury

Having determined that the Plaintiffs have demonstrated a strong likelihood of success on the merits of their claims, the Court also finds that they will suffer irreparable injury in the absence of preliminary injunctive relief.  *See Obama for Am.*, 697 F.3d at 436 ("A restriction on the fundamental right to vote [ ] constitutes irreparable injury.")

### C. Harm to Third Parties

Regarding harm to third parties, there is some evidence in the record suggesting that the Boards have not budgeted resources to conduct a Golden Week during the 2014 general election season.  However, as stated in Part IV.A.1 *supra*, nothing in the record suggests that additional costs incurred will be unmanageable for the Boards.

### D. The Public Interest

The Court further finds that the public interest weighs in favor of a preliminary injunction.  *See Obama for Am.*, 697 F.3d at 437 ("The public interest [ ] favors permitting as many qualified voters to vote as possible.")

### E. Balance of Factors

The Court now must balance the appropriate factors to determine if preliminary injunctive relief is appropriate.  The Court has found that the Plaintiffs have demonstrated a strong likelihood of success on the merits of their claims.  "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the

merits often will be the determinative factor." *Obama for Am.*, 697 F.3d at 436.  The Court has further found that the Plaintiffs will be irreparably harmed absent injunctive relief, that the public interest supports such relief, and that the record does not show that third parties will be substantially harmed by such relief.  Accordingly, the Plaintiffs have met their high burden in establishing that they are entitled to a preliminary injunction.

## V.

### A. Scope of Injunctive Relief

The Court now considers the appropriate scope of the preliminary injunctive relief it will award to the Plaintiffs, who have requested that the Court order Husted "to set uniform and suitable in-person early-voting hours for all eligible voters that includes multiple Sundays and weekday evening hours."  (Doc. 17 at 61.)  Regarding the purposes of a preliminary injunction, the Sixth Circuit has stated that:

> The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. If often happens that this purpose is furthered by preservation of the status quo, but not always. If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.

*Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978) (internal citations omitted). Therefore, the Court orders the preliminary relief described below with the purpose of preventing irreparable injury, in the form of infringement to their fundamental right to vote, to the Plaintiffs. The Court is also mindful of striking a balance between preserving the discretion of state officials to manage Ohio's elections and remedying the likely violations of the Constitution and Voting Rights Act that the Plaintiffs have identified.

### B. Conclusion

Accordingly, for the reasons discussed above, the Court **GRANTS** Plaintiffs' Motion for a Preliminary Injunction (Doc. 17).  The Court **DECLARES**:

That SB 238's amendments to § 3509.01 of the Ohio Revised Code reducing the EIP voting period from 35 days before an election to the period beginning the day following the close of voter registration are unconstitutional and in violation of § 2 of the Voting Rights Act of 1965, and are accordingly unenforceable; and

That Defendant Secretary Husted's Directives 2014-06 and 2014-17 are likewise unconstitutional and violative of § 2 of the Voting Rights Act of 1965 to the extent that they do not include evening voting hours and additional Sunday voting hours during the EIP voting period for the 2014 general election.

**FURTHER**, this Court **HEREBY ORDERS:**

That the State of Ohio and the Secretary Husted are enjoined from enforcing and implementing SB 238's amendments to § 3509.01 of the Ohio Revised Code reducing the EIP voting period from 35 days before an election to the period beginning the day following the close of voter registration;

That, for purposes of the 2014 general election, the EIP voting period shall consist of the 35 days prior to the election as was the case subsequent to SB 238's enactment;

That, for the 2014 general election, Defendant Secretary Husted shall require all Ohio county Boards of Election to set uniform and suitable EIP voting hours, in addition to those currently established by Directive 2014-17, for the following days:

- Tuesday, September 30, 2014 through Friday, October 3, 2014;

- Monday, October 6, 2014;

- Evening voting hours[11] between Monday, October 20, 2014 and Friday, October, 24, 2014, and between Monday, October 27, 2014 and Friday, October 31, 2014. Provided, that in setting such hours, Husted must, in good faith, take into consideration the Court's findings and legal conclusions regarding the impact of a lack of evening voting hours on the protected classes of voters discussed in this Memorandum Opinion and Order; and

- Sunday, October 26, 2014; and

That Defendant Secretary Husted is enjoined from preventing individual county Boards of Election from adopting, by a majority vote of their members and in accordance with the procedures established by Ohio election law, EIP voting hours in addition to those specified above and in Directive 2014-17.

Further, all issues regarding and pertaining to future elections are deferred and reserved for consideration on the motion for a permanent injunction. In the interim, the Ohio General assembly is charged with the responsibility of passing legislation consistent with this Memorandum Opinion and Order. *McGhee v. Granville Cnty.*, N.C., 860 F.2d 110, 115 (5th Cir. 1988) (proper to give appropriate legislative body the first opportunity to devise an acceptable remedial plan). Finally, the Court will hold an in-person status conference on Wednesday, December 3, 2014 at 2 p.m.

**IT IS SO ORDERED.**

**/s/ Peter C. Economus**
**UNITED STATES DISTRICT JUDGE**

---

[11] As stated in Section III.A. *supra*, the Court defines evening voting hours as hours after 5 p m.